James Hochberg
Hawaii Bar No. 3686
JAMES HOCHBERG AAL, LLLC
700 Bishop Street, Suite 2100
Honolulu, HI  96813
Telephone: (808) 256-7382
jim@jameshochberglaw.com

John C. Sullivan*
S|L LAW PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX  75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

Aaron Siri*
Walker Moller*
Laura Carroll*
SIRI | GLIMSTAD
700 S. Flower Street, Suite 1000
Los Angeles, CA  90017
Telephone: (213) 376-3739
aaron@sirillp.com
wmoller@sirillp.com
lcarroll@sirillp.com

Counsel for Plaintiffs and Proposed
   Class

* *Pro hac vice* motion forthcoming

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RIKI O'HAILPIN, NINA ARIZUMI, ROBERT ESPINOSA, ERWIN YOUNG, PUANANI BADIANG, SABRINA FRANKS, RONALD LUM, DAN SAIKI, and BRANDEE AUKAI<br><br>on their own behalf and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br><br>v.<br><br>HAWAIIAN AIRLINES, INC., and HAWAIIAN HOLDINGS, INC.<br><br>*Defendants*. | Civil No.: _____<br>CLASS ACTION COMPLAINT and EXHIBITS<br><br>Jury Trial Demanded |

**CLASS ACTION COMPLAINT**

1.      Plaintiffs Riki O'Hailpin, Nina Arizumi, Robert Espinosa, Erwin Young, Puanani Badiang, Sabrina Franks, Ronald Lum, Dan Saiki, and Brandee Aukai (collectively, "**Plaintiffs**"), on behalf of themselves and all others similarly situated, complain as follows against Defendants Hawaiian Airlines, Inc. and Hawaiian Holdings, Inc. (collectively, "**Hawaiian**").

2.      This is a class action brought to remedy Hawaiian's pattern of discrimination against employees who requested religious and/or medical accommodations from Hawaiian's mandate that its employees receive one of the COVID-19 vaccines.

3.      Rather than complying with its obligations under Title VII of the Civil Rights Act of 1964 ("**Title VII**") and the Americans with Disabilities Act ("**ADA**"), Hawaiian responded by issuing blanket denials of requests for accommodation, often failing entirely to address what the employee had stated in their request.  Moreover, throughout the process Hawaiian issued conflicting statements about how it viewed certain religious beliefs.  The one constant was that Hawaiian chose to deny virtually every request for an accommodation without a justifiable reason to do so.

4.      Hawaiian's virtual 100% denial rate shows a system designed to result in the denial of legally required protections.  In other words, it was rigged against employees entitled to accommodations from the mandate.  It aligned, however, with

Hawaiian CEO Peter Ingram's boast that he expected to have an "active workforce that [wa]s 100% vaccinated."  Hawaii News Now, *As Hawaiian Airlines vaccine deadline looms, industry insiders worry about job losses* (Jan. 4, 2022) https://www.hawaiinewsnow.com/2022/01/05/hawaiian-airlines-vaccine-deadline-looms-industry-insiders-worry-about-job-losses/.  A 100% vaccination rate, however, could only be achieved by violating the federal laws that require employers to accommodate certain classes of employees.

5.     Per U.S. Equal Employment Opportunity Commission ("**EEOC**") Guidance, because a variety of other accommodation options were available that would not have caused an undue hardship, Hawaiian's decision to place exempted employees on unpaid leave (or terminate them) was not a reasonable accommodation, and provides strong evidence of the company's discriminatory intent.  "What You Should Know About COVID-19 and . . . Other EEO Laws," EEOC (May 28, 2021), *available at* https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L   ("EEOC, What You Should Know").

6.     To be sure, the company claimed a "safety" rationale that supposedly could not be set aside because of the hardship it could cause Hawaiian.  Not only could Hawaiian not *demonstrate* undue hardship, this claim was pretextual and has been refuted by Hawaiian's own statements.

7.    *First*, in prior litigation over the lack of accommodations, Hawaiian conceded that COVID testing could have resolved the safety aspect of the mandate.[1] While the company still tried to hide behind a false claim that testing was an "undue hardship" for the company, Hawaiian's claim was based on a fake testing program (a program using expired tests) that the company never intended to be an accommodation that would last more than two months.  Hawaiian cannot now use the fact that it *temporarily* deployed a *flawed* testing program to prove that an actual testing accommodation was unreasonable (especially when Plaintiffs would have paid for their own testing).

8.    *Second*, two months into the forced vaccination regime, Hawaiian's Chief Operating Officer Jon Snook and Hawaiian's Senior Vice President of Human Resources Robin Kobayashi were caught on video (after they thought a company webcast had been closed) admitting that unvaccinated employees could be brought back but that the company did not want to let people know too quickly.  After all, telling those suffering without pay that there was hope for them to return soon would undermine Hawaiian's coercion efforts.

---

[1] *See* Exhibit 1, *O'Hailpin, et al. v. Hawaiian Airlines, Inc., et al.*, Civil No. 22-00007 JAO-KJM, Hearing Transcript (Feb. 1, 2022), at 24.

9. But even if Hawaiian's real goal had truly been safety—and, to be sure, no one ever doubted the seriousness of the pandemic—the company was still obligated to follow Title VII and the ADA.

10. Discriminating against employees entitled to an exemption under Title VII or the ADA is improper (and unlawful) when the costs of accommodating them safely is nothing more than a *de minimus* burden, at most. As seen with countless companies across the Nation—***including every major airline***—reasonable (free) accommodations were readily available to Hawaiian and could have been implemented without undue hardship. Under federal law, then, Hawaiian did not have a choice on whether to accommodate its employees.

11. Because forced vaccinations did not prevent employees from spreading COVID-19 and unvaccinated employees who did not have the virus certainly could not spread it, Hawaiian was correct to concede that testing alleviated safety concerns—it was the safest option. The company was not prepared, however, to address the fact that Plaintiffs would have paid for their own testing or arranged for testing through the State of Hawaii's free testing program (that Hawaiian itself sponsored). This would have made testing a zero-cost option for Hawaiian—and the EEOC has already warned that "administrative costs" associated with an accommodation do not rise above the de minimus threshold necessary for a company to avoid providing the accommodation.

12.     Alternatively, or in addition to testing, Hawaiian could have recognized natural immunity as satisfying its inoculation requirement.  Notably, Hawaiian has to date altogether avoided any discussion of natural immunity, likely because there is no good answer for why the company refused to consider it as satisfying its compulsory immunization policy.  Providing accommodations based on previous infections would have been in line with the CDC's recognition that a prior COVID-19 infection provides protection superior to a vaccine alone.  CDC, *COVID-19 Cases and Hospitalizations by COVID-19 Diagnosis—California and New York, May–November 2021* ("**CDC Report**"), https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm?s_cid=mm7104e1_w (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").  That means unvaccinated individuals with a previous COVID-19 infection unquestionably have a greater immunity to the virus than those previously vaccinated but who have not gotten booster shots.  Natural immunity has been observed through hundreds of years of scientific research and has been universally accepted as at least equivalent to immunity derived from vaccination. This should be unsurprising given that vaccine-based immunization is but an artificial attempt to emulate the mechanisms of natural immunity.  Further, Hawaiian did not even claim vaccine-induced immunity is superior to natural immunity.  But

while Plaintiffs have contracted and recovered from COVID-19, that immunity was never even considered by the company in connection with its vaccination mandate.

13.     Hawaiian's insistence on requiring an immunization method that would realistically endanger its employees' health or cause them to violate their beliefs— when a no-cost and very effective alternative was available—gives rise to a strong inference of discriminatory intent.  This is especially true when the company was *publicly* presented with this information from the CDC in January 2022, but instead of considering it as an alternative to vaccination continued to put people out of work. Tellingly, the CDC never terminated any unvaccinated employee and stopped requiring the vaccine or even asking employees their COVID-19 vaccination status as of January 24, 2022.[2]

14.     Alternatively, or in addition to testing and recognition of natural immunity, Hawaiian could have asked unvaccinated employees to wear masks.  This measure had already been implemented by Hawaiian as employees had previously been required to wear masks at times during the pandemic before vaccines became available, and were told by Hawaiian that they were working "safely" by doing so. Such an accommodation would be especially sensible for flight crews since it is already virtually impossible to catch COVID-19 on an airplane because of the air filtration systems.  Tellingly, Hawaiian gave that option to unvaccinated employees

---

[2] *See* Exhibit 2, FOIA Request to CDC (Dec. 2, 2022).

from other airlines that Hawaiian voluntarily allowed to ride its aircraft. If Hawaiian can make an accommodation for jumpseaters, Hawaiian must make an accommodation for employees exempt under Title VII and the ADA, and easily could have without undue hardship.

15.   Wearing masks would also have aligned with how the vaccine manufacturer Janssen (J&J) accommodated exempt employees. Even though Janssen employees were traveling to doctors' offices on a daily basis—coming into contact with patients and office staff alike—those employees entitled to an accommodation (including the spouse of a named Plaintiff here) were allowed to wear masks and only required to test for COVID if they showed symptoms. The reasonable accommodation process at Janssen was straightforward as well, requiring only a statement indicating the sincerely held religious belief at issue and not intruding into employees' personal lives any further.[3]

16.   After the pandemic subsided due to the Omicron variant—a variant that infected and kept a substantial portion of Hawaiian's "100% vaccinated" workforce out during the very month Hawaiian began terminating exempt employees—the company still refused to bring those exempt employees back to work. It was apparent by then that vaccine efficacy significantly wanes over time and it was known that the odds of an infection for individuals only vaccinated with a primary

---

[3] *See* Exhibit 3, Declaration of Donn Arizumi.

series were 13 times greater than for individuals with natural immunity.  Sivan Gazit, *et al.*, *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, MEDRXIV [preprint] (Aug. 25, 2021), https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.   Thus, those vaccinated prior to Hawaiian's mandate—who were not made to get booster shots— may have been *more* likely than unvaccinated individuals to contract and transmit COVID-19.

17.    All this shows that Hawaiian could have accommodated unvaccinated employees but simply determined (for whatever reason) that the company would not do so.  Instead, Hawaiian sought to impose onto Plaintiffs the choice of either taking the COVID-19 vaccine—at the expense of their religious beliefs and/or their health—or losing their livelihoods.  That decision haunted not just the Plaintiffs but others similarly situated who were forced into an impossible choice between their jobs and their health and/or faith, and were made to consider daily if they were doing the right thing or should just take the vaccine to provide for their families (also a religious belief).

18.    Not only was such a situation avoidable, it was not what Hawaiian promised when it first introduced the mandate in August 2021.  The company said at that time there would be reasonable accommodations for those unable to take the vaccine.  When the time came to honor such requests, though, Hawaiian received

more requests than it had realized it would and instead began either denying the requests without regard to their content or inventing other ways in which it could forgo reasonable accommodations.  As it turned out, the company was determined to coerce vaccinations and looked for any conceivable excuse it could to deny accommodation requests.

19.    And finally, as further proof of the company's retaliation toward those who could not take the vaccine, Hawaiian refused to bring employees back—even when (i) it became apparent that the vaccines were not preventing COVID-19 breakouts in the company; or when (ii) the pandemic was recognized as being meaningfully over in early 2022; or even when (iii) the CDC's "COVID-19 prevention recommendations no longer differentiate[d] based on a person's vaccination status."  CDC, *Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems – United States, August 2022*, https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm?s_cid=mm7133e1_w.   The fact that the company inexplicably maintained its discriminatory, anti-science policy until November 2022 only underscores the pretext of Hawaiian's safety rationale.

20.    Through its actions, Hawaiian has violated federal law by failing to engage in the interactive process, failing to provide reasonable accommodations that

would have caused no hardship whatsoever, and by retaliating against employees who engaged in protected activity.

## PARTIES

### A.    Plaintiffs

21.    Plaintiff Riki O'Hailpin is a Flight Attendant with Hawaiian based out of Honolulu.  Ms. O'Hailpin requested a religious accommodation from Hawaiian's vaccine mandate, but Hawaiian denied that request, calling her sincere religious beliefs merely a "personal preference."  Ms. O'Hailpin also requested a medical accommodation based on her doctors' recommendations that she not get the vaccine due to her antiphospholipid syndrome that affects her reproductive system. *Hawaiian*, however, made the medical determination that Ms. O'Hailpin's condition did not require an exemption from the COVID-19 vaccine mandate and denied that request as well.  Hawaiian's actions forced her into an unwanted, unpaid leave lasting from January until November 2022—nearly ten months without pay and benefits.

22.    Plaintiff Nina Arizumi was a Flight Attendant with Hawaiian based out of Honolulu.  Ms. Arizumi requested a religious accommodation from Hawaiian's vaccine mandate, but Hawaiian denied that request, calling her sincere religious beliefs (a sect of Shintoism) merely a "personal preference" (even though the company did not actually evaluate her beliefs, as shown by the company's

misstatements about what those beliefs even were).  Ms. Arizumi also requested a medical accommodation based on her doctor's recommendation that she not get the vaccine because of her mitral valve prolapse.  Again, *Hawaiian* made the medical determination that Ms. Arizumi's condition did not require an exemption from the COVID-19 vaccine mandate and denied that request as well.  Hawaiian terminated Ms. Arizumi when she was unwilling to accept the company's unreasonable "accommodation" of unpaid leave that indicated she would have to be vaccinated upon returning anyway (a requirement later undone by Hawaiian).

23.    Plaintiff Robert Espinosa is a First Officer with Hawaiian based out of Honolulu and a teaching pastor at his local church in Makakilo.  Mr. Espinosa requested a religious exemption from the mandate because of his sincerely held religious beliefs about the sanctity of human life that conflict with the vaccines' undisputed connections to stem cell lines from aborted fetuses.  Evidently failing to read his submission, Hawaiian denied Mr. Espinosa's exemption because it was— in Hawaiian's words—just a "personal preference . . . couched against the context of [his] religious beliefs [and was] not a sincere religious objection in actual conflict with [Hawaiian's] vaccine requirement."  Hawaiian's actions forced Mr. Espinosa into unpaid leave for more than nine months.

24.    Plaintiff Erwin Young was a Lead Aircraft Technician with Hawaiian at the Daniel K. Inouye International Airport in Honolulu.  Mr. Young requested a

religious accommodation from Hawaiian's vaccine mandate based on a straightforward statement that his body is the temple of the Holy Spirit and that he could not contaminate it with the vaccine. After interviewing Mr. Young only to see if he could be dissuaded from his sincerely held religious beliefs, Hawaiian responded to his request with a denial based on alleged "undue hardship." While the company acknowledged Mr. Young's beliefs, Hawaiian claimed that it could not safely accommodate him in any way—even though he worked safely during the pandemic for almost two years wearing a mask and following other company guidelines. Hawaiian terminated Mr. Young when he would not agree to unpaid leave as a reasonable "accommodation."

25.   Plaintiff Puanani Badiang was a Management Instructor for the Corporate Offices of Hawaiian in Honolulu. Ms. Badiang requested an accommodation from Hawaiian's vaccine mandate based on her sincerely held religious beliefs related to the vaccines' connections to abortions. Ms. Badiang was interviewed by representatives of Hawaiian to see what others at her church (including her pastor) thought about the vaccine and to see if she could be talked out of her religious beliefs. When she attempted to raise possible accommodations in an effort to engage the interactive process, she was told that it was not up to the interviewers and that they could not provide her with any solutions. Hawaiian denied Ms. Badiang's request based on alleged "undue hardship." While the

company acknowledged her sincere religious beliefs, it claimed that she could not be safely accommodated in any way—even though she could work and teach classes remotely and even though she implemented increased safety measures (including social distancing) for her in-person classes before it was required by the company. Because she is the only Plaintiff who was not part of a union, Hawaiian never offered her the option of unpaid leave and she was forced to take early retirement in January 2022 to preserve some of her benefits.

26.     Plaintiff Sabrina Franks was a Customer Service Agent for Hawaiian at the Daniel K. Inouye International Airport in Honolulu.  Ms. Franks requested a religious accommodation from Hawaiian's vaccine mandate based on her desire to honor God's direction against taking it.  Hawaiian denied that request based on alleged "undue hardship."   The company acknowledged Ms. Franks' sincere religious belief but claimed that she could not be safely accommodated in any way. This was supposedly the case even though Ms. Franks previously worked during the pandemic in the Hawaiian lounges—behind plexiglass while wearing a mask, face shield, and gloves—where her only interaction with others consisted of checking credentials and swiping membership cards for lounge entry using a small opening in the plexiglass.  Hawaiian terminated her employment when she would not accept the unreasonable "accommodation" of unpaid leave.

27.     Plaintiff Ronald Lum was a Captain with Hawaiian based out of Honolulu.  Mr. Lum requested a religious accommodation centered on the belief that his body is a temple of the Holy Spirit and that, given specific Scriptural commands found in the Bible, it should not be altered with an unwanted intrusion.  To deny that request, Hawaiian combined both the personal preference rationale and the undue hardship excuse.  Mr. Lum also submitted a request for a medical accommodation based on his doctor's recommendation that he not get the vaccine because of his coronary artery disease and the unnecessary risk of cardiac inflammation that the vaccine would cause.  As with others seeking accommodations for disabilities, though, *Hawaiian* made the medical determination that his condition did not require an exemption from the COVID-19 vaccine mandate and denied that request as well. Mr. Lum was placed on unpaid leave until August 2022, at which time he was forced into retirement by Federal Aviation Administration ("**FAA**") rules, denying him the ability to end his flying career with a prestigious final flight.

28.     Plaintiff Dan Saiki was a Captain with Hawaiian based out of Honolulu. Mr. Saiki requested a religious accommodation as part of his belief system as a member of the Church of Jesus Christ of Latter-Day Saints whose family does not take any vaccines.  In denying his request, Hawaiian claimed that his sincerely held religious belief was just a personal preference and that it would be an undue hardship to allow him not to take the COVID vaccine.  Unable to be without his medical

benefits, Mr. Saiki was forced to take early retirement from Hawaiian in December 2021.

29.     Plaintiff Brandee Aukai is a Flight Attendant with Hawaiian based out of Honolulu.   Ms. Aukai requested a religious accommodation from Hawaiian's vaccine mandate, explaining her sincere religious belief that the vaccines were offensive due to their ties to stem cell lines from aborted fetuses; she included a letter from her church supporting that view.   Hawaiian denied Ms. Aukai's request, though, disparaging her religious beliefs as merely a "personal lifestyle choice."  As a single mother supporting four children, she could not afford the company's punishment for having sincerely held religious beliefs.  Ms. Aukai was coerced into taking the vaccine in December 2021 to continue providing for her family.

## B.     Defendants

30.     Defendant Hawaiian Airlines, Inc. is a Delaware corporation with its principal place of business in Honolulu, Hawaii.  The airline's main hub is the Daniel K. Inouye International Airport on the island of O'ahu and the company maintains a large workforce there.  Hawaiian's headquarters are also located within this judicial district.

31.     Hawaiian Holdings, Inc. is a Delaware corporation and the parent company of Hawaiian Airlines, Inc.

## JURISDICTION AND VENUE

32.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5(f)(3).

33.     Plaintiffs' claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202.

34.     Class certification will be requested pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b).

35.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Hawaiian resides in this District and because a substantial part of the events complained of herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.     The COVID-19 Pandemic and Response**

36.     By Spring 2020, the novel coronavirus SARS-CoV-2, which can cause the disease COVID-19, spread rapidly around the world.

37.     Around this same time, Hawaiian began implementing certain mitigation procedures for its workforce, including several of the following requirements for its employees: wear Hawaiian-issued masks, gloves, and for some, eye protection; maintain distance from others; and participate in temperature checks. Hawaiian also began increasing the cleaning regimens of its aircraft—spraying

cabins with an anti-viral spray between flights—and upgraded its HEPA filters to prevent the spread of COVID-19.

38.     Over the past two years, at least four separate COVID-19 vaccines have been developed and authorized or licensed for use in the United States.  The Food and Drug Administration ("**FDA**") issued an Emergency Use Authorization ("**EUA**") for the Pfizer-BioNTech vaccine on December 1, 2020.  One week later, the FDA issued a second EUA for the Moderna COVID-19 vaccine.  The FDA issued an EUA for the Johnson & Johnson ("**Janssen**") COVID-19 vaccine on February 27, 2021.  And most recently, the FDA issued an EUA for the Novavax COVID-19 vaccine on July 13, 2022.  The Pfizer-BioNTech vaccine received FDA approval for use in a slightly altered form on August 23, 2021, and is said to be produced as Comirnaty—a form legally distinct from the EUA version.  The Moderna vaccine, Spikevax, has also since received FDA approval.  Those vaccines were created to combat the initial variants of COVID-19.

39.     Subsequent to the development of the vaccines, the Delta and Omicron variants of COVID-19 spread around the world.  In light of those variants, the accompanying increases in transmissibility of the virus, and the significant waning of the vaccines' efficacy, the FDA began recommending booster shots in addition to the initial vaccine regimens proposed.

40.     Studies have shown that the COVID-19 vaccines forced on Hawaiian employees wane significantly over time.  Not only has this been confirmed by the CDC, *see* CDC Report, one study showed Pfizer and Moderna efficacy dropping from 6% effectiveness against the Omicron variant in the first two months to -39% at 4 months and -42% at 6 months.  Sarah A. Buchan, *et al.*, *Effectiveness of COVID-19 vaccines against Omicron or Delta infection*, MEDRXIV [preprint] (Jan. 1, 2022),  https://www.medrxiv.org/content/10.1101/2021.12.30.21268565v1  (Table 2).  Another study showed a -76.5% efficacy for Pfizer and a -39.3% efficacy for Moderna against the Omicron variant.  Christian Holm Hansen, *et al.*, *Vaccine effectiveness against SARS-CoV-2 infection with the Omicron or Delta variants following a two-dose or booster BNT 162b2 or mRNA-1273 vaccination series: A Danish cohort study*, MEDRXIV [preprint] (Dec. 23, 2021), https://www.medrxiv.org/content/10.1101/2021.12.20.21267966v3          (Table). Omicron    booster    shots    have    recently    been    introduced. https://www.yalemedicine.org/news/omicron-booster-covid-19.

41.     To be "Up to Date" or current with COVID-19 vaccinations, an individual must have received "all doses in the primary series and all boosters recommended for you." *Stay Up to Date with Your COVID-19 Vaccines*, CDC (July 19,    2022),    https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html?s_cid=11305:%2BModerna%20%2B%20%2Bcovid%20%2Bvaccine:se

m.b:p:RG:GM:gen:PTN:FY21#footnote02.    For adults, this has been a two-shot regimen of the Pfizer or Moderna vaccine or a one-shot dosage of the Janssen or Novavax vaccine, followed by a first booster after the primary series and—for adults over 50 years old—a second booster at least 4 months after the first booster.  The "bivalent" booster shots targeting the Omicron variant became available on September 2, 2022 for individuals over 12 years of age.  Prior to that time, only "monovalent" boosters—those "designed to protect against the original virus that causes COVID-19"—were available for Hawaiian employees.  *Id.*[4]

42.    All Hawaiian employees not terminated or forced into unpaid leave because of the company's mandate were vaccinated with either the Pfizer, Moderna, or Janssen vaccine.  At the time Plaintiffs were forced out of work, some of those vaccinated individuals at the company had not received a COVID-19 vaccine in almost a year.  Additionally, booster shots were not required by Hawaiian, despite the CDC's strong recommendation that individuals take boosters in most circumstances.

---

[4] The newer Novavax vaccine has a two-dose initial regime and a monovalent booster that just became available under certain circumstances.  It was not approved for use during the implementation of Hawaiian's vaccine mandate and was just recently approved for use by pilots.  *See* Federal Aviation Administration, FAQs on Use of COVID-19 Vaccines by Pilots and Air Traffic Controllers (Oct. 26, 2022), https://www.faa.gov/coronavirus/guidance_resources/vaccine_faq.

**B.  Hawaiian's Vaccine Mandate**

43.   On August 9, 2021, Hawaiian CEO Peter Ingram announced that all employees would be required to receive a COVID-19 vaccine.   At *that* time, he assured employees that exemptions would be allowed for religious or medical reasons and to contact the Leave Management office.

44.   On September 1, 2021, Mr. Ingram informed employees that there was still no official policy in place, but that reasonable accommodation forms were available online and would be due October 1, 2021.

45.   On September 17, 2021, Hawaiian published its vaccination policy.   All employees would have to be vaccinated by January 30, 2022, or face termination. During that month, it became known throughout the company that Hawaiian intended to terminate employees who did not receive the vaccine, regardless of their request for a religious or medical accommodation.

46.   Hawaiian's mandate was absolute—there was no alternative for periodic testing, mask wearing, or social distancing, even for employees who already had COVID-19 and still enjoyed immunity from the disease.   Employees were forced to choose vaccination or termination.

47.   Alternatively, unvaccinated employees were given the option to be placed on a one-year involuntary leave of absence and then terminated at the end of

that period.  All pay, health, and flight benefits would also be suspended during the leave of absence.  The involuntary leave was not available to non-union workgroups.

48.     Hawaiian also said that it would offer a "testing" option during the months of November, December, and January for those who did not want to take the vaccination but would like more time to consider their decision.

49.     Hawaiian stated from the beginning that the testing option would only be temporary.

50.     This absolute vaccine-or-termination program differed substantially from every other major airline carrier.  Delta Airlines, for example, allowed any employee who did not wish to be vaccinated to test once a week at home and provide Delta with a notice that they are negative for COVID-19—an exemption was not even required.  Similarly, American Airlines and Southwest Airlines—after initially stating they would have a vaccination or termination policy—revised their policies to make clear that they would not be firing any employee who refused to get a vaccine.  Those employees continued to work with required masking and testing measures in place.

51.     Even United Airlines determined (albeit after being sued) that most of its employees with religious or medical exemptions could easily be accommodated with masks and self-testing.  After a setback in federal court, United determined (in

22

March 2022) that it could also accommodate unvaccinated pilots and flight attendants after all.

52.     Hawaiian's policy also differed substantially from the European Union's digital COVID-19 certificate, which considers the following as equivalent: (1) a COVID-19 vaccine; (2) a negative COVID-19 test; or (3) having previously recovered from COVID-19.  *See EU Digital COVID Certificate*, EUROPEAN COMMISSION,   https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/safe-covid-19-vaccines-europeans/eu-digital-covid-certificate_en.

53.     Finally, while Hawaiian's policy was in line with the "federal contractor mandate" that requires companies doing business with the United States government to require vaccination for its employees, that mandate was stayed and it provides—as it must under federal law—religious and medical exemptions. Hawaiian was not entitled to provide less protection to its employees than the regulation it used to partially justify its policy.  Hawaiian's policy was also out of step with the federal government's OSHA regulations that required vaccines *or* testing for employees of large companies like Hawaiian.

54.     When Hawaiian announced its policy, the company allowed employees to request accommodations for religious and/or health reasons.  This is in line with federal law and EEOC guidance on private employers issuing such mandates.  *See infra* EEOC, What You Should Know, §§ K.1 & K.2.

55.    According to Hawaiian, its vaccination mandate was aimed at increased safety.   As stated in each of its form letters denying religious and medical exemptions, Hawaiian "believe[d] that it [wa]s [the company's] responsibility to mālama our 'ohana and community by requiring our team to be vaccinated."

56.    Yet Hawaiian did not require any passenger flying on its planes, or interacting with its staff, to be vaccinated—the same was true of its vendors.   Nor did the mandate apply to pilots from other airlines allowed to ride in the "jumpseat" of the aircraft (in the cockpit) with Hawaiian flight officers.   And tellingly, Hawaiian stopped ensuring the "deep" cleaning of aircraft after each flight as it had previously during the pandemic months before instituting its vaccine edict.   Safety was apparently a flexible concept.

57.    To be sure, though, allowing unvaccinated individuals to fly on Hawaiian planes was not a safety problem.   The statistics known at the time showed that one's odds of catching COVID-19 on an airplane were virtually zero—with or without a vaccine.   Hawaiian was not wrong from a safety standpoint to let unvaccinated passengers fly—only wrong to stop its unvaccinated employees from doing so.

58.    In addition to ignoring the science related to aircraft, Hawaiian also ignored the science behind the vaccinations and their inability to stop COVID-19 transmission.   The CDC stated in August 2021 that COVID-19 vaccines work "with

regard to severe illness and death—they prevent it.  But what they can't do anymore is prevent transmission."  Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021).

59.     And while that fact had been known (or should have been known) for several months to any company mandating a medical treatment, the rise of the Omicron variant of COVID-19 in December 2021 and January 2022 confirmed that COVID-19 had become even more transmissible without regard to whether someone is vaccinated or not.  Unfortunately, COVID-19 vaccines were not the "silver bullet" to mālama (protect) one's 'Ohana (family).  That was because vaccines—unlike masks and testing—did not increase safety in the workplace.  While Hawaiian insisted in its form denial letters that the "widespread medical consensus" is that "vaccination against COVID-19 is *absolutely* necessary" for safety in the workplace, that claim could not withstand even a gentle breeze.

60.     That is why the CDC had recommended for the seven months leading up to Hawaiian's mandate that "air carriers consider implementing routine testing of crewmembers to minimize the likelihood of crewmembers working on aircraft while . . . infected with SARS-CoV-2."  Safety Alert for Operators (SAFO) 20009, U.S. Dep't of Transp., Fed. Aviation Admin. (May 25, 2021) (recognizing need for even fully vaccinated air travelers to be tested when traveling to the United States from a foreign country).  According to the CDC, testing was the key to safety at the time.

61.     It is also noteworthy that the CDC itself never had an absolute vaccination policy in place and terminated no unvaccinated employees, even ones without medical or religious reasons not to take the vaccine.  In fact, by the time Hawaiian followed through with terminations of unvaccinated employees, the CDC had already stopped asking employees for their vaccination status altogether.[5]

62.     If safety was the goal, testing—not vaccines—was how you mālama your 'Ohana.

**C.     Federal law prohibiting religious and disability discrimination and retaliation**

63.     Title VII prohibits Hawaiian from discriminating against employees based on their religion.  This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

64.     In other words, it is "unlawful 'for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.'"  *Opuku-Boateng v. State of Cal.,* 95 F.3d 1461, 1467 (9th Cir. 1996) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977)).

---

[5] *See* Exhibit 2.

65.    Title VII also prohibits Hawaiian from retaliating against an employee for engaging in protected activity.  *See Pardi v. Kaiser Foundation Hospitals,* 389 F.3d 840, 850 (9th Cir. 2004).

66.    Similarly, under the ADA, Hawaiian may not "discriminate against a qualified individual on the basis of disability."  *Humphrey v. Memorial Hospitals Ass'n*, 238 F.3d 1128, 1133 (9th Cir. 2001).

67.    Such discrimination "includes an employer's '*not making reasonable accommodations* to the known physical or mental limitations of an otherwise qualified . . . employee, *unless* [the employer] can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.'"  *EEOC v. UPS Supply Chain Solutions,* 620 F.3d 1103, 1110 (9th Cir. 2010) (quoting *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 396 (2002)).

68.    "To determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(o)(3).  The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  *Id.* Accordingly, "[t]he interactive process requires communication and good-faith exploration of possible accommodations." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391

(2002).  Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith.  *Id.* at 1116.  When a party obstructs the process or otherwise fails to participate in good faith, "courts should attempt to isolate the cause of the breakdown and then assign responsibility."  *Bultemeyer v. Ft. Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996).

69.    Additionally, the ADA makes it unlawful to retaliate against an employee for seeking an accommodation.  *See* 42 U.S.C. § 12203(a).

70.    Contrary to Hawaiian's belief, these statutes are applicable at all times, *especially* during a pandemic situation where employees with disabilities and employees who hold sincerely held religious beliefs are particularly vulnerable to employment discrimination.

71.    Indeed, while upholding the federal government's Medicare and Medicaid COVID-19 vaccine mandate, the Supreme Court was careful to point out multiple times that the agency rule allowed exemptions for religious and medical reasons.  *Biden v. Missouri*, 142 S. Ct. 647, 650–51 (2022).

72.    Thus, even frontline healthcare workers at medical facilities were entitled to continue working if they "[could not] be vaccinated or tested because of an ADA disability, medical condition, or sincerely held religious belief."  *Medicare & Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination*, § 5—

Vaccine Exemptions, 86 Fed. Reg. 61555, 61572, 2021 WL 5130520 (Nov. 5, 2021); *see id.* ("Employers must also follow Federal laws protecting employees from retaliation for requesting an exemption on account of religious belief or disability status."). Hawaiian was not entitled to provide less protection for its employees.

### D.   Hawaiian's reasonable accommodation process

73.   For employees seeking reasonable accommodations from the COVID-19 vaccine requirement, Hawaiian offered standard forms that could be completed and returned to the HR Department. There were separate forms for religious requests and medical requests.

74.   The religious form consisted of two areas where the company sought information: (1) the employee's religious beliefs, observances, and practices, including information about when they embraced those beliefs and examples of when, where, and how they have adhered to them; and (2) how the employee's religious beliefs, practices, or observances conflict with receiving the COVID-19 vaccination.

75.   The medical form asked for three things: (1) the functions of the employee's job that they had problems performing; (2) why they had problems performing those functions; and (3) any proposed accommodation that would enable them to perform those functions. This was especially confusing since employees were seeking medical exemptions from the *vaccine* requirement, not a *job*

requirement—as the employees had already been performing the essential functions of their jobs, they did not need an accommodation from any essential functions of the job.

76.   Employees were asked to submit these forms by October 1, 2021.

**E.    Hawaiian's initial response to accommodation requests**

77.   The initial wave of denials were issued in mid-October 2021, approximately two weeks after the deadline for submissions.  The primary response from Hawaiian was that religious requests were being denied because the employee's

> generalized belief that your body is a temple does not explain why you are sincerely and religiously opposed to receiving the COVID-19 vaccine per se and relies to at least some extent on medical opinions at odds with the scientific consensus.  This indicates that your belief is premised on the distinction you have made between vaccinations you consider medically necessary and those you do not.  This is a personal preference and not a generally applicable religious opposition.[6]

78.   This same response was given to virtually everyone denied at that time, even those who did not reference their body as a temple and those who provided extensive religious explanations (beyond their body being a temple) for why they could not take the vaccine.

---

[6] *See, e.g.*, Exhibit 4, Denial of Request for Religious Accommodation of Riki O'Hailpin.

79.    The canned denial letters ended with the especially offensive summary: "While your personal preference is couched against the context of your religious beliefs it itself is not a sincere religious objection in actual conflict with our vaccine requirement.  We have therefore denied your request."

80.    Although the EEOC instructs employers to assume that religious beliefs are sincere, Hawaiian did not follow that rule.  EEOC Guidance Section 12: Religious Discrimination, Part A.3, https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination.  Hawaiian likewise ignored the Supreme Court's (and multiple courts of appeals') direction for determining whether a belief is "religious" in nature.  The Court has cautioned that a bona fide "religious belief" need only be one that is "in [the believer's] own scheme of things, religious."  *United States v. Seeger*, 380 U.S. 163, 185 (1965).

81.    Hawaiian's denials at that time were not actually based on the substance of the requests, though.  As seen with Plaintiffs here, Hawaiian did not engage with the actual requests but relied instead on a generic (and unlawful and inapplicable) response for denial letters to employees.

82.    The generic, form denials at this time were also issued without any interactive process taking place.  Employees were not asked questions about their beliefs and, almost without exception, were not even asked to clarify anything.  As

seen with Plaintiffs here, Hawaiian assumed insincerity on the part of the requesters and did so without even asking them any questions or understanding their beliefs.

83.    The denied employees were told they must either enroll in the temporary testing program that Hawaiian had planned to run during November, December, and January, or that they would be terminated on November 1, 2021.

84.    The testing option had been set to expire on January 30, 2022, after which any unvaccinated employee could choose termination or a one-year leave of absence followed by termination if still unvaccinated.  The implementation of the "federal contractor mandate" in the meantime led Hawaiian to indicate that the testing program would end on December 8, 2021—the date the federal mandate was to take effect.

85.    On information and belief, around 70 religious requests were denied immediately, based on fabricated claims of insincerity because Hawaiian had not yet established its undue hardship alibi.  The decision was predetermined by a company policy seeking to coerce vaccination rather than allow accommodations, and therefore was in violation of Title VII.  It also appears that Hawaiian was attempting to establish a sincerity defense on the indefensible position that employees who are willing to sacrifice their livelihoods do not hold sincere beliefs.

**F.      The effect of federal regulations on Hawaiian's policy**

86.      A short time after Hawaiian began rolling out its vaccine mandate, the federal government also began issuing COVID-19 vaccination regulations related to federal contractors and large employers, both of which could cover Hawaiian.

87.      The "federal contractor mandate" required all federal contractors to enforce a 100% vaccination policy.  While provisions were made in the regulation for religious and medical exemptions, these companies would not be allowed to offer a general testing option for everyone.  *See* Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 2021 WL 4148112 (Sept. 9, 2021).

88.      It was originally set to go into effect in December 2021 but was then moved back until January 2022.

89.      The federal contractor mandate was subsequently stayed in federal court and continues to be litigated.  *See Georgia v. Biden*, 574 F.Supp.3d 1337 (S.D. Ga. Dec. 7, 2021).   The Eleventh Circuit recently upheld that injunction but narrowed the scope with respect to the states in which the EO is enjoined.  *Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022).  It was not in effect in Hawaii during the time in which the company terminated and placed employees on unpaid leave.

90.   The "OSHA mandate" was a rule issued by the Occupational Safety and Health Administration requiring employers who have more than 100 employees to implement either a vaccine or testing requirement at their workplace.

91.   The OSHA mandate was initially stayed by the Fifth Circuit Court of Appeals, *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021), and then that stay was overturned by a panel of the Sixth Circuit Court of Appeals after multiple cases in various circuits were consolidated through the MDL process. *In re: MCP No. 165*, 21 F.4th 357 (6th Cir. 2021). The stay was then reinstituted by the Supreme Court. *NFIB v. OSHA*, 142 S. Ct. 661, 662 (2022).

92.   Hawaiian stated that it would be following the federal contractor mandate but did not indicate that it would be following the OSHA regulations. As noted above, however, the federal contractor mandate was never in effect during Hawaiian's implementation of its vaccination policy. Moreover, even if it were in effect, that mandate explicitly provided for reasonable accommodations under Title VII and the ADA to those unable to take the vaccine for religious or medical reasons.

93.   Hawaiian chose to proceed with its vaccination policy but altered the terms so that individuals had until January 4, 2022, to present proof of vaccination to the company. This corresponded with the timeline of the federal contractor mandate, but that mandate was stayed by the time Hawaiian placed anyone out of work.

### G.    The second wave of denials

94.    During the month of November 2021, Hawaiian appears to have focused on denying medical accommodation requests.

95.    Prior to these denials, Hawaiian asked for physicians to fill out forms for their patients and explain why they were recommending the employees not receive a vaccine.  No conversations took place as to reasonable accommodations since all requests were to be denied.

96.    Despite multiple letters from doctors indicating why their patients should not receive the COVID-19 vaccination, Hawaiian determined that each requester should still receive the vaccination because "the information [the employee] provided [wa]s not considered a contraindication to receiving a COVID-19 vaccination per the Centers for Disease Control and Prevention."[7]

97.    Following the link to the website provided by Hawaiian shows that the CDC's webpage was merely providing examples of known contraindications in the context of allergic reactions.  *See Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States: Contraindications and precautions*, https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html#Contraindications.    Those

---

[7] *See, e.g.*, Exhibit 5, Denial of Request for Medical Accommodation of Riki O'Hailpin.

examples are applicable to the general population and were hardly intended to override specific physician diagnoses and recommendations for individuals subject to disabilities.

98.    It is of course the case that someone may have a disability under the ADA that is not a contraindication for the COVID-19 vaccine.   Nevertheless, Hawaiian determined that it should substitute itself into the medical process and make those determinations on behalf of its employees, in violation of the ADA.

### H.    The final wave of denials

99.    The final group of denials came during the month of December 2021. These letters followed a period during which Hawaiian interviewed some individuals who requested exemptions but did not interact with others at all.

100.   The individuals with whom Hawaiian did engage in an "interactive" process were never asked what the company might be able to do in order to accommodate their exemptions.   Instead, the individuals were only asked questions related to the sincerity of their beliefs and whether there was anything Hawaiian could do to convince them to take the vaccine.  In other words, no good faith process took place between the company and its employees.

101.   While Hawaiian continued to deny individuals with the earlier form letter (including the "personal preference" claim), most of the denials of religious exemptions at this time stated:

> Although you have a sincere religious belief, [Hawaiian] cannot reasonably accommodate you because it would cause an undue hardship that will result in significant disruption to our operation. Based on our assessment of your position and duties in this current environment, we cannot safely accommodate you because your role does not allow for maintaining baseline COVID-19 safety protocols, specifically maintaining physical distance and mandatory masking.[8]

102.   The letters went on to explain that the company has "also determined that we cannot accommodate you through testing [because] the complexity, expense, and administrative burden of managing the testing program is unsustainable.  This is particularly true because of the degree of non-compliance by a number of participants in the testing program . . . ."

103.   The testing program to which Hawaiian referred in its blanket denial letters was the onerous process it developed to weed out individuals rather than work toward a long-term accommodation solution.  Employees were forced to pick up specific test kits (that were already expired) from select airport locations and to test even when they would not be working.  From the beginning, the program was only offered as a temporary solution to let employees decide whether they were going to take the vaccine or be terminated.

104.   Moreover, the program—designed by Hawaiian—was made unnecessarily complex and created confusion for many users.  For example, some

---

[8] *See, e.g.*, Exhibit 6, Denial of Request for Religious Accommodation of Sabrina Franks.

"under the wing" employees initially tested on Thursdays, but the week before Thanksgiving the company suddenly changed that to Sundays. That meant those employees had to test twice that week. They were emailed on November 18, 2021, with the message that they had to test on November 18th and November 21st. But since the email went to their work address, and not everyone was reading their work email, there was some company-created non-compliance during that time.

105. Moreover, Hawaiian's testing program was also available to all unvaccinated Hawaiian employees, not just those seeking reasonable accommodations. It is unclear what "the degree of non-compliance" was in Hawaiian's estimation and it is unclear which individuals were offenders in the company's estimation.

106. The fact that Hawaiian chose something allegedly more difficult for itself does not weigh against Plaintiffs here or absolve Hawaiian of its duties under federal law.

107. It is also unclear what the expense or administrative burdens were to Hawaiian. As other airlines, hospitals, fire departments, etc. across the country have shown, there are multiple ways in which to conduct a testing program that are both safe and no more than a *de minimus* burden on the company.

108. Indeed, Plaintiffs volunteered to provide their own testing or to test at locations throughout the State of Hawaii that provided testing for unvaccinated

individuals. The State testing locations were established to accommodate those seeking to be in public for a period during 2021 and early 2022 when mandatory testing for unvaccinated individuals was required throughout Hawaii. Hawaiian Airlines knew about this program as it was a sponsor of the state-wide testing initiative for unvaccinated individuals.

109. And to be sure, claimed "administrative burdens" are not considered more than *de minimus*. *See* EEOC Guidance, § 12: Religious Discrimination, Part IV.B.2 ("EEOC Guidance") ("Generally, the payment of administrative costs necessary for an accommodation, such as costs associated with rearranging schedules and recording substitutions for payroll purposes, or infrequent or temporary payment of premium wages (e.g., overtime rates) while a more permanent accommodation is sought, will not constitute more than a *de minimis* cost . . . .").

110. It is also telling that the individual providing testimony in the prior litigation concerning the supposed "burdens" of a testing program—Senior Vice President Robin Kobaysahi—is the same individual who accidentally publicly revealed later that Hawaiian could accommodate unvaccinated employees who were being held out of work.

## I.     Plaintiffs' accommodation requests and Hawaiian's canned denials

111. Each of the named plaintiffs requested a religious accommodation from Hawaiian; Plaintiffs Riki O'Hailpin, Nina Arizumi, and Ron Lum also applied for

medical exemptions.   As seen below, every exempt employee (except for Pua Badiang) was given the choice of termination or the false accommodation of unpaid leave—an adverse employment action based on pretextual and unsupported rationales.

112.   Hawaiian's actions severely injured each of the Plaintiffs beyond just the money from the loss of a job.  The psychological trauma the company put each one of them through is almost indescribable as they were forced for months to face the impossible choice of their livelihoods or their faith/health.  And even those able to find other employment have lost years of seniority and longevity status with their new companies.  They now face things such as undesirable schedules that keep them away from home, working odd hours, or losing weekends off—the loss of privileges that represent years of their lives wasted in attempting career advancement at Hawaiian.

113.   Each of the named Plaintiffs has been issued a Right to Sue letter by the EEOC.

**Riki O'Hailpin**

114.   Plaintiff Riki O'Hailpin is a Flight Attendant with Hawaiian, where she has worked for almost 25 years.

115.  As a Flight Attendant, Ms. O'Hailpin's responsibilities include explaining safety protocols, handling any emergencies that arise, serving drinks and food, and generally helping customers.

116.  Ms. O'Hailpin worked throughout the duration of the pandemic, adhering to all company regulations and policies without incident.

117.  Ms. O'Hailpin is also a member of Inspire Church on O'ahu and serves as one of the worship leaders for her congregation.

118.  On October 1, 2021, Ms. O'Hailpin submitted a request for a reasonable accommodation from Hawaiian's vaccine mandate based on her sincerely held religious beliefs.  She explained that her body is a temple of the Holy Spirit and that God had directed her not to take the vaccine as a result.  That belief was later strengthened when she learned that the COVID-19 vaccines were developed using aborted fetal tissue because she believes that it is sinful to use anything derived from abortion.

119.  Hawaiian did not engage in any interactive process with Ms. O'Hailpin or seek any additional information concerning her sincerely held religious beliefs.

120.  On October 13, 2021, she received a form letter matching the ones received by others denied at that time.  It stated that her request was denied

> because your generalized belief that your body is a temple does not explain why you are sincerely and religiously opposed to receiving the COVID-19 vaccine per se and relies to at least some extent on medical opinions at odds with the scientific consensus.  This indicates that your

> belief is premised on the distinction you have made between
> vaccinations you consider medically necessary and those you do not.
> This is a personal preference and not a generally applicable religious
> opposition.[9]

121.   The letter went on state that what Ms. O'Hailpin had explained to

Hawaiian was merely a "personal preference . . . couched against the context of [her]

religious beliefs."

122.   On October 16, 2021, Ms. O'Hailpin submitted a separate request for a

reasonable accommodation based on her medical disability.  She followed up on this

request with a letter from her gynecologist on October 19, 2021, and an extended

discussion of her condition from her reproductive endocrinologist on October 29,

2021.

123.   Ms. O'Hailpin suffers from antiphospholipid syndrome—a disease

related to the autoimmune disease lupus.  It is a condition where a person's blood

has extra proteins and thus makes the individual subject to thrombophilia or over-

clotting.  This disease substantially affects her circulatory system and causes blood

clots that can lead to things such as a stroke, an aneurism, or deep vein thrombosis.

124.   Although Ms. O'Hailpin is not prevented from performing the essential

functions of her job—*i.e.*, it does not stop her from being a Flight Attendant—the

antiphospholipid syndrome is a physical impairment that also substantially limits her

---

[9] Exhibit 4.

reproductive system.   In fact, the disease has directly contributed to four miscarriages.  As it stands, whenever Ms. O'Hailpin gets pregnant, she must take the injectable blood thinner Lovenox in an attempt to prevent her body from spontaneously aborting the fetus due to her antiphospholipid syndrome.

125.   In light of this disability and the known risk of blood clots, both of Ms. O'Hailpin's doctors indicated they would not administer the COVID-19 vaccination to her.

126.   Despite the detailed explanations from her doctors—including a study outlining the dangers of Ms. O'Hailpin's condition and associated risks—Hawaiian denied the request for a medical exemption without any interactive process whatsoever on November 2, 2021 (waiting just a weekend after receiving the detailed report from her endocrinologist).

127.   While the company stated that it "recognize[d] that some of our teammates need a reasonable accommodation," Hawaiian revealed that it was substituting its own uninformed medical judgment for that of Ms. O'Hailpin's doctors.  The denial informed Ms. O'Hailpin that Hawaiian was denying her request because "the information [she] provided [wa]s not considered a contraindication to receiving a COVID-19 vaccine per the Centers for Disease Control and Prevention."[10]

---

[10] Exhibit 5.

128.   A review of the CDC website on which Hawaiian was basing its medical decisions, however, reveals that the CDC was only referencing a non-exhaustive list of allergy contraindications.  Unlike Hawaiian, the CDC did not purport to override either medical advice from a doctor or the ADA.

129.   If Hawaiian had engaged in a legitimate interactive process—as required by law—the company could have learned more about Ms. O'Hailpin's situation and been able to provide her with a reasonable accommodation.  She not only abided by Hawaiian's mock testing program, she would have been willing to do any other testing (or even take antibody tests) to ensure the safety of her coworkers, and to do so at her own expense in order to continue working.  Alternatively, Ms. O'Hailpin had already contracted COVID-19 and thus possessed the antibodies that a vaccine would have sought to cause her body to produce artificially—an accommodation for her would have been straightforward if Hawaiian had followed the science instead of the company's discriminatory instincts.

130.   Rather than use any of the costless reasonable accommodations available, Hawaiian placed Ms. O'Hailpin on unpaid leave.  She lost not only her paycheck but also her travel benefits, medical, dental, and prescription drug coverage, as well as profit sharing and company matched retirement contributions.

131.   Ms. O'Hailpin was also irreparably harmed by the loss of her medical insurance.  After four miscarriages, IVF may be her last opportunity to get pregnant and it was not feasible for her to pay for it out of pocket.  Given her age, though, 2022 was the final year that insurance will pay for that treatment—the insurance that Hawaiian took away.  She needed to begin her IVF cycle before April of 2022 when she turned 46 years old.  Moreover, the blood thinning medication that she must take while pregnant was only available to her with her insurance coverage.  She was unable to use the treatment during 2022 as a direct consequence of Hawaiian's failure to follow federal law.

132.   Ms. O'Hailpin returned to work in November 2022 after Hawaiian determined in September that it would rescind the vaccine mandate (following the CDC's August recommendation to no longer treat vaccinated and unvaccinated individuals differently).

**Nina Arizumi**

133.   Plaintiff Nina Arizumi was a Flight Attendant with Hawaiian, where she worked for approximately 11 years.

134.   As a Flight Attendant, Ms. Arizumi's responsibilities included explaining safety protocols, handling any emergencies that arise, serving drinks and food, and generally helping customers.

135.   She worked without issue during the pandemic, complying with all safety requirements set forth by Hawaiian throughout that time.

136.   On August 9, 2021, Ms. Arizumi submitted a request for a reasonable accommodation based on her sincerely held religious beliefs.   Hawaiian acknowledged receipt of the request but never followed up.   Subsequently, she submitted Hawaiian's religious form on September 29, 2021.   Ms. Arizumi practices a specific sect of Shintoism that prevents her from taking vaccinations because they would impurify her body and permanently disable her spirit.   She is the leader of her sect that was founded by her great-grandfather in Japan more than 100 years ago.

137.   She received an email on October 14, 2021, denying her request for a religious exemption.   It stated that she was denied

> because your generalized belief that your body is a temple does not explain why you are sincerely and religiously opposed to receiving the COVID-19 vaccine per se and relies to at least some extent on medical opinions at odds with the scientific consensus.  This indicates that your belief is premised on the distinction you have made between vaccinations you consider medically necessary and those you do not. This is a personal preference and not a generally applicable religious opposition.[11]

138.   This was one of several canned denial letters that Hawaiian issued to its employees to deny religious exemptions.   The lack of individualized assessment

---

[11] Exhibit 7, Denial of Request for Religious Accommodation of Nina Arizumi.

and good-faith consideration from Hawaiian can be seen by the letter's inapplicability to Ms. Arizumi's request.

139.   In her request, Ms. Arizumi did not talk about medical opinions but only sincere religious beliefs.  The fact that Hawaiian had not read her request was further highlighted by the fact that she never said that her "body is a temple."  Indeed, it is offensive to her religion to refer to the body as a temple in any way.  That is because temples are a part of the Buddhist religion, representing death and funerals; they are not part of the Shinto religion.

140.   Additionally, the letter from Hawaiian further downplayed the value of Ms. Arizumi's beliefs, stating that what she had explained to Hawaiian was merely a "personal preference . . . couched against the context of [her] religious beliefs." These types of blanket denials unfortunately demonstrate the company's lack of familiarity with religious belief systems and a condescension towards religious observance in the workplace.

141.   On August 9, 2021, Ms. Arizumi also submitted a request for a reasonable accommodation from the vaccine mandate based on a medical disability. Like her religious accommodation request, Hawaiian acknowledged receipt of the medical accommodation request but never followed up.   Subsequently, she submitted Hawaiian's medical form on September 30, 2021.  Ms. Arizumi suffers from mitral valve prolapse and her doctor strongly recommended that she not get the

COVID-19 vaccine.  Although Ms. Arizumi is not prevented from performing the essential functions of her job without an accommodation—*i.e.*, it does not stop her from being a Flight Attendant—the mitral valve prolapse is a physical impairment that substantially limits her circulatory system.  It causes shortness of breath and chest pain from time to time, and could be fatal without the treatment of her doctor. In light of this disability, Ms. Arizumi's doctor told her not to take the COVID-19 vaccination.

142.   Hawaiian followed up on the September 30, 2021 medical form that was filled out and signed by Ms. Arizumi's doctor by asking her doctor to fill out additional forms.  He did so on November 1, 2021, indicating both Ms. Arizumi's documented history of mitral valve prolapse (that is also treated by a cardiologist) as well as a family history of arrhythmias, pericarditis, and other cardiac-related issues.

143.   On November 4, 2021, Ms. Arizumi received an email denying her request for a medical exemption.  Hawaiian—substituting its medical judgments for that of Ms. Arizumi's doctor—informed her that the company was denying her request because "the information [she] provided [wa]s not considered a contraindication to receiving a COVID-19 vaccine."[12]

---

[12] Exhibit 8, Denial of Request for Medical Accommodation of Nina Arizumi.

144.   A review of the CDC website on which Hawaiian was basing its medical decisions, however, reveals that the CDC was merely referencing a non-exhaustive list of allergy contraindications—the CDC did not purport to override either medical advice from a doctor or the ADA.

145.   If Hawaiian had engaged in a legitimate interactive process—as required by law—the company could have learned more about Ms. Arizumi's situation and been able to provide her with a reasonable accommodation.  She had already indicated to the company that any accommodation would be "negotiable." Ms. Arizumi not only abided by Hawaiian's mock testing program, she would also have been willing to do any other testing (or even take antibody tests) to ensure the safety of her coworkers, and to do so at her own expense to continue working even though that would not be required under the ADA .

146.   Rather than providing a reasonable accommodation, Hawaiian terminated Ms. Arizumi, taking away her paycheck, travel benefits, medical, dental, and prescription drug coverage, as well as profit sharing and company matched retirement contributions, in addition to non-monetary losses that cannot be repaid by Hawaiian.  The entire process inflicted by Hawaiian caused her months of loss of sleep, depression, stress, and strained relationships—even after her termination.

**Robert Espinosa**

147.   Plaintiff Robert Espinosa is a First Officer with Hawaiian, responsible for piloting and commanding aircraft and crew.  He has been with Hawaiian for 11 years and is a retired Navy Captain/Aviator (O-6) with over 30 years of service.  He served as a Master Executive Council Veteran Affairs Chairman for Hawaiian's ALPA union for six years until he was removed from his position as a result of Hawaiian's forced leave of absence.

148.   Mr. Espinosa worked throughout the duration of the pandemic, adhering to all company regulations and policies without incident.  He always wore a mask indoors, participated in the faulty testing program, and followed social distancing guidelines when applicable.

149.   Mr. Espinosa is also an Elder and Teaching Pastor at his local church in Makakilo.

150.   On September 29, 2021, Mr. Espinosa submitted a request for a reasonable accommodation based on his sincerely held religious beliefs.  In his request, he explained that, as a follower of Christ and the Bible, he must take care of his body as a temple of the Holy Spirit.  The request showed that any of the COVID-19 vaccines would violate this belief for three reasons: (1) it would be ungrateful for God's blessing of natural immunity and a healthy immune system generally; (2) each of the vaccines uses or was tested on fetal stem cell lines, a desecration of the

sacredness of life; and (3) through prayer and discernment, God had shown him that not everyone has been truthful about the vaccines and that he should have nothing to do with them as a result.  Each of these reasons was obviously religious and, as an ordained Pastor, Mr. Espinosa is committed to avoid doing anything that violates the will of God or goes against His Word.  It would violate his conscience (and God's direct instruction) to take the vaccine.

151.   Without contacting Mr. Espinosa to engage in any sort of interactive process, and evidently without reading his submission, Hawaiian denied his request. He received the same form letter as others denied at that time, which stated that he was denied

> because your generalized belief that your body is a temple does not explain why you are sincerely and religiously opposed to receiving the COVID-19 vaccine per se and relies to at least some extent on medical opinions at odds with the scientific consensus.  This indicates that your belief is premised on the distinction you have made between vaccinations you consider medically necessary and those you do not. This is a personal preference and not a generally applicable religious opposition.[13]

152.   His denial letter went on to state that what Mr. Espinosa had explained to Hawaiian was merely a "personal preference . . . couched against the context of [his] religious beliefs."

---

[13] Exhibit 9, Denial of Request for Religious Accommodation of Robert Espinosa.

153.   If Hawaiian had engaged in an interactive process with Mr. Espinosa, the company could have learned more about his situation and recognized that he has a sincerely held religious belief that Title VII demands be honored.   Although Hawaiian has claimed that it would have difficulty in participating in an interactive process with employees due to the number of exemption requests, it was the company's duty to provide individualized consideration prior to any self-imposed deadlines it sought to meet.   The number of exemption requests does not lessen Hawaiian's legal obligations to provide such treatment, but the failure to address Mr. Espinosa's actual request reveals that no actual individualized assessment took place.

154.   Moreover, multiple accommodations were readily available such as COVID-19 testing or testing for COVID-19 antibodies.   Mr. Espinosa not only abided by Hawaiian's mock testing program, he would also have been willing to do any other form of testing at his own expense to continue working safely.   That would have been even more reasonable given the CDC's admission that vaccination does not prevent infection and transmission of COVID-19 and the fact that prior infection provides protection superior to vaccination alone.

155.   Mr. Espinosa was placed on unpaid leave, losing his paycheck, travel benefits, medical, dental, and prescription drug coverage, as well as profit sharing and company matched retirement contributions for almost nine months.

156.   Hawaiian's coercion also had a tremendous strain on his wife and children as they knew that taking the vaccine would violate his religious beliefs and testimony before his congregation.  They were afraid he might do so at any time to take care of them.

157.   Most importantly, Hawaiian wrongfully put Mr. Espinosa to a daily religious test: refuse the vaccine to honor one set of religious beliefs and be denied his livelihood; or take the vaccine to honor the religious belief he holds of providing for his family.

158.   Mr. Espinosa returned to work in November 2022 after Hawaiian determined that it would rescind the vaccine mandate (months after the CDC's recommendation to no longer treat vaccinated and unvaccinated individuals differently).

**Erwin Young**

159.   Plaintiff Erwin Young was a Lead Aircraft Technician with Hawaiian. He worked for the company for almost nine years.

160.   As an Aircraft Technician, Mr. Young was responsible for performing mechanic duties on Hawaiian's airplanes and leading a team that ensures the aircraft are ready to fly.  He worked safely throughout the pandemic, adhering to company regulations and protocols.  The only difficulty Mr. Young had at work related to COVID-19 was dealing with the toxic environment created by Hawaiian

management toward unvaccinated employees that left him forced to defend his religious beliefs to co-workers.  On September 30, 2021, Plaintiff Young submitted a request for a religious accommodation.

161.   In his accommodation request, Mr. Young explained that—based on I Corinthians 6:19—his body is a temple of the Holy Spirit and that God had directed him not to take the vaccine as a result.  His belief was later strengthened when he learned that the COVID-19 vaccines were developed using aborted fetal tissue.  He believes it is sinful to use anything derived from abortion.

162.   Representatives from Hawaiian met with Mr. Young on November 5, 2021, to discuss his exemption request.  He was asked if anything could be done to encourage him to take the vaccine and if there was any specific ingredient that was preventing him from taking the vaccine.

163.   Possible reasonable accommodations were discussed only briefly at the very end of the meeting when Mr. Young brought it up, but he was not provided with any answers and was told that no accommodations would be made.

164.   On December 16, 2021, Mr. Young's request for an accommodation was denied.  He was told:

> Although you have a sincere religious belief, [Hawaiian] cannot reasonably accommodate you because it would cause an undue hardship that will result in significant disruption to our operation. Based on our assessment of your position and duties in this current environment, we cannot safely accommodate you because your role

does not allow for maintaining baseline COVID-19 safety protocols, specifically maintaining physical distance and mandatory masking.[14]

165.   The letter went on to explain that the company has "also determined that we cannot accommodate you through testing [because] the complexity, expense, and administrative burden of managing the testing program is unsustainable.  This is particularly true because of the degree of non-compliance by a number of participants in the testing program . . . ."

166.   The company's new position was directly at odds with Hawaiian's continual reassurances to Mr. Young (along with all its employees) that it was safe to work during the pandemic with mitigation measures in place prior to the vaccine rollouts.

167.   The notification to Mr. Young was also at odds with what had taken place during the pandemic, throughout which he had adhered to Hawaiian's COVID-19 policies without incident.  Mr. Young had always worn a mask and socially distanced as required throughout the pandemic.  He also participated in Hawaiian's mock testing program throughout November and December 2021 without issue.

168.   If Hawaiian had engaged in a genuine interactive process with Mr. Young, the company would have realized that it could provide a reasonable accommodation such as COVID-19 testing paid for by Mr. Young, antibody testing

---

[14] Exhibit 10, Denial of Request for Religious Accommodation of Erwin Young.

that would show the same protection (or better) than the vaccine mandated by Hawaiian, or allowing him to keep his co-workers safe by wearing a mask.

169.    Mr. Young was terminated by Hawaiian, losing his paycheck, travel benefits, medical, dental, and prescription drug coverage, as well as profit sharing and company matched retirement contributions.

### **Puanani Badiang**

170.    Plaintiff Puanani Badiang was a Corporate Training Manager with Hawaiian.  She worked for Hawaiian for 20 years in various capacities.

171.    In her role, Ms. Badiang worked from home (or could work from home at any time) since she trained guest services workers for Hawaiian and could do so via Teams meetings online.  She occasionally taught classes in-person at the Corporate Headquarters, where she strictly followed all company guidance.  This included not only mask and social distancing guidelines but also temperature checks for students and special cleaning of the classroom that instructors performed both before and after class.  In fact, she undertook these same safety steps even prior to them being required by Hawaiian.

172.    On September 28, 2021, Ms. Badiang submitted a religious accommodation request along with a letter from her Pastor explaining her views.

173.    As noted in the letter, Ms. Badiang—a devout Christian—cannot abide by any process that relates to or uses aborted stem cell lines.  This includes receiving

vaccines that she believes were derived using aborted fetal tissue.  Ms. Badiang believes that receiving the vaccine is contrary to God's direct instructions for her life and it would violate her conscience to do so.

174.   Ms. Badiang was interviewed by a team from Hawaiian on November 1, 2021, concerning her request.  The meeting consisted of a few questions about what others at her church thought about the vaccine and if there was any way she could be persuaded to take the vaccine, either in its current form or a "new" version later.

175.   She attempted to discuss possible reasonable accommodations with the interviewers—such as remote work, COVID testing, antibody testing, etc.—but was informed that it was not something they could decide.

176.   On December 14, 2021, Ms. Badiang received an email informing her that her request had been denied.  Like others, she was told:

> Although you have a sincere religious belief, [Hawaiian] cannot reasonably accommodate you because it would cause an undue hardship that will result in significant disruption to our operation. Based on our assessment of your position and duties in this current environment, we cannot safely accommodate you because your role does not allow for maintaining baseline COVID-19 safety protocols, specifically maintaining physical distance and mandatory masking.[15]

177.   The letter went on to explain that the company has "also determined that we cannot accommodate you through testing [because] the complexity, expense,

_____

[15] Exhibit 11, Denial of Request for Religious Accommodation of Puanani Badiang.

and administrative burden of managing the testing program is unsustainable.  This is particularly true because of the degree of non-compliance by a number of participants in the testing program . . . ."

178.   The notification was at odds with what had taken place during the pandemic, throughout which Ms. Badiang adhered to Hawaiian's COVID-19 policies without incident.  Not only did her classroom lead the way in safety— implementing social distancing before it was required by Hawaiian—she also participated in Hawaiian's mock testing program without issue.

179.   Additionally, she would have been willing to take COVID-19 tests (or provide proof of antibodies) to ensure the safety of her coworkers.  She also would have even been willing to pay for any testing costs in order to continue working.

180.   If Hawaiian had engaged in a legitimate interactive process, the company could have learned more about Ms. Badiang's situation and been able to provide her with a reasonable accommodation.

181.   For example, the various vendors who worked with both Hawaiian's traveling public and alongside Hawaiian employees were not required to take a vaccination.  When they were attending a training in person at the Corporate Office, all that was ever required was a mask and a temperature check.

182.   Ms. Badiang was not provided that same accommodation and she was forced into retirement by Hawaiian's unlawful actions on January 3, 2022.

**Sabrina Franks**

183.    Plaintiff Sabrina Franks was a Customer Service Agent at Hawaiian and had been with the company for almost six years.  She handled check-in, baggage return, and—most recently—worked in the Hawaiian lounges at the Daniel K. International Airport in Honolulu.

184.    When working in the lounges, Ms. Franks verified customer credentials and checked them in.  She worked safely throughout the COVID-19 pandemic and followed all company guidelines.  During that time, plexiglass was placed in front of her check-in stations in the lounges, and she would take membership cards from customers through a small opening, swipe the card, and then return it to the customer. Ms. Franks wore a mask, face shield, and gloves while doing this.  She ensured customer safety at all times.

185.    On October 1, 2021, Ms. Franks submitted a request for a reasonable accommodation from the vaccine mandate based on her sincerely held religious beliefs.  As she explained in her submission, her life and body belong to God and she therefore prays and seeks counsel from God on what to do with her life and body (which is the temple of God).  When she prayed about the COVID-19 vaccine, she did not feel released by God to take the vaccine, and thus did not take it in order to honor God and what He asked of her.

186.   This decision was not one Ms. Franks took lightly.  Her parents and fiancé contracted COVID-19 during July of 2021 and were all hospitalized.  While her mother and fiancé recovered, her father did not.  He passed away on July 30, 2021, from COVID-19.

187.   Hawaiian arranged to have a meeting with Ms. Franks to discuss her request for a reasonable accommodation on October 20, 2021.  During that meeting, she was asked if she had previously taken vaccines (she had not) and if any information could be provided about the COVID-19 vaccine that would cause her to change her mind or if she could be persuaded into taking the vaccine.  Possible reasonable accommodations were not discussed during the meeting.

188.   On December 13, 2021, Ms. Franks received an email informing her that her request had been denied.  She was told:

> Although you have a sincere religious belief, [Hawaiian] cannot reasonably accommodate you because it would cause an undue hardship that will result in significant disruption to our operation. Based on our assessment of your position and duties in this current environment, we cannot safely accommodate you because your role does not allow for maintaining baseline COVID-19 safety protocols, specifically maintaining physical distance and mandatory masking.[16]

189.   The letter went on to explain that the company has "also determined that we cannot accommodate you through testing [because] the complexity, expense, and administrative burden of managing the testing program is unsustainable.  This

---

[16] Exhibit 6.

is particularly true because of the degree of non-compliance by a number of participants in the testing program . . . ."

190.   This letter was at odds with Ms. Franks' experience during the pandemic.  At all times she had worn a mask and maintained social distancing requirements—especially when working in the lounges behind plexiglass.  Moreover, she participated in Hawaiian's mock testing program during November and December 2021 without any issue.

191.   Additionally, Ms. Franks was willing to pay for her own COVID-19 or antibody testing to ensure that Hawaiian faced no burden in accommodating her.  Her only goal was to continue working.  If the company had engaged in an interactive process aimed at resolving her Title VII exemption rather than trying to talk her out of it, a reasonable accommodation would have been apparent.

192.   Hawaiian terminated Ms. Franks on January 31, 2022, taking not only her paycheck but her health insurance and flight benefits as well.  Adding injury to injury, the company's action forced Ms. Franks to rush her physical rehabilitation program in which she was enrolled to overcome a workplace injury she sustained while working for Hawaiian.  Unable to continue physical therapy without a job or insurance, Ms. Franks is likely to suffer long-term damage to her body.

193.   Ms. Franks also believes that Hawaiian has caused long-term damage to the relationships she and others have within the company.  An airline that has

always taken pride in its "aloha" damaged its workforce by pitting vaccinated employees against unvaccinated employees and by forcing individuals to violate their faith or lose their job.  That is not how families protect each other.

### Ronald Lum

194.   Plaintiff Ronald Lum was a Captain with Hawaiian, responsible for piloting and commanding Boeing 717 aircraft.

195.   Mr. Lum worked throughout the duration of the pandemic, adhering to all regulations and policies without incident.  He always wore a mask indoors, participated in the mock testing program, and followed social distancing guidelines when applicable.

196.   In line with Hawaiian's *repeated* advertising, Mr. Lum always felt extremely safe flying during the pandemic given things such as HEPA filtration devices that clean the air and the electrostatic fogging of the planes that Hawaiian was doing at one point (but later stopped even prior to the vaccine mandate).  On the 717, the cabin air is constantly exchanged with outside air—after adjusting the temperature—to make sure it is free of viruses and keep individuals on the planes extremely safe.

197.   On October 10, 2021, Mr. Lum submitted the first of two separate requests for a reasonable accommodation from the vaccine mandate; it was based on a medical disability.  Mr. Lum suffers from coronary artery disease and his doctor

recommended that he not get the COVID-19 vaccine.  While Mr. Lum could perform all of the essential functions of his job without an accommodation—*i.e.*, it did not prevent him from flying—coronary artery disease is a physical impairment that substantially limits his circulatory system.  It must be treated with medicine and could be fatal without the care of a doctor.  In light of his disability, Mr. Lum's medical provider instructed him not to take the COVID-19 vaccine.

198.  On December 7, 2021, Mr. Lum's request for a medical accommodation was denied.  In Hawaiian's words, "the information [he] provided [wa]s not considered a contraindication to receiving a COVID-19 vaccine."[17]

199.  The CDC website, to which the denial letter refers, only references a non-exhaustive list of allergy contraindications, though.  The CDC never claimed to override either medical advice from a doctor or the ADA.

200.  Mr. Lum also submitted a request for a religious exemption on October 25, 2021.  As he stated, 1 Corinthians 6:19–20 teaches that his body is the temple of the Holy Spirit.  Because he can care for his body, the temple, with the wisdom and convictions that God gives him, it is his sincere religious belief that it would dishonor God to take the vaccine.

201.  On December 17, 2021, Hawaiian sent Mr. Lum a letter denying his religious exemption request.  Even though his religious belief paralleled others the

---

[17] Exhibit 12, Denial of Request for Medical Accommodation of Ronald Lum.

company admitted were sincere, his denial letter stated that the request merely "demonstrate[d] a personal preference" not to take the vaccine.[18]

202.  Had Hawaiian engaged in an interactive process with Mr. Lum, the company could have learned how difficult this question was for him and that he did not decline the COVID-19 vaccine lightly.  Indeed, he scheduled vaccination appointments on multiple occasions only to end up canceling each time because he felt God telling him not to take the vaccine.  He also has a girlfriend who is vaccinated and consistently asked him to get the vaccine.  At the same time, he cares for his elderly mother and has worried about transmitting COVID-19 to her.  In other words, not taking the vaccine was already a difficult decision that Mr. Lum faced even prior to Hawaiian's mandate.  To have not taken it at that point clearly evidenced a sincerely held religious belief and legitimate medical concern—it was hardly just a personal preference.

203.  The denial letter went on to give the common explanation that Hawaiian would also be unable to accommodate Mr. Lum anyway because it would be an "undue hardship" for the company.

204.  Again, if Hawaiian had engaged in an interactive process with Mr. Lum, the company could have learned more about his situation and recognized that there would have been no undue hardship in accommodating him.  Multiple

---

[18] Exhibit 13, Denial of Request for Religious Accommodation of Ronald Lum.

accommodations were readily available such as COVID-19 testing or testing for COVID-19 antibodies.  Not only did Mr. Lum abide by Hawaiian's mock testing program, he regularly tested himself even prior to the program to protect his elderly mother and girlfriend.  Additionally, Mr. Lum would have been willing to do any other form of testing at his own expense to continue working safely.  Any of these options were reasonable given the CDC's admission that vaccination does not prevent infection and transmission of COVID-19 anyway.

205.  Mr. Lum was placed on unpaid leave until his FAA mandated retirement in August 2022.  Thus Hawaiian robbed him not only of his paycheck and benefits for more than seven months, the company took away his retirement flight. Because pilots must stop flying commercially at age 65 with no exceptions, a pilot's last flight before his 65th birthday is cause for quite the celebration—the pilot's family will often take the final trip with him or her and there may be water cannons shooting over the plane as the Captain pulls in to the gate for the last time.  This moving ceremony is the capstone on a career in aviation that Hawaiian denied Mr. Lum through its violation of federal law.

**Dan Saiki**

206.  Plaintiff Dan Saiki was a Captain for Hawaiian with 36 years of service, responsible for piloting and commanding multiple aircraft, including—most recently—the Airbus 330.

207.    Mr. Saiki worked throughout the duration of the pandemic, adhering to all regulations and policies without incident.

208.    In line with Hawaiian's *repeated* advertising, Mr. Saiki always felt extremely safe flying during the pandemic given things such as HEPA filtration devices that clean the air and the electrostatic fogging of the planes that Hawaiian was doing at one point (but later stopped even prior to the vaccine mandate).

209.    On October 1, 2021, Mr. Saiki submitted a request for a reasonable accommodation from the vaccine mandate based on his sincerely held religious beliefs.  He pointed to the teaching in 1 Corinthians 6 that his body is the temple of the Holy Spirit and explained that God had directly him and his family not to take any vaccines.  They have followed this religious belief for over two decades and provided Hawaiian evidence to that effect.

210.    On December 14, 2021, Hawaiian sent Mr. Saiki a letter denying his religious exemption request.  It acknowledged his "sincere religious belief" but went on to give the common excuse that Hawaiian would also be unable to accommodate Mr. Saiki because it would be an "undue hardship" for the company.  He was provided the same form letter stating:

> Although you have a sincere religious belief, [Hawaiian] cannot reasonably accommodate you because it would cause an undue hardship that will result in significant disruption to our operation. Based on our assessment of your position and duties in this current environment, we cannot safely accommodate you because your role does not allow for maintaining baseline COVID-19 safety protocols,

specifically maintaining physical distance and mandatory masking.[19]

211.   By that point, Hawaiian had begun attempting to claim that its fake testing program had shown that it could not accommodate anyone through testing because of non-compliance by a number of participants in the program.  Mr. Saiki understood, though, that Hawaiian had never intended for the program to work—it was well-known the program used expired test kits and was purposefully made cumbersome by the company so that individuals would have difficulty complying.

212.   But if Hawaiian had engaged in an interactive process with Mr. Saiki, the company could have learned more about his situation and recognized that there would have been no undue hardship in accommodating him.   Multiple accommodations were readily available such as COVID-19 testing or testing for COVID-19 antibodies.   In fact, the company was aware that Mr. Saiki had just recovered from COVID in August 2021 and was thus significantly less of a risk than those who had been vaccinated earlier in the pandemic but who had not recovered from an infection.  Additionally, Mr. Saiki would have been willing to do any other form of testing at his own expense to continue working safely.  Any of these options were reasonable given the CDC's admission that vaccination does not prevent infection and transmission of COVID-19, and the scientific evidence showing the effectiveness of natural immunity compared to artificial immunity.

---

[19] Exhibit 14, Denial of Request for Religious Accommodation of Dan Saiki.

213.   Mr. Saiki was informed he would be placed on unpaid leave beginning in January 2022.   This forced him to make the difficult decision to take early retirement in order to salvage some pay and medical benefits until Hawaiian's unlawful actions could be remedied in court.

214.   Mr. Saiki's constructive discharge from the company was effective with his retirement on December 31, 2021.   The entire process inflicted on him by Hawaiian caused months of loss of sleep, depression, stress, and strained relationships—even after his unwanted retirement.

**Brandee Aukai**

215.   Plaintiff Brandee Aukai is a Flight Attendant with Hawaiian, where she has worked for almost 27 years.

216.   As a Flight Attendant, Ms. Aukai's responsibilities include explaining safety protocols, handling any emergencies that arise, serving drinks and food, and generally helping customers.

217.   Ms. Aukai is a member of Calvary Chapel in Kaneohe and attends there with her four children—three girls and one boy.

218.   On September 30, 2021, Ms. Aukai submitted a request for a reasonable accommodation based on her sincerely held religious beliefs.   She explained that receiving the COVID-19 vaccine conflicted with her belief system because of the ties of the vaccines to fetal stem cell lines.   She also attached a letter from her pastor

reiterating this religious reason for declining to be vaccinated and underscoring the biblical truth that her body was a temple of the Holy Spirit that she should not be pressured into taking the vaccine.

219. Ironically, when Hawaiian asked for alternative accommodations that might address Ms. Aukai's needs, she responded that they were "negotiable"—ironic because Hawaiian never intended to negotiate anything about reasonable accommodations with its exempt employees.

220. Hawaiian refused to engage in a sincere interactive process with Ms. Aukai or seek any additional information concerning her religious beliefs. Instead, Hawaiian subjected her (via a Zoom meeting) to an interrogation of her beliefs that caused her to break down crying because of its offensiveness and coercive nature. She was asked about the exact moment she knew she believed in Christ and how he communicates with her, including what Christ had told her about the vaccine. She was also interrogated as to what her pastor encouraged at church and whether or not he had been vaccinated. Finally, as part of the assault on her beliefs, Ms. Aukai was grilled as to what she does when she gets sick and what medicines she takes (including whether she takes Tylenol, which she does not). No possible reasonable accommodations were discussed during her interrogation.

221. On November 29, 2021, Ms. Aukai received a denial of her request that stated:

> While we recognize that some of our teammates need a reasonable accommodation, your statements demonstrate that your objection to the vaccine relies on your beliefs regarding the safety and/or efficacy of the COVID-19 vaccine as well as your personal lifestyle choices. This indicates a personal preference in your decision to not take the COVID-19 vaccine.[20]

222. The offensive letter revealed that Hawaiian had not actually examined the substance of Ms. Aukai's request—her explanation concerning the ties of the vaccines to cell lines from aborted fetuses was clearly religious and hardly just a "personal preference" tied to a "lifestyle choice."

223. If Hawaiian had engaged in a legitimate process—as required by law—the company would have known she had a sincerely held religious belief, could have learned more about Ms. Aukai's situation, and would have been able to provide her with a reasonable accommodation. She not only abided by Hawaiian's mock testing program, she would have been willing to do any other testing (or even take antibody tests) to ensure the safety of her coworkers, and to do so at her own affordable expense in order to continue working. Ms. Aukai had already had COVID-19 and thus possessed the antibodies that a vaccine was supposed to cause her body to produce artificially—an accommodation for her would be straightforward.

224. Instead, Hawaiian forced an impossible choice on Ms. Aukai. She is a single mother who provides the support for her entire family. Because there is also

---

[20] Exhibit 15, Denial of Request for Religious Accommodation of Brandee Aukai.

a Scriptural command to provide for one's family, and because she could not replace her income from Hawaiian if placed on unpaid leave, Ms. Aukai was coerced into taking the vaccine.  This injury is permanent and still causes Ms. Aukai distress.

## CLASS ALLEGATIONS

225.   Plaintiffs bring this class action under Federal Rules of Civil Procedure 23(a) and (b).

226.   Through this action, Plaintiffs seek to represent a class of all Hawaiian employees who requested accommodations from Hawaiian's vaccine mandate and had those accommodation requests either formally or functionally denied by Hawaiian's discriminatory process—forced to take a false accommodation of unpaid leave, be separated from the company through termination or retirement, or violate their faith or medical needs by taking the vaccine.

227.  By effectively treating all accommodation requesters the same, Hawaiian's actions are generally applicable to the entire class of Hawaiian employees for whom Hawaiian failed to grant reasonable accommodations.  With its virtually 100% denial rate through canned form letters that either did not address the actual issues at stake or, at the least, failed to demonstrate any undue hardship on Hawaiian, the company is liable for a pattern of discrimination.  Accordingly, the Court may grant relief to the entire affected class to remedy Hawaiian's violation of federal civil rights laws.

228.   Additionally, the class is so numerous that joinder of all members is impractical.  While the exact class size is unknown to Plaintiffs at this time, it is expected to exceed 500 employees.  The precise number and identification of the class members will be ascertainable from Hawaiian's records during discovery.

229.   There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

    a.   Did Hawaiian engage in a pattern or practice of discrimination with respect to employees seeking exemptions from the company's COVID-19 vaccine mandate?

    b.   Did Hawaiian comply with its obligations under federal law to reasonably accommodate employees when it pretextually responded to accommodation requests with canned (and inaccurate) denial letters following no meaningful dialogue as to what solution could be reached?

    c.   Did Hawaiian comply with its obligations under federal law to reasonably accommodate employees with religious and/or medical objections to the vaccine mandate when it issued summary denials without demonstrating *any* hardship, let alone undue hardship?

d.    Did Hawaiian violate employment discrimination law when it pretextually assumed and then claimed that unvaccinated employees would necessarily pose a greater threat to safety without evidence to support its claim?

e.    Did Hawaiian violate employment discrimination law when it assumed (without evidence) that unvaccinated employees would necessarily pose a greater threat to safety and purposefully created a toxic work environment toward unvaccinated employees—especially those seeking accommodations under Title VII—as part of a program of coercion purposefully designed to compel compliance with the mandate?

f.    Did Hawaiian retaliate against employees who engaged in protected activity when it responded to each request by terminating (or functionally terminating) employment, by engaging in coercive conduct to dissuade employees from requesting (or continuing to seek) an accommodation, and then by refusing to bring back employees even when it was clear the vaccine mandate was unnecessary and unsupported by the CDC and other health organizations?

230.   Plaintiffs' claims are typical of the claims of the class because they, like the class members, requested accommodations from Hawaiian's vaccine mandate and Hawaiian denied those requests without engaging in an individualized assessment, providing an interactive process, or having proof of undue hardship in providing reasonable accommodations.

231.   For the same reason, Plaintiffs will fairly and adequately protect the interests of the class because their interests in resolving the matter are the same as those of the class and they have no conflicts of interest with the class.

232.   Because of Hawaiian's unlawful policy denying virtually 100% of reasonable accommodation requests, the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims.  Joinder of all members is impracticable.

233.   As explained above, Hawaiian has taken at least one relevant act that affects all members of the class.

**COUNT I**
**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**Religious discrimination—failure to accommodate**

**On behalf of Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang,**
**Franks, Lum, Saiki, and Aukai**
**and others similarly situated**

234.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

235.   Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang, Franks, Lum, Saiki, and Aukai hold sincere religious beliefs that precluded them from receiving a COVID-19 vaccine.

236.   Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang, Franks, Lum, Saiki, and Aukai informed Hawaiian of those beliefs and requested religious accommodations from the vaccine mandate.

237.   Hawaiian's processing of the religious claims, however, demonstrated a pattern of discrimination that pretextually (and often cynically) and improperly, challenged sincerity without any basis to do so.  The inauthenticity of Hawaiian's sincerity statements was evident from the fact that (1) it did not read some of the submissions (based on the incongruity and inapplicability of Hawaiian's responses); and (2) it later recognized the exact same beliefs as being sincere.  Any credible argument from Hawaiian against the sincerity of Plaintiffs' beliefs is no longer viable.

238.   Hawaiian also refused to engage in the interactive process with Plaintiffs regarding their religious accommodation requests and, at best, only responded to Plaintiffs with questions designed to deter Plaintiffs from exercising their religious beliefs.  At the least, Hawaiian completely failed its duty to undergo a genuine individualized assessment of the religious accommodation requests.

239.   Irrespective of the interactive process, Hawaiian failed to provide Plaintiffs with reasonable accommodations for their religious beliefs.  Termination (or unpaid leave for one year pending termination) is an adverse employment action.

240.   Hawaiian thereby discriminated against Plaintiffs because of their religious beliefs.

241.   Hawaiian's failure to provide religious accommodations has harmed Plaintiffs.

242.   By failing to engage in an authentic interactive process or offer any reasonable accommodation, Hawaiian's discriminatory actions were intentional and/or reckless and in violation of Title VII.

**COUNT II**
**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**Religious discrimination—disparate impact**

**On behalf of Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang,**
**Franks, Lum, Saiki, and Aukai**
**and others similarly situated**

243.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

244.   Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang, Franks, Lum, Saiki, and Aukai hold sincere religious beliefs that precluded them from receiving a COVID-19 vaccine.

245.  Hawaiian's compulsory vaccination policy, both in its imposition and the subsequent accommodations process, resulted in a statistically significant disparity of resulting adverse employment action between religious employees and secular employees.  Specifically, the vaccination policy adversely impacted religious employees at statistically significant rates.

246.  At the time Hawaiian announced the policy, Hawaiian knew or should have known that a statistically significant disparity existed between its unvaccinated religious employees and secular employees.

247.  The accommodations process resulted in statistically significant disparities between religious employees who were subjected to adverse employment action and secular employees who were permitted to keep their jobs.

248.  Because Hawaiian's vaccinated employees were contracting and spreading COVID-19 at similar or higher rates than its unvaccinated religious employees during the relevant timeframes, the vaccination policy cannot be justified by business necessity.  The foregoing conduct, in addition to the allegations throughout this Complaint, constitutes unlawful disparate impact discrimination under 42 U.S.C. §2000e-2 *et seq*, and Plaintiffs were harmed as a result.

## COUNT III
### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
### Religious discrimination—retaliation

### On behalf of Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang, Franks, Lum, Saiki, and Aukai
### and others similarly situated

249.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

250.   Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang, Franks, Lum, Saiki, and Aukai engaged in protected activity when they requested religious accommodations from Hawaiian's vaccine mandate.

251.   Hawaiian responded by denying virtually every request for accommodation.   Although corporate officials stated that Hawaiian would not simply terminate (or otherwise force out of the company) those seeking exemptions, that turned out to be precisely what Hawaiian did.

252.   Hawaiian's response to Plaintiffs' protected activity was an adverse employment action intended to force employees to forego their religious beliefs and receive the COVID-19 vaccine.   Indeed, for any employee the company engaged with on an individual basis, the only thing Hawaiian wanted to know was whether their belief was sincere and if there was anything the company could do to talk them out of it.   When its improper questioning of the employees' religious beliefs failed, Hawaiian chose to retaliate by giving the employees the unlawful choice between vaccination and termination (or forced unpaid leave, the functional equivalent).

253. Hawaiian further retaliated against Plaintiffs by following through with terminations even after the Omicron variant of COVID-19 demonstrated that earlier vaccination was not effective at stopping transmission of the virus. Hawaiian's own employee records will demonstrate the high amount of absenteeism throughout January 2022 based on COVID infections of the "100% vaccinated" staff, as well as Hawaiian's resultant flight cancelations throughout the related timeframe. Moreover, as companies (and the CDC) had already begun recognizing, forced vaccination was not an effective option at preventing the spread of COVID-19 and there was no need to persist in the policy at all, let alone prevent exempt employees from working.

254. Moreover, Hawaiian continued to retaliate against those employees who were exempt from the forced vaccination regime when the company refused to bring back employees who were unlawfully placed on unpaid leave. Hawaiian knew that it could bring those employees back with no safety concerns whatsoever and yet still refused to do so in order to further coerce employees into taking an outdated vaccine so that Hawaiian could continue its virtue signaling (which continued to foment a toxic environment toward unvaccinated employees).

255. Plaintiffs' religious beliefs and protected activity were the causes of Hawaiian's adverse employment action.

256.   By retaliating against Plaintiffs for engaging in protected activity, Hawaiian has violated Title VII.  This violation has harmed Plaintiffs.

## COUNT IV
### Violation of the ADA, 42 U.S.C. § 12101, *et seq*.
### Disability discrimination—failure to accommodate

### On behalf of Plaintiffs O'Hailpin, Arizumi, and Lum, and others similarly situated

257.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

258.   Plaintiffs O'Hailpin, Arizumi, and Lum have disabilities that prevent them from receiving a COVID-19 vaccine but do not prevent them from performing the essential functions of their jobs.

259.   Plaintiffs O'Hailpin, Arizumi, and Lum informed Hawaiian of these disabilities and requested reasonable medical accommodations from Hawaiian's vaccine mandate for those disabilities.

260.   Hawaiian refused to engage in the interactive process with Plaintiffs regarding their medical accommodation requests.

261.   Hawaiian instead inserted itself into the medical process, attempting to override Plaintiffs' doctors by informing Plaintiffs they should still be vaccinated based off Hawaiian's (mis)interpretation of the CDC's website, and blatant disregard for ADA requirements.

262.   Plaintiffs could have been accommodated by Hawaiian with no undue hardship, including through testing or recognition of Plaintiffs' natural immunity.

263.   Hawaiian violated the ADA when it denied Plaintiffs' accommodation requests and offered them termination (or the functional equivalent).

264.   Because of the virtual 100% denial rate, Hawaiian engaged in a pattern and practice of unlawful discrimination against Plaintiffs and those similarly situated because of their disabilities.

265.   Hawaiian's failure to provide medical accommodations harmed Plaintiffs.

266.   By failing to engage in the interactive process or offer any reasonable accommodation, Hawaiian's discriminatory actions were intentional and/or reckless, and in violation of the ADA.

## COUNT V
**Violation of the ADA, 42 U.S.C. § 12101, *et seq*.**
**Disability discrimination—retaliation**

**On behalf of Plaintiffs O'Hailpin, Arizumi, and Lum,**
**and others similarly situated**

267.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

268.   Plaintiffs O'Hailpin, Arizumi, and Lum engaged in protected activity when they requested medical accommodations from Hawaiian's vaccine mandate.

269.   Hawaiian responded by taking an adverse employment action against each of them when it announced that it would terminate their employment for not receiving the vaccine (or force them into unpaid leave, the functional equivalent of termination).

270.   Hawaiian's response to Plaintiffs' protected activity was an adverse employment action intended to force employees to forego their medical reasons for not receiving the COVID-19 vaccine.

271.   Plaintiffs' medical disability and protected activity were the causes of Hawaiian's adverse employment action.

272.   Hawaiian further retaliated against Plaintiffs by refusing to bring back employees who were unlawfully placed on unpaid leave.  Hawaiian knew that it could bring those employees back with no safety concerns whatsoever and yet still refused to do so in order to further coerce employees into taking an outdated vaccine so that Hawaiian could continue its virtue signaling.

273.   By retaliating against Plaintiffs for engaging in protected activity, Hawaiian has violated the ADA.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

a.     Certify this action as a class action under Federal Rules of Civil Procedure 23(a) and (b).

b.     Declare that Hawaiian has violated Title VII and the ADA by failing to engage in the interactive process or a genuine individualized assessment of requests for accommodations to its COVID-19 vaccine mandate and, instead, denying (formally or functionally) virtually every request based on pretextual reasons as part

of a pattern of discrimination against those needing reasonable accommodations that the company was unwilling to provide.

   c. Declare that Hawaiian has violated Title VII and the ADA by discriminating against its employees and failing to provide reasonable accommodations to its COVID-19 vaccine mandate.

   d. Declare that Hawaiian has violated Title VII and the ADA by retaliating against employees who engaged in protected activity.

   e. Award Plaintiffs, and those similarly situated, damages, including back pay, reinstatement (along with seniority and longevity) or front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages.

   f. Award Plaintiffs reasonable attorneys' fees and costs.

   g. Grant any other relief that the Court deems just, proper, and equitable.

   h. Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

December 22, 2022                          Respectfully submitted,

                                          */s/ James Hochberg*
                                          James Hochberg
                                          Hawaii Bar No. 3686
                                          JAMES HOCHBERG AAL, LLLC
                                          700 Bishop Street, Suite 2100
                                          Honolulu, HI 96813
                                          Telephone: (808) 256-7382
                                          jim@jameshochberglaw.com

                                          John C. Sullivan*
                                          S|L LAW PLLC
                                          610 Uptown Boulevard, Suite 2000
                                          Cedar Hill, TX 75104
                                          Telephone: (469) 523-1351
                                          Facsimile: (469) 613-0891
                                          john.sullivan@the-sl-lawfirm.com

                                          Aaron Siri*
                                          Walker Moller *
                                          Laura Carroll*
                                          SIRI | GLIMSTAD
                                          700 S. Flower Street, Suite 1000
                                          Los Angeles, CA 90017
                                          Telephone: (213) 376-3739
                                          aaron@sirillp.com
                                          wmoller@sirillp.com
                                          lcarroll@sirillp.com

                                          Counsel for Plaintiffs and Proposed
                                             Class

                                          * *Pro hac vice* motion forthcoming