IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RIKI O'HAILPIN, et al., | CIVIL NO. 22-00532 JAO-RT |
| Plaintiffs, | |
| vs. | ORDER DENYING PLAINTIFFS' MOTION TO CERTIFY CLASSES AND APPOINT CLASS COUNSEL |
| HAWAIIAN AIRLINES INC., et al., | |
| Defendants. | |

**ORDER DENYING PLAINTIFFS' MOTION TO CERTIFY CLASSES AND APPOINT CLASS COUNSEL**

In this putative class action, the named Plaintiffs allege their employer, Defendant Hawaiian Airlines Inc. and its parent company Defendant Hawaiian Holdings, Inc. (collectively, "Hawaiian"), violated their rights under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA") by discriminating against employees who requested medical or religious accommodations from Hawaiian's Covid-19 vaccine policy. Before the Court is Plaintiffs' Motion to Certify Classes and Appoint Counsel ("Motion"). For the reasons discussed below, the Court DENIES the Motion.

## I.    BACKGROUND

**A.    Factual Background**

The backdrop of this case is, quite obviously, the Covid-19 pandemic that began in early 2020 and had an unprecedented impact on workplaces across the country.  Hawaiian was no exception.  *See* ECF No. 67-4 (Kobayashi Decl.) ¶ 3.  Like other employers, Hawaiian implemented a vaccine requirement for its employees.  *Id.* ¶¶ 4, 18.  In August 2021, Hawaiian announced that all U.S.-based employees would need to be vaccinated by November 1, 2021 unless they had a reasonable accommodation for a disability as defined under the ADA or a sincerely held religious belief that conflicted with their ability to receive a Covid-19 vaccine.  *Id.* ¶ 4.

Against the backdrop of this mandate from Hawaiian was one of the Biden Administration's federal vaccine mandates.  *Id.* ¶ 19.  On September 9, 2021, President Biden issued Executive Order No. 14042 (the "Federal Contractor Mandate"), which required federal contractors (including Hawaiian) to ensure their workforces were fully vaccinated.  *Id.*  The deadline for compliance was extended several times, eventually to January 4, 2022.  *Id.*  Under the Federal Contractor Mandate and related guidelines, Hawaiian was required to have its unvaccinated employees masked and socially distanced in the workplace; thus, any exemptions

to Hawaiian's vaccine policy would need to comply with those masking and distancing requirements.  ECF No. 67-5 (Jackson Decl.) ¶ 4.

Hawaiian received 568 reasonable accommodation requests related to its vaccine policy; 496 were for religious accommodations and 72 were for medical ones.  *Id.* ¶ 10.  Hawaiian's Senior Director of Leave Management, Willard Jackson, made the final determination on all these requests—often in consultation with members of Human Resources, the Law Department, and a retained medical consultant, Dr. Frederick Chen.  *See id.* ¶ 14.  In light of the requirements of the Federal Contractor Mandate, Hawaiian examined every work position and every work location to determine whether masking and distancing were feasible.  *Id.* ¶ 16.  By December 1, 2021, it determined that for almost all positions, it was not. *Id.*

The parties present conflicting stories on how the religious and medical accommodation requests were handled.  Hawaiian points to the hours (over 800) that its team spent reviewing accommodation requests, conducting interviews, obtaining additional information, and analyzing the feasibility of masking and distancing in support of its contention that it conducted individualized reviews as required under the law.  *See id.* ¶ 29.  Hawaiian also points to evidence that, for example, certain employees expressed opposition to receiving a Covid-19 vaccine based on concerns unrelated to religion or disability (e.g., based on concerns with

3

certain vaccines' emergency use authorization or fears of encroachment on individual liberties), and that certain requests for accommodation were accompanied by form letters (in both the religious and medical contexts) that prompted the need for individualized follow-ups to confirm whether accommodations were actually justified. *See, e.g.*, *id.* ¶¶ 20–23, 25, 27.

In contrast, Plaintiffs point to certain evidence—particularly internal emails and presentations, discussed in more detail below—that they claim prove Hawaiian harbored an unlawful animus towards unvaccinated employees, particularly those seeking religious accommodations, or otherwise failed to engage in the individualized inquiries required under Title VII and the ADA in an effort to achieve—by unlawful means—an entirely vaccinated workforce. *See, e.g.*, ECF No. 50-1 at 7–10 . On this point, Plaintiffs rely on the fact that Hawaiian denied 99% of the accommodation requests it received. *See* ECF No. 50-1 at 5, 16. The story that Plaintiffs present is, essentially, that Hawaiian denied hundreds of requests with no follow up; interviewed some employees requesting accommodations or requested more information from them, yet still denied their requests; and that as to others—later on in the review process—Hawaiian finally, for the first time, began to acknowledge that certain employees had a sincere religious belief, but nonetheless still denied accommodations based on what

Plaintiffs claim was a pretextual "undue hardship" defense premised on the burdens posed by a testing program Hawaiian implemented. *See id.* at 7–10.

Under that program—what Hawaiian called a "Transition Period Testing Program" or the "TPTP," Hawaiian provided several weeks until the January 4, 2022 deadline for unvaccinated employees to test while they decided whether or not to get vaccinated, and a 12-month unpaid leave of absence starting no earlier than January 5, 2022 for those who did not wish to get vaccinated and were not granted an accommodation. ECF No. 67-4 (Kobayashi Decl.) ¶¶ 8–10. According to Hawaiian, the TPTP was meant to provide an opportunity for employees who did not want to get vaccinated and who were not granted an accommodation to wait out the pandemic without being terminated. *Id.* However, according to Hawaiian's evidence, the TPTP was too burdensome to administer. The reasons for this ranged from the costs of implementing the actual testing protocols to difficulty securing adequate tests to the disruptions that testing caused. *Id.* ¶¶ 13–14. For example, over half of the employees participating in the TPTP failed to timely test and so over 150 noncompliance letters were issued. *Id.* ¶ 14. At least for union employees, noncompliance involved its own financial and logistical burdens: disciplinary hearings needed to be held, with the employee placed on paid leave until the hearing could be scheduled, leading to additional costs and unpredictable staffing shortages. *Id.* ¶ 14. And staffing unvaccinated TPTP

employees on international flights created further complications, based on other

countries' requirements or testing protocols for unvaccinated individuals.  *Id.* ¶ 15.

As noted above, Plaintiffs have a different take on the TPTP—arguing that

Hawaiian used it as a pretext for denying accommodation requests.  They do not

dispute Hawaiian's evidence regarding the financial and logistical burdens

imposed by the TPTP.  Instead, Plaintiffs rely primarily on the following: (1) that

before December 2021, i.e., the final days of the TPTP, Hawaiian did not admit

that any employee held a sincere religious belief that conflicted with the vaccine

requirement; (2) that Hawaiian acknowledged at the outset of the TPTP, in

September 2021, that it was "just buying some more time" for employees (i.e., it

was never intended as a long-term accommodation), ECF No. 50-15 at 2; and the

following statements in a December 2021 email from Hawaiian's Senior Vice

President of Human Resources:

> Hardship versus approval of accommodation: Last week, we
> stated that we would approve the request for an accommodation
> with an unpaid leave. . . . I decided against doing this because if
> we approve an accommodation with leave, we would be required
> by law to allow the employee to use *paid* leave (e.g., vacation
> and sick).  I know that is not our intent.  Rather, our intent is that
> any accommodation that meets our standards of safety poses an
> undue hardship. . . . Therefore, to be true to our intent, I
> recommend that we acknowledge the employee's religious belief
> is bona fide but provide that we cannot accommodate their
> request due to undue hardship.

ECF No. 50-5 at 2.

By January 5, 2022, employees who remained unvaccinated, did not have an approved accommodation, or were not on a leave of absence were subject to termination proceedings.  ECF No. 67-4 (Kobayashi Decl.) ¶ 20.  When the vaccine policy ended on October 1, 2022, those on the 12-month unpaid leave were provided an opportunity to return to work.  *Id.* ¶ 22.

**B.    Procedural Background**

Plaintiffs, former and current Hawaiian employees whose religious and medical accommodation requests were denied, commenced this putative class action in December 2022.  ECF No. 1.  In their Motion, which Hawaiian opposes, they propose certification of the following class and subclasses under Federal Rule of Civil Procedure 23(b)(3):

> 1. **Primary Class**: approximately 500 members[.] (568 total accommodation requests from around 500 employees denied an accommodation).
>
> 2. **Subclass 1**: approximately 436 members[.] (496 total religious requests—seven granted, fifty-three rescinded/no final decision).
>
> 3. **Subclass 2**: approximately 53 members[.] (fifty-three religious requests rescinded/no final decision).
>
> 4. **Subclass 3**: approximately 55 members[.] (seventy-two total medical requests—three granted, fourteen rescinded/no final decision).
>
> 5. **Subclass 4**: approximately 14 members[.] (fourteen medical requests rescinded/no final decision).

ECF No. 50-1 at 11–12.  The Court held a hearing on the Motion on November 22, 2023.  ECF No. 99.

## II.   LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation and quotation marks omitted).  As such, Rule 23 "imposes stringent requirements for certification."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).  "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc).  A party requesting class certification must first satisfy Rule 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements.  Fed. R. Civ. P. 23(a)).  If all four of these prerequisites are met, Plaintiffs must then "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast*, 569 U.S. at 33.  Under the provision that is at issue here, Rule 23(b)(3), the Court can only certify a class if it finds that "the questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

8

"Before it can certify a class, a district court must be satisfied, after a rigorous analysis, that the prerequisites of both Rule 23(a) and 23(b)(3) have been satisfied." *Olean*, 31 F.4th at 664 (citation and quotation marks omitted). This rigorous analysis may entail some overlap with the merits of the plaintiffs' underlying claims, *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), and resolving disputes that are relevant to the class certification analysis, *see Olean*, 31 F.4th at 667. But "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

## III. DISCUSSION

### A. Rule 23(a) Requirements Not in Dispute

The Court begins by addressing the requirements under Rule 23(a) that are not in dispute: numerosity and adequacy. *See* Fed. R. Civ. P. 23(a)(1), (4). As evident from the discussion below, simply because Hawaiian does not challenge Plaintiffs' ability to meet these requirements does not always mean the Court agrees they are met—although it usually does.

9

### 1.     Numerosity

Numerosity is satisfied if "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  This requirement mandates an "examination of the specific facts of each case and imposes no absolute limitations."  *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 330 (1980).  "[A]s a general rule, classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough."  *Handloser v. HCL Techs. Ltd.*, 2021 WL 879802, at *5 (N.D. Cal. Mar. 9, 2021) (citation and quotation marks omitted); *see also McMillon v. Hawaii*, 261 F.R.D. 536, 542 (D. Haw. 2009) ("Generally, a class satisfies numerosity if it is likely to exceed forty members.") (citations omitted).

Here, the proposed primary class consists of 500 members, with all of the proposed subclasses, with one exception, also exceeding 40 members.  *See* ECF No. 50-1 at 11–12.  One subclass is only 14 members—encompassing individuals whose medical exemption requests were rescinded, such that no final decision was reached (as compared to the separate subclass of individuals whose medical exemption requests were actually denied, amounting to 55 individuals).  *Id.* at 12.  Although apparently not an issue to Hawaiian, this is nonetheless problematic for the Court—who, again, must undertake a rigorous analysis—because each proposed subclass must separately meet the numerosity requirement under Rule

23(a).  *See Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014); Fed. R. Civ. P. 23(c)(5).  In the briefing, Plaintiffs skate over this issue by asserting that each *group* of subclasses exceeds 40 persons, in other words, because the total number of individuals who requested medical exemptions that were either denied *or* rescinded exceeds 40, that is sufficient.  *See* ECF No. 50-1 at 11.  But that's not what Plaintiffs proposed; instead, they proposed separate subclasses for those *denied* a medical exemption and those who *rescinded* their medical exemption requests.  *See id.*  Practically speaking, this makes sense given the distinct positions of these individuals.[1]  When pressed at the hearing on this issue, Plaintiffs' counsel indicated that breaking out the ADA subclasses mattered only for purposes of damages.  Still, he did not offer any specific justification why a subclass consisting of 14 individuals meets the numerosity requirement.  The Court doubts that it does, and so concludes that certification of that subclass could likely be denied based on numerosity grounds alone.[2]  *See A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 835 (9th Cir. 2022) (noting that the Supreme Court has

---

[1]  Notably, it does not appear that any named Plaintiff would fit into this category; in other words, all the named Plaintiffs' requests appear to have been denied rather than rescinded.  *See* ECF No. 1 ¶¶ 21–29.  The Court thus doubts that typicality could be met for these subclasses of individuals who rescinded their requests.

[2]  As discussed below, the Court finds that, based on other grounds, certification is not warranted for *any* ADA subclass—and so any denial is not based on numerosity alone.

"eschew[ed] any bright-line rules" but has stated that a class of fifteen is too small).  As to the overall class and other subclasses, though, the Court agrees numerosity is met.

### 2. Adequacy

Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The purpose of the adequacy of representation requirement is to ensure that absent class members are "afforded adequate representation before entry of a judgment which binds them." *Hanlon*, 150 F.3d at 1020 (citation omitted).  "Whether the class representatives satisfy the adequacy requirement depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) (citation and quotation marks omitted).

Hawaiian does not contest the adequacy of either the named Plaintiffs or their counsel in this matter.  Based on the Court's experience with this litigation thus far, and the evidence provided in support of the Motion, the Court is satisfied that counsel would be competent class counsel and that all the named Plaintiffs and their counsel are invested in vigorously prosecuting this action on behalf of the class.  Hawaiian offers no argument that there is any conflict of interest between

either counsel or the named Plaintiffs and other putative class members, and the Court is aware of no such conflicts.  The Court therefore concludes Plaintiffs have met their burden as to this requirement.

**B.      Remaining Rule 23 Requirements & *Teamsters* Framework**

Having laid out the general requirements for commonality, typicality, predominance, and superiority above, the Court finds it most efficient to address these factors together—because there is significant overlap in this case.

**1.      Remaining Rule 23 Requirements**

Under Rule 23(a)(2), a party seeking class certification must show that "there are questions of law or fact common to the class."  Fed R. Civ. P. 23(a)(2). A common question is one that is "of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  A common question alone does not satisfy the commonality requirement.  Rather, "[w]hat matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* (citation omitted).

Relevant here, plaintiffs seeking to litigate a class action involving a large number of individual employment decisions must establish "some glue holding the alleged *reasons* for all those decisions together" in order to satisfy the

commonality requirement.  *Id.* at 352.  Without this "glue" linking the reasons for the individual hiring decision together, it is "impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*."  *Id.*

Turning next to typicality, under Rule 23(a)(3), plaintiffs must establish that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  The typicality and commonality requirements "tend to merge."  *Dukes*, 564 U.S. at 349 n.5.  The typicality requirement "limit[s] the class claims to those fairly encompassed by the named plaintiff's claims."  *General Tel.*, 446 U.S. at 330; *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.") (citation and quotation marks omitted).

As noted above, because Plaintiffs seek to certify a class under Rule 23(b)(3), they must also demonstrate predominance—a "far more demanding" requirement than the commonality one.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997).  "[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3)

action would be inappropriate." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (citation omitted).  This is because, among other reasons, "the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified."  *Id.* (citation omitted).

And finally, because they seek to certify a class under Rule 23(b)(3), Plaintiffs must also show a class action is superior to having these claims proceed on an individualized basis.  Relevant to the superiority inquiry are: (1) the interest of individuals within the class in controlling their own litigation; (2) the extent and nature of any pending litigation commenced by or against the class involving the same issues; (3) the convenience and desirability of concentrating the litigation in the particular forum; and (4) the manageability of the class action.  *See* Fed. R. Civ. P. 23(b)(3)(A)–(D); *Amchem Prods.*, 521 U.S. at 615–16.

### 2.     *Teamsters* Framework

There is, however, an additional twist to the Court's assessment of these requirements based on how Plaintiffs seek certification here—namely by alleging that Hawaiian engaged in a "pattern and practice of discrimination."  ECF No. 50-1 at 10.  In doing so, Plaintiffs seemingly invoke the *Teamsters* evidentiary framework, named for the case in which it was first articulated.  *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977).  The Court says

"seemingly" because Plaintiffs did not clearly explain the interplay between their pattern and practice arguments and the merits of their Title VII and ADA claims in the context of the requirements of Rule 23. As the Court expressed at the hearing, this made it difficult to pin down why Plaintiffs believe they have met their burden under Rule 23 based on the *type of claims* (for Title VII religious accommodations and ADA medical exemptions) *and relief* (damages) at issue here. The Court has thus looked to other authority—not cited by the parties—and relied on certain clarifications Hawaiian offered at the hearing—which Plaintiffs did not specifically object to—to try to make sense of things.

To begin with, *Teamsters* set forth a two-phase framework for analyzing Title VII pattern-or-practice suits brought by the government, which has subsequently been applied to private class actions like this one. The first phase is the "liability stage" and the second is the "remedial stage." *See Heath v. Google LLC*, 345 F. Supp. 3d 1152, 1166–67 (N.D. Cal. 2018). The district court in *Heath* summarized the evidence relevant at phase one, and how the burden shifts between employees and employer:

> During *Teamsters* phase one, the burden is on Plaintiffs "to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." 431 U.S. at 360. Plaintiffs must show that intentional discrimination was the defendant's "standard operating procedure" as opposed to an "unusual practice." *Id.* at 336. To carry their burden, Plaintiffs must produce evidence giving rise to a sufficient inference that employment decisions

16

> were based on an unlawful discriminatory criterion. Plaintiffs
> can establish this inference through circumstantial evidence such
> as statistical disparities, documents, and testimony from
> protected class members.
>
> At phase one of a pattern-or-practice case, Plaintiffs are "not
> required to offer evidence that each person for whom it will
> ultimately seek relief was a victim of the employer's
> discriminatory policy." *Teamsters*, 431 U.S. at 360. Rather,
> Plaintiffs' burden "is to establish a prima facie case that such a
> policy existed." *Id.* "The burden then shifts to the employer to
> defeat the prima facie showing of a pattern or practice by
> demonstrating that the [plaintiffs'] proof is either inaccurate or
> insignificant." *Id.*
>
> "If an employer fails to rebut the inference that arises from the
> [plaintiffs'] prima facie case," the finder of fact can conclude
> "that a violation has occurred" and the trial court can award
> prospective equitable relief. *Id.* at 361.

345 F. Supp. 3d at 1167 (certain citations and internal quotations omitted).

Now, here, Plaintiffs are *not* seeking prospective injunctive relief. *See* ECF

No. 1 at 82–83. Instead, they seek to certify a damages class under Rule 23(b)(3).

So *Teamster*'s second phase is necessary:

> When the plaintiff seeks individual relief such as reinstatement
> or backpay after establishing a pattern or practice of
> discrimination, "a district court must usually conduct additional
> proceedings . . . to determine the scope of individual relief."
> *Teamsters*, 431 U.S. at 361. At this phase, the burden of proof
> will shift to the company, but it will have the right to raise any
> individual affirmative defenses it may have, and to "demonstrate
> that the individual applicant was denied an employment
> opportunity for lawful reasons." *Id.* at 362.

*Dukes*, 564 U.S. at 366–67.

17

Still, in the context of Rule 23, "[m]ere allegations of a pattern or practice of discrimination do not *per se* satisfy the predominance requirement." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 537 (N.D. Cal. 2012) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982) ("[T]he allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified.")).  Instead, such allegations must "still be subject to generalized proof." *Ellis*, 285 F.R.D. at 537.  And to meet Rule 23's predominance requirement, the common issues in a "pattern and practice" case that can be resolved on a classwide basis must still present a significant aspect of the case.  *See id.*  So even in a "pattern and practice" case, a court should separate the issues susceptible to "generalized proof" from those that would require "individualized proof" to assess whether predominance has been met.  *See id.* at 537–38 (citing *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *6 (N.D. Cal. June 5, 2006) ("Predominance requires that the common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members.")); *see also id.* (certifying class of women, under Rule 23(b)(3), subjected to a uniform promotion system for two discrete positions because "the individualized hearings required [were] narrow in scope and

significance when compared to the threshold, classwide issues subject to generalized proof").

But heeding that directive in this case necessarily requires addressing the elements of the claims at issue—again, something Plaintiffs have not satisfactorily done for the Court here.  And on this point, the Court finds at least somewhat persuasive authority noting that, in the context of yet another type of Title VII claim, the *Teamsters* framework must be adjusted according to the merits of that type of claim.  Specifically, in addressing pattern and practice claims based on a hostile work environment—where liability depends on a showing that an individual claimant's work environment is both objectively and subjectively hostile—district courts have acknowledged the awkward fit of the *Teamsters* framework.  *See EEOC v. Int'l Profit Assocs., Inc.*, 2007 WL 3120069, at *15 (N.D. Ill. Oct. 23, 2007) (noting the *Teamsters* burden-shifting framework is "logical in the context of a discrimination-in-hiring case, where the primary questions at the individual stage is whether the claimants were subject to a discriminatory policy" but that this framework "cannot be applied in a straightforward fashion to a hostile work environment case" because proving an employer had a policy of tolerating unlawful sexual harassment does not necessarily make it more likely that a particular claimant was subject to *actionable* sexual harassment).  And in the context of putative class actions bringing hostile work environment claims, district

19

courts have denied certification because, despite a common pattern or policy at issue, determining whether an employer was liable to each individual claimant still required an individualized assessment because of the elements of that type of Title VII claim. *See Van v. Ford Motor Co.*, 332 F.R.D. 249, 274–80, 288–89 (N.D. Ill. 2019). In short:

> [A] finding that an employer had a pattern or practice of tolerating . . . harassment in violation of Title VII does not necessarily establish that an individual claimant was exposed to harassment or that the harassment an individual claimant suffered violates Title VII. The *Teamsters* pattern-or-practice framework can assist a court's analysis of whether a defendant has engaged in a pattern or practice of discrimination prohibited under Title VII, but it is Title VII itself that defines the scope of prohibited discrimination and sets the substantive boundaries within which the method of proof must operate. In other words, adopting the *Teamsters* method of proof to adjudicate plaintiffs' claims does not obviate the need to consider the statutory elements of the specific cause of action pled.

*Brown v. Bd. of Trustees of Univ. of Illinois*, 2022 WL 17547575, at *4 (C.D. Ill. Dec. 9, 2022) (citation and quotation marks omitted). With that in mind, then, the Court turns to the specific elements of the claims at issue here, beginning with the Title VII claims.

## C.    Title VII Subclasses

To establish religious discrimination on the basis of a failure-to-accommodate theory, a plaintiff must set forth a prima facie case that (1) they had a bona fide religious belief, the practice of which conflicts with an employment

duty; (2) they informed the employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected them to an adverse employment action because of their inability to fulfill the job requirement.  *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004).

Again, though, Plaintiffs invoke *Teamsters*.  So taking the Title VII subclasses first based on religious accommodation requests, the Court finds Plaintiffs have marshaled enough evidence to demonstrate that they have raised the right type of common question here—regarding whether Hawaiian had a discriminatory employment policy that was impermissibly antagonistic to requests for religious exemptions from its vaccine requirement.  In making this determination the Court finds the following evidence particularly relevant: (1) the email from Hawaiian's COO in September 2021 stating "I think we are all more sympathetic to those claiming medical versus claiming religious accommodations," ECF No. 50-22 at; (2) the fact that a single individual—Mr. Jackson—ultimately made the final determination on every accommodation request, *see* ECF No. 50-5 (Jackson Decl.) ¶ 14; (3) evidence suggesting that Hawaiian resolved certain religious accommodation requests with "canned" responses and in so doing cited and rejected reasons that an employee never put forward (e.g., claiming an employee sought an accommodation based on their "generalized belief that your body is a temple" when, in fact, the employee never claimed to hold such a belief),

21

*see* ECF No. 50-1 at 18–19; and (4) evidence indicating that Hawaiian described

its own approach to analyzing religious accommodation requests as "aggressive,"

ECF No. 50-11 at 13.  The Court agrees with Hawaiian's argument that

acknowledging it was taking a "strict" approach, specifically "as strict as the law

will allow," *see* ECF No. 50-10 at 2, does not necessarily amount to evidence of

discrimination.  *See* ECF No. 67 at 18–19 n.3.  But the combination of describing

Hawaiian's stance towards these requests as "aggressive," with an executive's

explicit statement that they were less sympathetic to religious accommodation

requests, with evidence that could tend to demonstrate Hawaiian's responses were

"canned," all in the context of a 99% denial rate are, together, sufficient to meet

Plaintiffs' burden on this front.

Hawaiian certainly contends that the evidence shows it engaged in a fair,

individualized assessment of each religious accommodation request.  But that does

not change the fact that the question of whether Hawaiian's approach was a sham

with predetermined outcomes as opposed to individualized assessments can indeed

be answered by way of generalized, classwide proof.  *See Doster v. Kendall*, 54

F.4th 398, 435 (6th Cir. 2022) ("According to the Plaintiffs, the Air Force has a

'standard operating procedure' of violating the law by denying exemptions based

on its general health and readiness interests.  According to the Air Force, it has

examined each member's unique circumstances and reached the conclusion that its

compelling health and readiness interests in requiring vaccination win out over every conceivable mix of specific duties and alternative means. *Either way— whether this practice stems from an illegal broad-brush approach or from a legal individualized analysis—the answer will be the same for the whole class*.") (citation omitted and emphasis added).[3]

Nonetheless, that does not resolve the entire inquiry for whether the Title VII subclasses should be certified. Hawaiian's primary argument against certification of these subclasses is that whether any one class member had a sincerely held religious belief conflicting with its vaccine requirement—again, an element of a prima facie case for these types of claims—is too individualized to warrant class treatment. *See* ECF No. 67 at 20–26. As Hawaiian notes, in *Doster*, on which Plaintiffs rely heavily, the class was defined to include only those individuals confirmed as holding a sincere religious belief that was burdened by their employer's Covid-19 vaccine requirement. *See* 54 F.4th at 433.[4] Ultimately,

---

[3] The Court recognizes that, yesterday, the Supreme Court vacated the judgment in *Doster*, and remanded the case to the Sixth Circuit with instructions to direct the district court to vacate as moot its preliminary injunctions (presumably based on the fact that the vaccine mandate at issue had been rescinded while the case was pending at the Sixth Circuit). *See Kendall v. Doster*, No. 23-154, 2023 WL 8531840, at *1 (U.S. Dec. 11, 2023). The Court still finds the excerpt above helpful in thinking about certification here.

[4] Of course, *Doster*'s overall persuasiveness may be limited by the fact that it has now been vacated. But even more importantly, the class in *Doster* was certified

the Court agrees with this argument; however, that also does not resolve the issue completely because, as Plaintiffs note, for some employees, Hawaiian acknowledged they had a sincerely held religious belief—but nonetheless denied any accommodation based on undue hardship.

### a.     Individuals Denied Based on "Personal Preference"

The Court turns first to those individuals for whom Hawaiian denied an accommodation based on a finding that their objection to the vaccine requirement amounted to a "personal preference" rather than a sincerely held religious belief in conflict with that requirement.  In addressing another case involving employee objections to their employer's Covid-19 vaccine requirement, the Ninth Circuit noted:

> A religious belief need not be consistent or rational to be protected under Title VII, and an assertion of a sincere religious belief is generally accepted. *Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981) ("[T]he resolution of [whether a belief is religious] is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."); *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176 n.3 (9th Cir. 2021) ("We may not . . . question the legitimacy of [Appellants'] religious beliefs regarding COVID-19 vaccinations." (citing *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018))), *recons. en banc denied*, 22 F.4th 1099 (9th Cir. 2022); EEOC Guidance, § 12–I(A)(2) ("[T]he sincerity of an employee's stated religious belief is usually not in dispute and is generally presumed or

under Rule 23(b)(2)—meaning the court there did not address predominance and superiority, which, as discussed below, are additional hurdles for Plaintiffs here. *See* 54 F.4th at 438–41.

24

easily             established."            (cleaned            up)).

*Keene v. City & Cnty. of San Francisco*, 2023 WL 3451687, at *2 (9th Cir. May

15, 2023).  That said, this still "does not mean that courts must take plaintiffs'

conclusory assertions of violations of their religious beliefs at face value." *Bolden-*

*Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023) (citing

*Oklevueha Native Am. Church of Haw., Inc. v. Lynch*, 828 F.3d 1012, 1016–17

(9th Cir. 2016)).  Nor does Title VII require an employer to accommodate personal

preferences, as it does not protect secular preferences.  *See Tiano v. Dillard Dep't*

*Stores, Inc.*, 139 F.3d 679, 681–83 (9th Cir. 1998) (holding that the plaintiff failed

to establish a prima facie case of religious discrimination under Title VII because

she failed to show that the timing of her religious pilgrimage was part of her bona

fide, pilgrimage-related religious belief, as opposed to a personal preference, and

explaining that employers need not "accommodate the personal preferences of the

employee" because "Title VII does not protect secular preferences").

So although an employer's ability to question the line between sincerely held

belief and secular preference may be limited, it nonetheless exists.  And the Court

agrees with Hawaiian that probing that distinction—and whether Hawaiian did so

permissibly here—necessarily involves individualized inquiries that are not

susceptible to common proof.  *See* EEOC Compliance Manual §12(A)(1)

(explaining that deciding whether a belief or practice is religious requires a "case-

by-case inquiry"); *see also* EEOC Compliance Manual § 12(A)(3) (explaining that "where an alleged religious observance, practice, or belief is at issue, a case-by-case analysis is required"). For employees denied an accommodation on this basis, the Court sees no way around the need to examine each employee's specific request for an accommodation, as well as any follow-up information provided in an interview or otherwise, to assess whether Hawaiian was wrong to conclude that their objection to the vaccine was based on an unprotectible personal preference.

Plaintiffs' arguments to the contrary are not convincing. Merely showing that someone was willing to lose their job rather than comply with the vaccine requirement or submitted their request for exemption on a form intended for *religious* accommodations is not a sufficient means to prove, by common evidence, that all those individuals did so based on a *religious* belief *in conflict with* getting a Covid-19 vaccine. *See* ECF No. 89 at 15–17. The contents of the forms themselves would still need to be parsed. And while Plaintiffs convincingly argue that Hawaiian's opposition has relied on accommodation forms that include what could be described—and what Plaintiffs argue Hawaiian itself has described—as reasons opposing the vaccine requirement based at least in part on religious beliefs, the Court still is not convinced this means class treatment is appropriate. *See, e.g.*, *id.* at 16–17 (comparing accommodation forms opposing vaccination based on the employee's "understanding of the Bible" with Mr. Jackson's deposition testimony

26

admitting that the belief that the vaccine was "not in accord with God's word" was a religious belief).  In short, Plaintiffs' own arguments demonstrate that the Court could not answer the question of whether Hawaiian improperly denied these individuals' requests in one stroke.  The evidence would not be the same for all class members and would instead still require the Court to look at the materials for each individual's accommodation request to see the precise basis for the objection to the vaccine and to what extent it was tied to a religious belief, and then compare treatment of that objection to Hawaiian's statements in this litigation (or treatment of other individuals' similar accommodation requests).

Other cases involving challenges to Covid-19 vaccine mandates bear out the concern that resolving the question of whether a sincerely held religious belief is in conflict with a vaccine policy may result in a "yes" answer for some employees, but a "no" answer for others, even when they have overlapping grounds for objecting to the vaccine.  *See Ellison v. Inova Health Care Servs.*, 2023 WL 6038016, at *6–7 (E.D. Va. Sept. 14, 2023) (permitting one plaintiff's Title VII claim to proceed based on a claimed abortion-based objection to the Covid-19 vaccine, while dismissing another plaintiff's because her allegations were too conclusory to provide a sufficient connection between her objection to the vaccine and her subjective religious beliefs); *cf. Kather v. Asante Health Sys.*, 2023 WL 4865533, at *5 (D. Or. July 28, 2023) ("[V]ague expressions of sincerely held

27

Christian beliefs alone cannot serve as a blanket excuse for avoiding all unwanted employment obligations.  [Three of the plaintiffs] allege facts that hint at religious beliefs but do not specify how those beliefs conflict with receiving a COVID-19 vaccine.").  In light of this, the Court also cannot say that the named Plaintiffs' claims will necessarily be typical.

Significantly, the parties' briefs do not squarely address whether this assessment of a sincerely held religious belief in conflict with an employment requirement must occur at phase one or two of the *Teamsters* framework.  At the hearing, Hawaiian posited that the analysis must necessarily come at phase one— because it is part of any one plaintiff's prima facie case.  Plaintiffs offered no objection to this contention.  Based on the authority cited above, the Court agrees, i.e., because the assessment is necessary to determine whether Hawaiian's treatment of religious accommodation requests resulted in *actionable* discrimination under Title VII.  As to this group of individuals, then, individualized inquiries into whether they had a religious belief that conflicted with a vaccine requirement would predominate any common inquiry into whether Hawaiian was antagonistic to granting religious accommodations to unvaccinated employees—and so the Court concludes certification of that class of individuals cannot meet the requirements of a Rule 23(b)(3) damages class.

A final point on a related issue: the Court is similarly not convinced that certification is warranted based on Plaintiffs' theory that Hawaiian used certain organized religions' official positions on the Covid-19 vaccine as a reason to deny accommodations to individuals who identified as members of those religions.  *See* ECF No. 50-1 at 27.  Denying a claim on this basis alone may not accord with the law.  *See Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981) (noting that protection of religious beliefs is not limited to beliefs shared by one's religious sect); *see also* 29 C.F.R. § 1605.1 ("The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee.").  But for purposes of the class certification analysis, Plaintiffs have not disputed Hawaiian's evidence that no one was actually denied an accommodation on this basis.  *See* ECF No. 67-5 (Jackson Decl.) ¶ 24; *see also* ECF No. 67 at 18 n.3.  So Plaintiffs have not met their burden that this provides any glue justifying classwide resolution of the Title VII claims here.

### b.   Individuals Denied Based on Undue Hardship

More persuasive in the Title VII context is Plaintiffs' request to certify a class of individuals that Hawaiian recognized held sincere religious beliefs, but still denied any accommodation based on its defense of undue hardship.  Plaintiffs

contend such a class of individuals exists because, for what the parties estimated at the hearing to be about 300 or so individuals, Hawaiian issued denials that stated: "Although you have a sincere religious belief, we cannot reasonably accommodate you because it would cause undue hardship that will result in a significant disruption to our operation." ECF No. 50-20. According to Plaintiffs, this is a concession that the individuals who received these letters had a sincere religious belief that conflicted with receiving a Covid-19 vaccine. But because Plaintiffs raised this argument for the first time in reply, Hawaiian had no opportunity to provide a written response. And at the hearing, when the Court tried to get some clarity on Hawaiian's position, it was left with the understanding that while the letters acknowledged sincerely held religious beliefs, Hawaiian was *not* conceding that these letters proved that Hawaiian had admitted that such religious beliefs *conflicted with* receiving a Covid-19 vaccine. Indeed, as Plaintiffs cited at the hearing, during his deposition, Mr. Jackson acknowledged that Hawaiian's team operates under the assumption that someone requesting a religious accommodation has a sincerely held religious belief, but also went on to state that what Hawaiian was trying to determine was "how does that religious belief prevent you from performing an essential function at your job, which is at that time getting vaccinated for COVID-19." ECF No. 50-6 (Jackson Depo.) at 47.

Now, it may be that, under the law, and particularly in light of other evidence in the record here,[5] Hawaiian is estopped—under Title VII precedent or otherwise—from arguing that it properly denied accommodation requests because a certain employee did not have a religious belief that conflicted with getting vaccinated when the denial was ostensibly based only on undue hardship.  But Plaintiff—who has the burden on the issue before the Court—has not cited anything to the Court that says as much.  So the Court is not even certain that such a subclass of people—with an undisputed bona fide religious belief that conflicts with the vaccine mandate—exists here.

But even assuming it does exist, the Court still cannot conclude this group of individuals can meet Rule 23's requirements based on an equally individualized assessment under "undue hardship."  "Once an employee establishes a prima facie case of failure to accommodate religion, the burden shifts to the employer to show either that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship."  *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023) (citation and quotation marks omitted).  Because undue hardship is an affirmative defense, *see id.*, Hawaiian offered at the hearing that this

---

[5]  *See, e.g.*, ECF No.  50-5 at 2 (email from Ms. Kobayashi stating: "I recommend that we acknowledge the employee's religious belief is bona fide but provide that we cannot accommodate their request due to undue hardship.").

31

analysis comes into play at phase two of the *Teamsters* framework.  To meet its burden, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023); *see also id.* at 471 ("'[U]ndue hardship' in Title VII means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test.").

Hawaiian's undue hardship defense on this front seems to be two-fold: (1) that it determined that masking and distancing, as mandated by the federal government, was not feasible for the vast majority of positions and locations; and (2) that it determined the TPTP was also not feasible.  And because the first portion of that justification required Hawaiian to undertake individualized analyses regarding the functions of each position and location, Hawaiian seems to argue this defeats commonality—or at the very least predominance.  *See, e.g.*, ECF No. 67 at 29–30.  The Court agrees.  Taking the TPTP piece first, the extent to which that potential accommodation burdened Hawaiian (due to costs, inability to obtain tests, lack of compliance that created further costs and logistical challenges) would appear to be, for the most part, capable of classwide resolution based on generalized proof.  *See* ECF No. 67-4 (Kobayashi Decl.) ¶¶ 9–15.  Still, Hawaiian's evidence indicates the reasonableness of this accommodation or extent

32

to which it imposed a hardship on Hawaiian could be an individualized inquiry. For example, the evidence suggests that Hawaiian faced a greater hardship when unionized employees did not comply with TPTP testing requirements or where in-flight crew were being accommodated through the TPTP.[6] *See* ECF No. 50-4 (Kobayashi Decl.) ¶¶ 14-15, 23.  With regard to the feasibility of masking and distancing, the individualized inquiries become even more apparent.  In their briefing, Plaintiffs offered no response to Hawaiian's evidence that it made individualized assessments when it came to undue burden, by looking at every single job position and work environment to assess the feasibility of masking and distancing.  *See* ECF No. 67-5 (Jackson Decl.) ¶¶ 4, 16-17, 29.  Indeed, in their own Complaint, Plaintiffs themselves emphasize their unique job positions when contending that masking and distancing *were* feasible *for them specifically*.  *See, e.g.*, ECF No. 1 ¶ 26 (noting that Plaintiff Sabrina Franks, a Customer Service Agent, was denied an accommodation based on undue hardship even though she worked "behind plexiglass while wearing a mask, face shield, and gloves—where her only interaction with others consisted of checking credentials and swiping membership cards for lounge entry using a small opening in the plexiglass").

---

[6]  Again, this point also underscores that Plaintiffs have failed to convincingly demonstrate typicality here—where a number of the named Plaintiffs are union members and/or part of in-flight crew, meaning the burden of the TPTP as to them may have been more acute when compared to other putative class members.  *See* ECF No. 1 ¶¶ 21–29.

When pressed on this issue at the hearing, Plaintiffs offered a vague suggestion of "bellwether trials." How many such trials would be needed, i.e., for each job position and work location? And, for purposes of typicality, how many different job positions and work locations[7] are covered by the named Plaintiffs alone? Plaintiffs' counsel did not say. Plainly, this is not sufficient to meet their burden when Hawaiian has pointed to the individualized issues that the Court agrees would predominate over any common inquiry regarding, e.g., Hawaiian's alleged animus to religious accommodations or even to the feasibility of or alleged pretextual nature of a testing program. *Compare Van*, 332 F.R.D. at 290–91 (noting, in addressing proposed Title VII class action, that numerous separate hearings would be needed on the issue of liability and that "Plaintiffs' failure to submit a viable litigation plan" was an additional ground for denying class certification) (quoting *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013) ("[I]f class counsel is incapable of proposing a feasible litigation plan though asked to do so, the judge's duty is at an end.")); *with Ellis*, 285 F.R.D. at 539 (noting that plaintiffs had submitted a trial plan and concluding that the "individualized hearings required are narrow in scope and significance when compared to the threshold, classwide issues subject to generalized proof").

---

[7] Again, looking to typicality, the Court notes that the named Plaintiffs all appear to be based only out of Honolulu and/or at the Daniel K. Inouye International Airport. *See* ECF No. 1 ¶¶ 21–29.

In so concluding, the Court clarifies that it is *not* persuaded by Hawaiian's claim that individualized *damage* inquiries defeat certification here.  For one, although Hawaiian cites evidence that the nature and amount of each class members' damages may be distinct, it cites no authority that this alone bars certification.  *See* ECF No. 67 at 29–30.  As noted in the *Ellis* case, particularly in the context of the *Teamsters* framework, individualized damages inquiries alone do not defeat certification.  285 F.R.D. at 539.  And this point holds true outside that framework, as well:

> Both *Levya* and *Jimenez* stand for the established proposition that a class may be certified even if individualized damages calculations will be necessary.  *See Levya*, 716 F.3d at 513–14; *Jimenez*, 765 F.3d at 1167–78. When read in conjunction with the Supreme Court's decision in *Comcast*, these cases set forth the unremarkable principle that "[s]o long as the damages can be determined and attributed to a plaintiff's theory of liability, damage calculations for individual class members do not defeat certification." *Lindell*, 2014 WL 841738, at *14.

*Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *14 (N.D. Cal. Dec. 15, 2014).  Instead, the Court bases its predominance analysis on the fact that Hawaiian's *liability* generally and then remedially as to each putative class member will require too many individualized assessments—and thus also declines Plaintiffs' request, raised briefly for the first time in their reply, to certify any type of issue class in this case under Rule 23(c)(4).  *Cf. Sellars v. CRST Expedited, Inc.*, 371 F. Supp. 3d 557, 566 n.4, 657 (N.D. Iowa 2019) (decertifying class in a Title

VII hostile work environment case after district court acknowledged that whether employer had a policy, pattern, or practice, and whether such a policy, pattern, or practice created or contributed to a hostile work environment "ha[d] limited value in advancing the litigation as neither can result in a finding of liability without consideration of individual circumstances" and was "too intertwined with the individual issues to make issue certification a worthwhile tool in resolving this dispute").

Relatedly, the Court also concludes that Plaintiffs have not demonstrated that a class action is the superior method to bring these claims. This is not only because of the many individualized inquiries that underpin liability as to any one employee—which Plaintiffs have not offered a manageable trial plan to address—but also based on the other individual actions already brought against Hawaiian. Plaintiffs do not challenge Hawaiian's contention that, in the seven individual actions that have already been filed in this District, the issues and damages at stake make clear that members of the putative class have a demonstrated interest in litigating their own claims. *See* ECF No. 67 at 30. Will the COO's email regarding medical requests being viewed more sympathetically, Hawaiian's missteps in responding to religious accommodation requests, and Hawaiian's 99% denial rate be evidence relevant to every putative class member's Title VII claim? Undoubtedly. But as noted above, the Court ultimately cannot say that using this

evidence in support of a contention that Hawaiian discriminated against religious accommodation requests will predominate over the crucial questions of liability that are unique to each employee based on their religious beliefs and their role at Hawaiian.

Based on the foregoing, then, the Court DENIES the Motion as to the Title VII subclasses.

### D.   ADA Subclasses

Plaintiffs contend the *Teamsters* framework also justifies certifying two subclasses of individuals who requested medical exemptions and were either denied or withdrew the request without a decision, allegedly in violation of the ADA.  According to Plaintiffs, for these ADA subclasses, "[w]hat is at issue is whether the Court can answer in one stroke the following question: was Hawaiian's use of the CDC's list of contraindications to the COVID vaccine as the only bases for granting medical exemptions to getting vaccinated consistent with the ADA."  ECF No. 89 at 20 (citation and alteration omitted).  Phrased in this way, commonality, typicality, predominance, and superiority would seem to be easily met.  After all, Hawaiian does not dispute that it used the CDC's list of contraindications as a litmus test for medical exemptions.  *See* ECF No. 67-5 (Jackson Decl.) ¶ 15; ECF No. 67 at 12-13.  Resolving the permissibility of

Hawaiian relying on this criteria alone would thus appear to provide the necessary glue for those claiming discrimination based on a disability.

Ultimately, though, that oversimplifies Plaintiffs' burden—both as to proving Hawaiian's liability under the ADA and demonstrating that certification is appropriate.  In reaching this conclusion, the Court is persuaded by authority Hawaiian cites ruling that the *Teamsters* framework operates differently in the context of ADA claims because "[t]he ADA does not define the scope of its protections and prohibitions as broadly as Title VII."  *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 191 (3d Cir. 2009).  That is because, although Title VII extends statutory protection to *all* individuals, the ADA extends it only to *qualified* individuals, where a qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires[.]"  42 U.S.C. § 12111(8).

In *Hohider*, private plaintiffs sought to bring a class action alleging that their employer, UPS, discriminated against them by failing to accommodate their disabilities after returning to work from medical leaves of absence.  *See* 574 F.3d at 172.  The district court certified a class under Rule 23(b)(2), reasoning that the individualized inquiry into whether any one class member was a "qualified" individual under the ADA could be delayed until the second step of the *Teamsters* framework, i.e., after liability had been established on a classwide basis at the first

38

step. *See id*. at 172–75.  According to the district court, certification was

warranted because "if plaintiffs are able to prove the existence of [certain] policies

. . . as UPS's 'standard operating procedure,' such proof, with nothing more, would

be sufficient to establish that UPS engaged in a classwide pattern or practice of

discrimination prohibited under the ADA." *Id.* at 184.

The Third Circuit reversed, noting that "[i]t is the ADA . . . and not the

*Teamsters* evidentiary framework, that controls the substantive assessment of what

elements must be determined to prove a pattern or practice of unlawful

discrimination in this case." *Id.* at 185.  And substantively, the ADA "requires

evaluation of whether a disabled individual is 'qualified' as defined under the

statute to determine not only whether discrimination on the basis of disability has

occurred, but more fundamentally, whether such discrimination against that

individual is unlawful." *Id.* at 192.  In short: under the ADA, liability at phase one

necessarily requires an inquiry into whether the class members are "qualified

individuals with disabilities." *See id.*  And in *Hohider*, that inquiry was too

individualized to meet Rule 23's requirements.  As the Third Circuit explained:

> For a plaintiff to be "qualified" under the ADA, he "must
> 'satisf[y] the prerequisites for the position, such as possessing the
> appropriate educational background, employment experience,
> skills, licenses, etc.' and, [he] must be able to 'perform the
> essential functions of the position held or desired, with or without
> reasonable accommodations.'" *Taylor*, 184 F.3d at 311 (first
> alteration in original) (quoting *Gaul v. Lucent Techs. Inc.*, 134
> F.3d 576, 580 (3d Cir. 1998)). The class, as defined, contains no

39

> unifying or limiting criteria—with respect to employment
> positions held or desired, for instance, or conditions suffered, or
> accommodations sought—that potentially would permit
> classwide evaluation of whether each member of the class is
> "qualified" and thus can perform the essential functions of a
> given job with or without reasonable accommodation.

*Id.* at 189.  At least one district court in the Ninth Circuit has relied on *Hohider* in

declining to certify a class claiming violations of the ADA, at least in part because

individualized inquiries into whether a particular person was a qualified individual

under the ADA and whether the employer had to provide a reasonable

accommodation defeated the commonality requirement.  *See Kittel v. City of*

*Oxnard*, 2018 WL 6004524, at *8–9 (C.D. Cal. Feb. 20, 2018).

Notably, Plaintiffs do not disagree with *Hohider*'s reasoning regarding the

need to distinguish between Title VII and ADA claims based on substantive

differences in those laws.  Plaintiffs also do not fully engage with Hawaiian's

argument that certification here is inappropriate, in line with *Hohider* and *Kittel*,

because Hawaiian still engaged in an individualized inquiry as to whether a

specific employee's request was legitimate and fit within the CDC guidelines (and

often received guidance from its medical expert on this), and further that

> the various components of the ADA interactive process (whether
> the plaintiff is a qualified individual with a disability, the job-
> related requirements of each putative class member's job
> position and work location; the potential reasonable
> accommodations available, the cost and burdens of such
> reasonable accommodation measures, etc.) confirm that there are

40

too many individualized inquiries necessary for these claims to
be resolved on a class-wide basis.

ECF No. 67 at 29.

Instead, Plaintiffs cite part of *Hohider*, excerpted above, acknowledging that,
hypothetically speaking, an ADA class *could* be certified if the class contains some
"unifying or limiting criteria—with respect to employment positions held or
desired, for instance, or conditions suffered, or accommodations sought—that
potentially would permit classwide evaluation of whether each member of the class
is 'qualified' and thus can perform the essential functions of a given job with or
without reasonable accommodation."  574 F.3d at 189; *see also* ECF No. 89 at 19;
*cf. EEOC v. FedEx Ground Package Sys., Inc.*, 158 F. Supp. 3d 393, 401–02 (W.D.
Pa. 2016) (finding *Hohider* inapplicable, among other reasons, because the EEOC
brought a claim on behalf of individuals with a common disability (being deaf or
hard-of-hearing) employed in or applicants for a common position (package
handler) where the minimum qualifications for that position (an individual 18 years
or older who could pass a background check) were "commonly applicable, easily
identifiable, and provable if true").  Plaintiffs contend that unifying criteria exists
here because Hawaiian treated all disabled employees the same by denying any
exemption without a meaningful interactive process, which is a standalone claim
under the ADA that is capable of class treatment.  ECF No. 89 at 19.  But *Hohider*
rejected this argument on each front.

41

The plaintiffs in *Hohider* had similarly pointed to alleged uniform policies, specifically: (1) a "100% healed" policy that required employees returning from medical leave to present a full medical release, without any restrictions, demonstrating they could perform the essential functions of their last position before returning to work for UPS in any capacity; (2) an accommodation process that was essentially a sham, and designed to delay and prevent reasonable accommodations while creating a false record of ADA compliance; and (3) job descriptions with extraneous and excessively demanding requirements, designed to foreclose impaired employees from qualifying for any position at UPS. 574 F.3d at 174 n.6. So merely showing that an employer applied a uniform policy to people claiming to be disabled was not enough.

And *Hohider* further rejected the argument that there would be no need to engage in the "qualified" inquiry if the uniform policy amounts to a failure to engage in the interactive process and grant an employee individualized consideration based on the theory that itself is prohibited discrimination under the ADA. *See id.* at 193. As the Third Circuit explained, failure to engage in the interactive process constitutes a violation only if a given individual was actually "qualified," meaning they can perform the essential functions of the job with or without an accommodation that is reasonable and that does not impose an undue hardship on the employer. *See id.* at 192. If there is no reasonable

accommodation, then an employer is not liable merely for failure to engage in the interactive process. *Id.* at 193–94 ("The ADA, as far as we are aware, is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made.") (citation omitted).  Relevant here, *Hohider* cited cases from other courts—including the Ninth Circuit—to show cross-circuit uniformity on this point of law.  *See id.* at 194 n.20 (citing, among other cases, *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000) (en banc) (collecting cases and "hold[ing] that employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute *if a reasonable accommodation would have been possible*"), *vacated in part on other grounds*, 535 U.S. 391 (2002)) (emphasis added).  And the Ninth Circuit has more recently and succinctly reiterated: "[T]here exists no stand-alone claim for failing to engage in the interactive process.  Rather, discrimination results from denying an available and reasonable accommodation." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018).  Plaintiffs' contention to the contrary is thus incorrect.  *Compare* ECF No. 89 at 19 (stating in their reply that "a lack of interactive process is a standalone claim under the ADA"); *with* ECF No. 50-1 at 22 (acknowledging in their Motion that the Ninth Circuit has held that "employers are liable under the ADA when they do not

engage in the interactive process in good faith *if a reasonable accommodation was possible"*) (emphasis added).

What this means, then, is that Plaintiffs have not shown that the Court can ignore the "qualified" inquiry under the ADA when assessing whether Plaintiffs have met their burden under Rule 23. And Plaintiffs have offered no real response to Hawaiian's contention regarding the individualized inquiries this would entail here. Instead, at the hearing, Plaintiffs' counsel conceded that, for example, an individual seeking an accommodation on the grounds that they were pregnant, *see* ECF No. 67 at 28, or had "natural immunity" to Covid-19, *see* ECF No. 57-5 (Jackson Decl.) ¶ 18, would *not* mean the person was a qualified individual with a disability under 29 C.F.R. § 1630.2. Counsel indicated that the class definition could be altered to account for this issue, but did not articulate how this would avoid the need to engage in an individualized assessment as to whether someone fit within the class definition. Nor did counsel offer any specific information regarding how many individuals would fit within that class definition. And as noted above under the Title VII subclasses, Plaintiffs also had no real response to Hawaiian's contention that whether a reasonable accommodation exists (that Hawaiian could therefore be liable for failing to offer) is necessarily individualized, based on the person's position and location, and the extent to which an accommodation would amount to an undue hardship on Hawaiian.

The Court notes that, in the context of other litigation involving Covid-19 vaccine mandates, this precise inquiry was individualized.  *See Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 430 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022) ("*Mass General*").  In *Mass General*, certain hospital employees sought a preliminary injunction after their employer denied them exemptions from its vaccination policy.  In addressing the likelihood of success factor, the district court cited the general definition of a qualified individual under the ADA, i.e., (1) they must possess the skill, experience, education, and requirements for the position; and (2) they must be able to perform the essential functions of the position with or without a reasonable accommodation.  *Id.* at 430.  The district court then went on to note that a plaintiff would *not* be a qualified individual "if they pose a 'direct threat' to the health or safety of other individuals in the workplace." *Id.* at 431 (citing 42 U.S.C. § 12113(b)).  Regarding the applicability of this "direct threat" defense in the Covid-19 vaccine context, the district court quoted the following EEOC guidance at length:

> To determine if an employee who is not vaccinated due to a disability poses a "direct threat" in the workplace, an employer first must make an individualized assessment of the employee's present ability to safely perform the essential functions of the job . . . .  The determination that a particular employee poses a direct threat should be based on a reasonable medical judgment that relies on the most current medical knowledge about COVID-19. Such medical knowledge may include, for example, the level of community spread at the time of the assessment. Statements from the CDC provide an important source of current medical

45

knowledge about COVID-19, and the employee's health care provider, with the employee's consent, also may provide useful information about the employee. *Additionally, the assessment of direct threat should take account of the type of work environment, such as: whether the employee works alone or with others or works inside or outside; the available ventilation; the frequency and duration of direct interaction the employee typically will have with other employees and/or non-employees; the number of partially or fully vaccinated individuals already in the workplace; whether other employees are wearing masks or undergoing routine screening testing; and the space available for social distancing.*

If the assessment demonstrates that an employee with a disability who is not vaccinated would pose a direct threat to self or others, the employer must consider whether providing a reasonable accommodation, absent undue hardship, would reduce or eliminate that threat. *Potential reasonable accommodations could include requiring the employee to wear a mask, work a staggered shift, making changes in the work environment (such as improving ventilation systems or limiting contact with other employees and non-employees), permitting telework if feasible, or reassigning the employee to a vacant position in a different workspace.*

*Id.* at 431–32 (citing EEOC, What You Should Know About Covid-19 and the ADA, the Rehabilitation Act, and Other EEO Laws: § K (2021) (emphasis added)). Based on this guidance, the district court in *Mass General* therefore looked at the positions each plaintiff in that case held and the extent to which they interacted with patients, visitors, and other staff at the hospital. *See id.* In other words, each plaintiff's unique situation informed whether they were "qualified" under the ADA.

46

Here, as already discussed above, Hawaiian has submitted evidence
that it assessed the extent to which masking and social distancing would be
feasible for "every single work position and every work location" as relevant
to complying with the Federal Contractor Mandate.  ECF No. 67-5 (Jackson
Decl.) ¶¶ 4, 16-17, 29.  And while the answer was nearly uniformly "no"
that masking and distancing "would not be feasible in light of required job
duties," *id*. ¶ 16—and also uniformly "no" that a testing program was also
not feasible, *see* ECF No. 67-4 (Kobayashi Decl.) ¶¶ 12–15, Plaintiffs have
put forth no argument as to why the seemingly individualized assessment
regarding the accommodations of masking and social distancing (or some
other type of accommodation) for each distinct class member (e.g., a pilot
versus a baggage handler versus someone in information technology, *see*
ECF No. 50-8) would not defeat typicality and predominance here—even if
the feasibility of or hardship created by the TPTP was more susceptible to a
uniform assessment.[8]  Indeed, Plaintiffs themselves point to evidence
indicating that for *some* putative class members (but not necessarily others),
there is evidence indicating reasonable accommodations were "doable."  *See*

---

[8]  Again though, as already noted above, even as to the TPTP Hawaiian's evidence
indicates the reasonableness of this accommodation or extent to which it imposed a
hardship on Hawaiian could be an individualized inquiry (e.g., as to union
employees or for in-flight crew).  *See* ECF No. 50-4 (Kobayashi Decl.) ¶¶ 14-15,
23.

ECF No. 50-1 at 14 (citing Hawaiian's VP of Flight Operations' statement that reasonable accommodations were "doable in Flight albeit not optimal"); *see also* ECF No. 50-19 at 2.  Again, the "bellwether trials" that Plaintiffs' counsel proposed as a way to litigate Hawaiian's ultimate determination on these individualized assessments are too vague and amorphous.

Because it is ultimately Plaintiffs' burden to explain why commonality, typicality, and predominance are met despite these seemingly individualized inquiries, and they have not done so here, the Court agrees with Hawaiian that certification of the ADA subclasses is not warranted despite Hawaiian's across-the-board reliance on CDC guidance.  *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002) ("the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances").  And for the same reasons already discussed above as to the Title VII subclasses, nor can the Court conclude on the record before it that a class action is the superior way for these claims to proceed.

Plaintiffs' Motion in this respect is therefore also DENIED.

## IV.   CONCLUSION

Based on the foregoing, the Motion is DENIED.

IT IS SO ORDERED.

DATED:      Honolulu, Hawaiʻi, December 12, 2023.

Jill A. Otake
United States District Judge

CV 22-00532 JAO-RT, *O'Hailpin, et al., v. Hawaiian Airlines Inc., et al.*; ORDER DENYING PLAINTIFFS' MOTION TO CERTIFY CLASSES AND APPOINT CLASS COUNSEL

49