William Harrison, HBN 2948
**HARRISON LAW CENTER**
1001 Bishop Street, Ste. 2828
Honolulu, HI 96813
(808) 809-7065
william@harrisonlawcenter.com

John C. Sullivan*
Austin R. Nimocks*
Jace Yarbrough*
**S|L LAW PLLC**
610 Uptown Blvd., Ste. 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com
austin.nimocks@the-sl-lawfirm.com
jace.yarbrough@the-sl-lawfirm.com

Walker Moller*
**SIRI | GLIMSTAD LLP**
700 S. Flower St., Ste. 1000
Los Angeles, CA 90017
Telephone: (213) 376-3739
wmoller@sirillp.com

Christopher Wiest*
**CHRIS WIEST, ATTY AT LAW, PLLC**
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
Telephone: (513) 257-1895
chris@cwiestlaw.com

*Counsel for Plaintiffs*

*Admitted *pro hac vice*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| RIKI OʻHAILPIN, NINA ARIZUMI, ROBERT ESPINOSA, ERWIN YOUNG, PUANANI BADIANG, SABRINA FRANKS, RONALD LUM, DAN SAIKI, and BRANDEE AUKAI,<br><br>    *Plaintiffs*,<br><br>v.<br><br>HAWAIIAN AIRLINES, INC. and HAWAIIAN HOLDINGS, INC.,<br><br>    *Defendants*. | Civil No. 1:22-cv-00532-HG-WRP<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF DR. RAM DURISETI UNDER *DAUBERT***<br><br>Trial Date:  June 9, 2025<br>Trial Judge:  Honorable Helen Gillmor |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................... 1

BACKGROUND ..................................................................................... 3

DR. DURISETI'S EXPERT TESTIMONY ............................................... 4

   I.  DR. DURISETI'S OPINIONS ....................................................... 4

   II. Dr. DURISETI'S PROFESSIONAL QUALIFICATIONS ........................... 8

APPLICABLE LEGAL STANDARDS ...................................................... 10

ARGUMENT .......................................................................................... 12

   I.  DR. DURISETI'S OPINIONS REFLECT SCIENTIFIC EXPERTISE
      BASED ON ESTABLISHED METHODOLOGIES THAT SUPERSEDE
      TEMPORARY POLICITAL CONSENSUS ................................................ 12

      A. Dr. Duriseti's Testimony Is Reliable Because He Is Highly
         Qualified and Experienced at Explaining His Sources and
         Reasoning ............................................................................... 13

      B. Dr. Duriseti's Opinions Are Carefully Limited to Help the Jury
         Understand the Scientific Considerations of "Undue Burden" in this
         Case ........................................................................................ 17

CONCLUSION ...................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Children's Broad. Corp. v. Walt Disney Co.*,
  357 F.3d 860 (8th Cir. 2004) ................................................................. 16

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .................................................................... *passim*

*Daubert v. Merrell Dow Pharm., Inc.*
  43 F.3d 1311 (9th Cir. 1995) ......................................................... 13, 18

*Hemmings v. Tidyman's Inc.*
  285 F.3d 1174 (9th Cir. 2002) ............................................................. 13

*Kim v. Crocs, Inc.*,
  No. CV 16-00460 JAO-KJM, 2018 WL 6179320
  (D. Hawaii Nov. 27, 2018) ................................................................. 15

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ..................................................................... 10, 13

*Leite v. Crane Co.*,
  868 F. Supp. 2d 1023 (D. Hawaii 2012) ............................................... 16

*Lindner v. Meadow Gold Dairies, Inc.*,
  249 F.R.D. 625 (D. Hawaii 2008) ........................................................ 15

*Messick v. Novartis Pharms. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) ............................................................. 11

*Parker v. Peacehealth*,
  No. 6:23-cv-00450-MTK, 2024 U.S. Dist. LEXIS 220288
  (D. Or. Dec. 5, 2024) ..................................................................... 1, 12

*Peña v. Clark Cty.*,
  No. 3:21-cv-05411-DGE, 2023 U.S. Dist. LEXIS 79114
  (W.D. Wash. May 5, 2023) ................................................................. 16

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) .......................................................... 10, 11

*Ramirez v. Olympic Health Mgmt. Sys.*,
    610 F. Supp. 2d 1266 (E.D. Wash. 2009) .................................... 13, 18

*Standard Oil Co. of Cal. v. Moore*,
    251 F.2d 188 (9th Cir. 1958) .............................................................. 11

*Stilwell v. Smith & Nephew, Inc.*,
    482 F.3d 1187 (9th Cir. 2007) ............................................................ 11

*United States v. Ruvalcaba-Garcia*,
    923 F.3d 1183 (9th Cir. 2019) ............................................................ 10

*United States v. Sandoval-Mendoza*,
    472 F.3d 645 (9th Cir. 2006) .............................................................. 10

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017) ............................................................ 16

## Rules

Fed R. Evid. 702 ............................................................................... *passim*

## Other Authorities

Zacharty J. Madewell et al., *Household Transmission of SARS-CoV-2: A
    Systematic Review and Meta-analysis*, JAMA Netw Open.
    2020;3(12):e2031756. doi:10.1001/jamanetworkopen.2020.31756 .................. 16

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE THE TESTIMONY AND OPINIONS OF
DR. RAM DURISETI UNDER *DAUBERT***

### INTRODUCTION

Defendants' Motion to Exclude the Testimony of Dr. Ram Duriseti is nearly identical to their Motion to Exclude the Testimony of Plaintiffs' other expert, Dr. Andrew Bostom.  *See* ECF 200-1; 198-1.  And in both, the Defendants do not focus on the fact-specific reliability standards required by *Daubert* and Fed. R. Evid. 702, as those standards pertain to the validity of each doctor's opinions.  Instead, Hawaiian Airlines broadly asks the Court to compare Plaintiffs' experts to a different expert in a different case—"Dr. French"—who was deemed a purveyor of "junk science" by the District of Oregon.  *See* 200-1 (citing *Parker v. Peacehealth,* No. 6:23-cv-00450-MTK, 2024 U.S. Dist. LEXIS 220288, at *14 (D. Or. Dec. 5, 2024)).

Like Dr. Bostom, Dr. Duriseti's outstanding qualifications and carefully curated opinions have no overlap with "Dr. French."  Dr. Duriseti is an associate professor at Stanford University, a practicing emergency room physician who has treated over 1,000 COVID-19 patients, holds a Ph.D. in machine learning and quantitative decision-making, and has published on issues highly relevant to material issues in this case.  His testimony is being offered for the purpose of helping the jury to understand the scientific validity of the mitigating measures that could be offered as alternatives to the COVID-19 vaccine as an accommodation option.

1

Although Defendants characterize Dr. Duriseti as an "anti-vaxxer" whose opinions evince bias, that charge is unfounded—in reality, Hawaiian just doesn't like his conclusions. Indeed, Dr. Duriseti is vaccinated against COVID-19, as are most of his family members—and Dr. Duriseti encourages at-risk patients to get vaccinated. *See* Exhibit 1, Deposition of Dr. Ram Duriseti ("Duriseti Depo."), 93:5-16. Relying on trustworthy sources and analysis of randomized controlled trials, Dr. Duriseti is able to explain the scientific bases for why the COVID-19 vaccines are incapable of stopping infection and transmission of the virus. And at the same time, he is able to provide detailed scientific explanations for why the COVID-19 vaccines can be valuable personal protection devices against severe disease, while acknowledging that recognizing prior infection and recovery against COVID-19 ("natural immunity") is an effective countermeasure against COVID-19 (and, thus, a reasonable accommodation option that Defendants could have offered to the Plaintiffs in this case). The scientific nuance here is evidently lost on Hawaiian as it merely recycles the misplaced "anti-vax" narrative.

Because Defendants fail to present any judicially-cognizable reason why Dr. Duriseti's opinions should be excluded under *Daubert*, the Court should deny Defendants' Motion to exclude Dr. Duriseti's expert opinions.

2

<u>**BACKGROUND**</u>

In August of 2021, Hawaiian's CEO Peter Ingram announced a mandate that all Hawaiian employees would be forced to receive one of the COVID-19 vaccines (the "Mandate"). In response, hundreds of Hawaiian employees, including Plaintiffs Saiki and Espinosa, requested a religious accommodation from the Mandate. But the company chose to take an "aggressive" approach to processing accommodations, and, consistent with this decision, denied virtually 100% of the requests it received. *See* ECF No. 186-2. Along the way, Hawaiian regularly issued conflicting statements about how it viewed certain religious beliefs, automatically denying some requests as based on "personal preference" but then later acknowledging nearly identical beliefs as sincerely held religious convictions in conflict with the Mandate. *Compare* ECF No. 183-3 (Plaintiff Espinosa's request for accommodation based in part on "use of stem cells from aborted fetuses" and the belief that our bodies are "temples of the Holy Spirit") *and* ECF No. 186-4 (auto-denial letter to Plaintiff Espinosa with no interview); *with* ECF No. 186-5 (Plaintiff Badiang's request for accommodation based in part on use of "aborted human fetal tissue" and body being "the temple of the Lord") *and* ECF No. 186-6 (acknowledging interview with Plaintiff Badiang as well as her "sincere religious belief" in conflict with the vaccine).

3

During its last round of canned denials, Hawaiian began citing "undue hardship" as justification for its pre-determined decisions, claiming that the temporary testing program it had been using was too administratively difficult to continue. *See, e.g.*, *id.* Hawaiian eventually terminated or forced into early retirement hundreds of employees (including Plaintiffs Saiki and Espinosa) simply for refusing the COVID-19 vaccine for religious reasons.

When Defendants placed them out of work, Plaintiffs Saiki and Espinosa had already recovered from a prior COVID-19 infection (and, consequently, had been immunized naturally against the virus). *See* Exhibit 2, Deposition transcript of Plaintiff Daniel Saiki ("Saiki Depo."), at 115:22-117:17 (Plaintiff Saiki describing prior infection and recovery from COVID-19); *see also* Exhibit 3, Deposition transcript of Plaintiff Robert Espinosa ("Espinosa Depo."), at 43:18—44:2 (Plaintiff Espinosa testifying as to COVID-19 positive test submitted to Defendants on January 4, 2022. Nonetheless, Plaintiffs Espinosa and Saiki were placed on unpaid leave and forced into early retirement (respectively).

## DR. DURISETI'S EXPERT TESTIMONY

### I. DR. DURISETI'S OPINIONS

Dr. Duriseti agrees that the vaccine can promote "health and safety" for an individual who decides to receive it, but opines that the vaccines "were not an effective tool for reducing transmission and infection spread." *See* Exhibit 1,

Duriseti Dep., 68:21-25; 69:1-7.  Dr. Duriseti himself received a dose of the COVID-19 vaccine in July or August of 2021.  *Id.* at 19:19-23.  Most of his immediate family also received a COVID-19 vaccine.  *Id.* at 20:6-14.  Recognizing that the COVID-19 vaccines can be an important personal protection device, Dr. Duriseti has "swayed many patients to get vaccinated" who are at risk from severe COVID, but if he is unable to convince the patient, he recommends alternative mitigation measures for the individual.  *Id.* at 93:5-16.  Dr. Duriseti also points out the personal protection that the COVID-19 vaccines provide should be considered in the context whether the individual already has natural immunity.  *Id.* at 101:13-102:5 (discussing personal benefits of vaccination but highlighting that those benefits are largely manifested in individuals with "no prior infection").

Dr. Duriseti will opine that dating back to early 2021 it was "absolutely disputable" whether the vaccine could slow the transmission of COVID-19.  Duriseti *Id.* at 65:8-14.  By 2021, there was substantial data available showing that the vaccine did not have a lasting impact on the suppression of infection and transmission.  *Id.* at 63:9-17.  Dr. Duriseti's testimony will explain that there is nothing in randomized controlled trials that definitively establishes that COVID-19 vaccines "attenuate" the transmission of the virus by anything more than 30-percent for any longer than 3 to 5 months.  *Id.* at 60:11-23.  Indeed, studies claiming that COVID-19 vaccines have contributed to substantial reductions in hospitalization and

5

death have often ignored data about age, clinical frailty, and body mass index. *Id.* at 112:11-25; 113:1-9.

Dr. Duriseti will also provide helpful opinions regarding the alternatives to vaccination that Defendants could have utilized in Plaintiff Espinosa and Saiki's cases. The most glaring alternative option to vaccination would be a strict policy for employees to quarantine when symptomatic. *See* Exhibit 4, Duriseti Rebuttal Report ("Report"), ¶ 30. Dr. Duriseti observes that quarantining symptomatic employees is at least as effective as the vaccine "because people who are symptomatic are about 25 to 30 times more likely to transmit than people who are asymptomatic. So, while asymptomatic transmission does occur, it's about 25 to 30 times less likely." Exhibit 1, Duriseti Depo., 62:1-8. In other words, if an employee detects a COVID symptom, such as a fever, staying out of work is safer than coming to work even if that employee has taken the vaccine, and Dr. Duriseti will be able to provide helpful scientific explanations for why this is the case.

Further, recognition of infection acquired immunity in the place of vaccination is another accommodation option on which Dr. Duriseti will be able to provide helpful opinions and explanations for the jury's benefit. Ex. 4, Report, ¶¶ 30, 34. Dr. Duriseti will also explain that natural immunity and the vaccine are similar because "both infection and vaccination provide protection against infection that wanes with time," although infection also provides a component of "mucosal

6

immunity," which the vaccines do not (and, as such, natural immunity provides a more robust and durable immune response against COVID-19).  Exhibit 1, Duriseti Depo., 91:3-23; *see also* Exhibit 4, Report, ⁋ 102 (explaining that data show that those with prior infection, with or without associated vaccination, "have a robust rise in neutralizing antibodies after an Omicron infection").  As to naturally acquired immunity, Dr. Duriseti will explain some of the biology of natural versus vaccine-based immunity.  Specifically, the vaccine does not provide more certainty in terms of an immune response than prior infection and recovery because individuals who have had tested positive for COVID form anti-nucleocapsid antibodies while individuals who are merely vaccinated do not; that is because the vaccine did not code for that valuable antibody.  Exhibit 1, Duriseti Depo.*,* 108:9-25; 109:1-2.

Further, filtration and ventilation systems on airplanes, much like those in hospitals, significantly reduce the likelihood of infection and transmission, and Dr. Duriseti will be able to provide helpful opinions on this topic as well as it relates to whether Plaintiffs Espinosa and Saiki could have been safely accommodated. Exhibit 4, Report*,* ¶¶ 22-25, 88.

In his deposition, Dr. Duriseti declined every invitation from Defendants' counsel to overstate his opinions or exaggerate his sources.  For example, Dr. Duriseti explained that it would be very difficult to determine the duration of immunity derived from prior infection and recovery in an individual, which is the

same case for the vaccine.  Exhibit 1, Duriseti Depo., 107:16-25.  And critically, while Dr. Duriseti acknowledges that both vaccine-elicited immunity and immunity derived from prior infection and recovery wane over time, he provides detailed explanations for why prior infection and recovery presents a superior immune response to vaccination alone.  *See* Exhibit 4, Report, ¶¶ 90, 94-97 (detailing that vaccination is but an artificial attempt to stimulate the mechanisms of prior infection immunity," comparing and contrasting the mechanisms of immunity derived from prior infection and vaccination, citing sources that recognize that "vaccination against COVID-19 mucosal respiratory viruses like SARS-CoV-2" do not "generate an effective mucosal immune response," while prior infection and recovery does).

Hawaiian's rebuttal witnesses are not well-suited to challenge these opinions.  Dr. Chen is neither an expert in epidemiology nor COVID-19, and he has not studied ventilation in the manner Dr. Duriseti has.   Duriseti Depo*.,* 55:16-25; 56:1-6.  Indeed, Dr. Duriseti was shocked that Dr. Chen claimed that nothing new had been learned about the vaccines since their release.  *Id.* at 63:18-25.  Additionally, Dr. Mayer has never treated a single COVID patient, *id.* at 56:7-19, while Dr. Duriseti has treated thousands of COVID-19 patients.  *Id.* at 56:20-57:4.

## II. DR. DURISETI'S PROFESSIONAL QUALIFICATIONS

Dr. Duriseti is a clinical associate professor at Stanford University.  Exhibit 5, Dr. Duriseti Curriculum Vitae, p. 1; *see also* Duriseti Dep., 5:6-13.  He also

worked clinically at Standford up until 2022. Exhibit 1, Duriseti Dep., 15:23-25; 16:1-2. Dr. Duriseti is licensed to practice medicine in California and Montana. *Id.* at 27:4-5. Dr. Duriseti also has a private practice working for Sutter Health. *Id.* at 16:19-25. Dr. Duriseti regularly treats patients with COVID-19 symptoms in the emergency department. *Id.* at 17:19-25.

Dr. Duriseti's Ph.D. background, at least in part, "is optimization and machine learning, [and] quantitative decision-making." *Id.* at 14:18-24. He has published articles in the *New England Journal of Medicine* and the *Annals of Internal Medicine* that were reviewed by epidemiologists and has written papers addressing epidemiologic issues. *Id.,* 38:16-21; 39:4-8; *see also* Exhibit 5, Dr. Duriseti Curriculum Vitae, at 3–5. In fact, Dr. Duriseti has more training on the quantitative techniques of data analysis than the average epidemiologist, and as part of his Ph.D., Dr. Durisetti performed epidemiologic work. Exhibit 1, Duriseti Depo*.,* 39:1-14.

Dr. Duriseti does not hold himself out as an expert on aviation safety, airline management, or religious freedom, nor has he ever been involved in reviewing requests for religious exemptions from vaccine mandates. *Id.* at 40:3-17. As set out in his Rebuttal Report, Dr. Duriseti will rely on trusted and well-known sources, including the Centers for Disease Control, the National Institute of Health, and *The New England Journal of Medicine. See* Exhibit 4, Report, ¶¶ 23, 45, 119.

## APPLICABLE LEGAL STANDARDS

"Before admitting expert testimony into evidence, a district court must perform a gatekeeping role of ensuring that the testimony is both relevant and reliable under Rule 702." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 597)). This requires the court to determine if the expert's reasoning or methodology underlying the testimony: (1) is scientifically valid (*i.e.*, reliable); and (2) can be applied to the facts at issue (*i.e.*, relevant). *Daubert*, 509 U.S. at 592–93.

The reliability inquiry "requires that the expert's testimony have a reliable basis in the knowledge and experience of the relevant discipline." *Ruvalcaba-Garcia*, 923 F.3d. at 1188–89 (internal quotation marks omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). If an expert's opinion is found to be reliable, however, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 592, 596.

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)). "Reliable expert testimony need only be relevant and need not establish

10

every element that the plaintiff must prove, in order to be admissible." *Id.* (citing *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007)).

The party seeking to introduce expert testimony evidence must show by a preponderance of the evidence that the testimony is admissible under Rule 702. *Daubert*, 509 U.S. at 592 n.10. However, Rule 702 should be applied with a "liberal thrust" favoring admission. *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano*, 598 F.3d 558, 564-65, as amended (Apr. 27, 2010). "Under *Daubert*, the district judge is a gatekeeper, not a fact finder. When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.*

Even if the Court has concerns about the evidence or thinks the evidence is "shaky", it does not result in exclusion as long as there is some reliable basis for it (even if defendants contest it). *See Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 220 (9th Cir. 1958) ("[Plaintiff] can, through cross-examination, expose to the jury the asserted deficiencies of the hypothetical question as asked. It is for this reason that it is usually held that defects in such a question go not to the competency of the evidence, but merely affect its weight."); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful

11

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

**ARGUMENT**

## I. DR. DURISETI'S OPINIONS REFLECT SCIENTIFIC EXPERTISE BASED ON ESTABLISHED METHODOLOGIES THAT SUPERSEDE TEMPORARY POLITICAL CONSENSUS.

As set out in Plaintiffs' Response in Opposition to Defendants' Motion to Exclude the Testimony of Dr. Bostom, Defendants' *Daubert* arguments are largely based on the District of Oregon's repeat admonishments of an expert named "Dr. French." *See Parker v. Peacehealth,* No. 6:23-cv-00450-MTK, 2024 U.S. Dist. LEXIS 220288, at *14 (D. Or. Dec. 5, 2024) ("This Court is not alone in finding that Dr. French's opinion on this subject falls below accepted standards of reliability."). Like Dr. Bostom, however, Dr. Duriseti also is not Dr. French, and Defendants' *Parker* comparison is a misplaced and unhelpful caricature. In *Parker,* Dr. French overstated his claims, mischaracterized his sources, and, at one point, argued that a study is reliable because it contains "graphs, charts, [and] references." *Id.* at *9.

Defendants identify no similarities between Dr. French and Dr. Duriseti that would lead to Dr. Duriseti's exclusion. The implication of Hawaiian's cookie-cutter Motion, however, is that experts who do not opine in favor of the COVID-19 vaccine as best way to prevent infection and transmission of the virus—in a manner similar to Hawaiian's own experts—must be engaging in "junk science" and are thus

12

excludable *as a matter of law*.  Rule 702 does not allow for such picking and choosing of expert opinions based on conclusions.  To the contrary, "Rule 702 permits a flexible, fact-specific inquiry that embodies the twin concerns of reliability and helpfulness."  *Ramirez v. Olympic Health Mgmt. Sys.*, 610 F. Supp. 2d 1266, 1276 (E.D. Wash. 2009) (citing *Kumho Tire Co.*, 526 U.S. at 150); *see Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002)).

The test for reliability under *Daubert* "is not the correctness of the expert's conclusions but the soundness of his methodology."  *Ramirez*, 610 F. Supp. 2d at 1276 (citing *Daubert v. Merrell Down Pharm.*, 43 F.3d 1311, 1318 (9th Cir. 1995)).  But testimony that is reliable must also be helpful—essentially a relevancy inquiry.  *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").  Here, Dr. Duriseti's testimony is both reliable and helpful.

> ### A.    Dr. Duriseti's Testimony Is Reliable Because He Is Highly Qualified and Experienced at Explaining His Sources and Reasoning.

Dr. Duriseti has a B.A. from Stanford University in Political Economy, a B.S. from Stanford in Biology, an M.D. from the University of Michigan, and a Ph.D. from Stanford in Computational Decision Modeling.  *See* Exhibit 5, Dr. Duriseti Curriculum Vitae, at 1.  In addition, Dr. Duriseti is a clinical associate professor at

Stanford University. *Id.; see also* Exhibit 1, Duriseti Dep., 5:6-13. He also worked

clinically at Stanford up until 2022. Duriseti Dep., 15:23-25; 16:1-2.

Dr. Duriseti's advanced education and extensive experience, including his

experience as a professor at Stanford, are reflected in his deposition testimony. And

Dr. Duriseti carefully nuances and does not overstate his opinions. For example,

Defendants' counsel repeatedly invited Dr. Duriseti to overstate his claims and

evince un-scientific bias against the COVID-19 vaccines, but Dr. Duriseti uniformly

declined those invitations:

> Q. So, back then, you would disagree that the transmission of -- or the use of vaccine as a tool to slow the transmission of COVID-19 and prevent serious illness and death cannot be reasonably disputed, you disagree with that?
> A. The problem is that you're including a severity of illness and death in that statement, and that's what I'm trying to draw a distinction between. And this is the sort of semantic game that is played by some experts, and I'm not saying you're playing this game, Mr. Hunt, by some attorneys, because they want to come back and say, well, you believe vaccines are ineffective. It's – it's a disingenuous game. I don't believe the immune system is ineffective. Whether the immune system is stimulated by a vaccine or infection, there's no magical pathway that vaccines choose separate[ly] from an infection. They are one and the same immune system. They are stimulated in different ways, and they have different benefits, but, ultimately, they take someone who is immune naïve, and they make them no longer immune naive.

Exhibit 1, Duriseti Depo., 66:24-25; 67:1-20.

Defendants pushed Dr. Duriseti towards an answer about the COVID-19

vaccine that might class him as an "anti-vaxxer" or a rigid idealogue, but Dr. Duriseti

exposed that "disingenuous game" and responded with an accessible and helpful

explanation of the basic science of the human immune system.  As Dr. Duriseti

explained when Defendants repeated the same question: the benefits of the vaccine

for individual safety are well-know because it educates the individual's immune

system, just as a prior infection does, but clarified that the vaccine is "not an effective

tool for reducing transmission and infection spread for any sustained period of time."

*Id.,* 68:21-25; 69:1-7.

Revealingly, Defendants do not attack Dr. Duriseti's sources, or his ability to

interpret them—as one might expect in a *Daubert* motion—because his sources, and

interpretation of those sources, is consistently reliable.[1]  When Dr. Duriseti offers

data to show that symptomatic patients are more likely to spread the virus than

asymptomatic patients, for example, Dr. Duriseti provides statistics from a study

conducted by an epidemiologist for the Centers for Disease Control, who stated in

an article for the American Medical Association:

> Estimated mean household secondary attack rate from symptomatic index
> cases (18.0%; 95% CI, 14.2%-22.1%) was significantly higher than from
> asymptomatic or presymptomatic index cases (0.7%; 95% CI, 0%-
> 4.9%; *P* < .001), although there were few studies in the latter group.  These
> findings are consistent with other household studies reporting asymptomatic
> index cases as having limited role in household transmission.

---

[1] Moreover, to the extent Defendants are attacking Dr. Duriseti's opinions, he is a
rebuttal witness, who should not be held to the same standard as an expert offering
an independent opinion.  *See Kim v. Crocs, Inc.*, No. CV 16-00460 JAO-KJM, 2018
WL 6179320, at *2 (D. Hawaii Nov. 27, 2018) (denying motion to exclude rebuttal
report); *Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 636 (D. Hawaii
2008) (rebuttal experts not required to support independent opinions).

*See* Exhibit 2, Report, ¶ 26, fn. 23.[2]  This study, from December 2020, supports Dr. Duriseti's position that asymptomatic employees present a very low transmission risk, and is hardly the "junk science" of which Defendants baselessly accuse him.

Defendants (and their experts Drs. Chen and Mayer) may disagree with Dr. Duriseti and conclude that the COVID-19 vaccines are the best tool for reducing infection and transmission of the virus—and that question may be considered by a factfinder.  But "[o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Peña v. Clark Cty.*, No. 3:21-cv-05411-DGE, 2023 U.S. Dist. LEXIS 79114, at *13 (W.D. Wash. May 5, 2023) (citing *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004); *see also Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 596) ("[T]he interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system—'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'—to 'attack[ ] shaky but admissible evidence[.]'"); *Leite v. Crane Co.*, 868 F. Supp. 2d 1023, 1036–37 (D.

---

[2] Zacharty J. Madewell et al., *Household Transmission of SARS-CoV-2: A Systematic Review and Meta-analysis*, JAMA Netw Open., 2020;3(12):e2031756. doi:10.1001/jamanetworkopen.2020.31756.

Hawaii 2012) (noting other evidence that conflicts with expert's opinions goes to weight, not admissibility).

Here, Plaintiffs must offer an expert, like Dr. Duriseti, to rebut Defendants' experts and explain the scientific distinctions between things like immunogenic resistance to symptoms versus the likelihood of transmission. Or to provide helpful explanations for why prior infection and recovery against COVID-19 provided a equal or superior level of protection against COVID-19 relative to vaccine-based immunity. Or even to explain whether additional alternative countermeasures to vaccination (*e.g.*, quarantining when symptomatic, utilization of high quality filtration systems, etc.) were feasible alternatives that would have promoted workplace safety to a similar or greater degree than vaccination alone. And at the same time, there is no credible danger that a Stanford professor—who has published extensively, including on COVID-19 related subjects—is going to foist "junk science" onto the jury. Dr. Duriseti's opinions will provide helpful insight into material issues in this case. *See Daubert*, 509 U.S. at 592–93 (noting expert testimony admissible where it is reliable and can applied to the issues in the case).

> **B.    Dr. Duriseti's Opinions Are Carefully Limited to Help the Jury Understand the Scientific Considerations of "Undue Burden" in this Case.**

Whether there were safe and effective alternatives to the COVID-19 vaccine that Defendants could have offered as an accommodation option to Plaintiffs Saiki

and Espinosa is a central issue in this case.  And courts should not exclude proffered

scientific evidence if "it speaks clearly and directly to an issue in dispute in the case,

and . . . will not mislead the jury." *Ramirez*, 610 F. Supp. 2d at 1278 (citing *Daubert,*

43 F.3d at 1321 n.17).

Dr. Duriseti's opinions and testimony speaks "clearly and directly" to the

issue of what alternatives to vaccination were possible: Dr. Duriseti observes, for

example, that quarantining symptomatic employees is at least as effective as the

vaccine "because people who are symptomatic are about 25 to 30 times more likely

to transmit than people who are asymptomatic.  So, while asymptomatic

transmission does occur, it's about 25 to 30 times less likely."  Exhibit 1, Duriseti

Depo., 62:1-8.  Indeed, "the rate of asymptomatic infection is much higher in

vaccinated individuals."  *Id.* at 62:12-14; *see also* Exhibit 2, Report, ¶ 30 ("The most

glaring alternative option to vaccination would be a strict policy for employees to

quarantine when symptomatic.  The CDC also strongly recommended masking,

regular testing, and social distancing as mitigation measures.").  In other words,

while vaccinated employees may have decreased symptoms, they are still likely to

transmit the virus to coworkers; whereas, a policy that immediately quarantined any

employee with symptoms is very likely to prevent transmission because the

transmission rate is exponentially lower when an employee is asymptomatic.

Dr. Duriseti also provides helpful and reliable opinions regarding whether recognizing natural immunity as an alternative to vaccination in Plaintiffs Saiki's and Espinosa's cases would have been a feasible accommodation option. *See* Exhibit 2, Report, at 14, 42 ¶¶ 34, 88. In fact, Hawaiian's own experts recognize that natural immunity affords protection against COVID-19, and do not dispute high quality research demonstrating that natural immunity likely affords stronger and more durable protection against COVID-19. *See* Exhibit 6, Deposition transcript of Dr. Lawrence Mayer, at 156:18-25 (Q; "Okay … [the scientific study examined concluded] that natural or previous infection conferred more durable protection than vaccination; correct? [Dr. Mayer Answer]: Yes, sir. Q Okay. You don't dispute that; right? A: I have no reason to dispute it"); *see also* Exhibit 7, Deposition of Dr. Frederick Chen, at 160:21-24 (Dr. Chen stating "I do know natural immunity [against COVID-19] exists because that's why we've become—you know, you can become immune to something"); 187:23-189:20 (discussing research conducted by Dr. Chen's employer, the University of Washington, finding that protection derived from prior infection and recovery affords strong and durable protection against COVID-19 and Dr. Chen acknowledging no reason to dispute those findings).

Finally, Defendants complain (at 15) that Dr. Duriseti's opinions on "religious freedom" and the provision of religious exemptions is too prejudicial for the jury. Even if this were true, which it is not, such opinions are entwined but downstream

19

of Dr. Duriseti's learned opinions on the efficacy of the vaccine, the relative efficacy of naturally acquired immunity, and other alternative COVID-19 countermeasures. Moreover, Dr. Duriseti does not hold himself out as an expert on religious freedom, aviation safety, or airline management.  Exhibit 1, Duriseti Depo., 40:3-17.  He does not seek to offer expert opinions on "religious freedom" but, rather, offers expert medical opinions regarding whether there were accommodation options in lieu of vaccination that Defendants could have safely implemented in Plaintiffs Saiki's and Espinosa's cases.

Accordingly, Dr. Duriseti's opinions cannot be anything but helpful to the jury, and to the extent he was to stray off topic, he is subject to cross examination and the Court's limiting instructions.

## CONCLUSION

Defendants' motion to exclude the testimony of Dr. Duriseti should be denied.

April 17, 2025

Respectfully submitted.

William Harrison
Hawaii Bar No. 2948
**HARRISON LAW CENTER**
1001 Bishop Street, Suite 2828
Honolulu, HI 96813
Telephone: (808) 809-7065
william@harrisonlawcenter.com

*/s/ John C. Sullivan*
John C. Sullivan*
Austin Nimocks*
Jace Yarbrough*
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com
austin.nimocks@the-sl-lawfirm.com
jace.yarbrough@the-sl-lawfirm.com

Walker Moller*
**SIRI|GLIMSTAD LLP**
1005 Congress Avenue, Suite 925-C36
Austin, TX 78701
Telephone: (512) 265-5622
wmoller@sirillp.com

Christopher Wiest*
**CHRIS WIEST, ATTY AT LAW, PLLC**
50 E. Rivercenter Boulevard
Suite 1280
Covington, KY 41011
Telephone: (513) 257-1895
chris@cwiestlaw.com

*Counsel for Plaintiffs*
    * Admitted *pro hac vice*

21

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the foregoing upon Counsel of record by filing same via CM/ECF, this 17th day of April, 2025.

/s/ *John C. Sullivan*
John C. Sullivan


**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with Local Rules 7.4 and 10.2 regarding length and font type.

/s/ *John C. Sullivan*
John C. Sullivan