PAUL ALSTON                1126-0
WILLIAM S. HUNT           3844-0
NICKOLAS A. KACPROWSKI   8627-0
JOHN RHEE                  9681-0

DENTONS US LLP
1001 Bishop Street, Suite 1800
Honolulu, Hawai`i  96813
Telephone: (808) 524-1800
Facsimile: (808) 524-4591
E-mail:   paul.alston@dentons.com
          william.hunt@dentons.com
          nickolas.kacprowski@dentons.com
          john.rhee@dentons.com

CHRISTINE K.D. BELCAID      10125-0
LITTLER MENDELSON, P.C.
500 Ala Moana Boulevard
Suite 7400, PMB #404
Honolulu, Hawaii   96813
Telephone:  (808) 509-2052
Email:    kbelcaid@littler.com

Attorneys for Defendants
HAWAIIAN AIRLINES, INC. and
HAWAIIAN HOLDINGS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| RIKI O'HAILPIN, NINA ARIZUMI, ROBERT ESPINOSA, ERWIN YOUNG, PUANANI BADIANG, SABRINA FRANKS, RONALD LUM, DAN SAIKI, and BRANDEE AUKAI, on their own behalf and on behalf of all others similarly situated,<br><br>Plaintiffs, | Civil No.:  1:22-cv-00532-HG-WRP<br><br>**DEFENDANTS HAWAIIAN AIRLINES, INC. AND HAWAIIAN HOLDINGS, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO ERWIN YOUNG, PUANANI BADIANG, SABRINA FRANKS, AND RONALD LUM** |
|---|---|

10109927\000047\132179330\V-4

vs.

HAWAIIAN AIRLINES, INC. and
HAWAIIAN HOLDINGS, INC.,

Defendants.

Trial Date:  TBD
Trial Judge:  Honorable Helen Gillmor

10109927\000047\132179330\V-4

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    RELEVANT FACTUAL BACKGROUND ......................................................2

    A.    Hawaiian's vaccine policy arose during a time of
upheaval in the airline industry. ...........................................................3

    B.    Hawaiian received an unprecedented number of
accommodation requests while the travel industry was
attempting to recover from the pandemic. .............................................4

    C.    Various factors limited the potential options for
reasonable accommodations to the vaccine policy. ............................5

        1.    The Federal Contractor Mandate and related guidance
required masking and social distancing for all
unvaccinated employees. ..........................................................5

        2.    State and local measures required distancing and other
safety measures of Hawaiian's employees at airports. ..............6

        3.    Hawaiian faced unique operational challenges that
required a focus on safety when considering potential
accommodations......................................................................6

    D.    Hawaiian's Transitional Period Testing Program ("TPTP")
demonstrated the significant burdens and limitations of testing...........8

    E.    Hawaiian determined that providing accommodations to
Plaintiffs Lum, Franks, Young, and Badiang would have
constituted an undue hardship. ...........................................................10

III.   STANDARD OF REVIEW.......................................................................14

IV.   ARGUMENT.........................................................................................15

    A.    Summary Judgment should be granted as to the Plaintiffs'
Title VII claims. ...............................................................................15

1.    The Ninth Circuit's three-part analysis of undue
      hardship in *Petersen* applies here. ...........................................15

2.    The health and safety costs of accommodating Plaintiffs
      are undisputed. ...........................................................................15

3.    The operational burdens of accommodating Plaintiffs
      are undisputed. ...........................................................................22

4.    The financial burdens of accommodating Plaintiffs
      are undisputed. ...........................................................................24

B.    Summary Judgment should be granted as to the Plaintiff
      Ronald Lum's ADA claim. ..................................................................25

1.    The same considerations of health/safety risk and
      operational/financial burdens demonstrate undue
      hardship under the ADA. ..........................................................25

2.    Allowing Plaintiffs to work while unvaccinated
      would have created a direct threat. ..........................................26

V.    CONCLUSION....................................................................................................28

10109927\000047\132179330\V-4

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bordeaux v. Lions Gate Entertainment, Inc.*,
2025 WL 655065 (9th Cir. Feb. 28, 2025) ........................................................16

*Bordeaux v. Lions Gate Entertainment, Inc.*,
703 F.Supp.3d 1117 (C.D. Cal. Nov. 21, 2023) ................................................17

*Bragdon v. Abbott*,
524 U.S. 624 (1998)...........................................................................................26

*Carlson v. City of Redmond*,
No. 2:22-CV-01739, 2025 WL 3496535
(W.D. Wash. Dec. 5, 2025)................................................................................18

*Cline v. PeaceHealth*,
No. 6:23-CV-01985-MTK, 2025 WL 295113
(D. Or. Jan. 24, 2025) .......................................................................................18

*Commodity Futures Trading Comm'n v. Savage*,
611 F.2d 270 (9th Cir. 1979) ............................................................................14

*Echazabal v. Chevron USA, Inc.*,
336 F.3d 1023 (9th Cir. 2003) ..........................................................................26

*Efimoff v. Port of Seattle*,
No. 2:23-CV-01307-BAT, 2024 WL 4765161
(W.D. Wash. Nov. 13, 2024) ...............................................................19, 21, 23

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) .........................................................................18

*Eshom v. King Cnty.*,
No. 2:23-CV-00028-JNW, 2025 WL 3187479
(W.D. Wash. Nov. 14, 2025)..............................................................................17

*Gemmrig v. Asante Three Rivers Med. Ctr., LLC*,
Civ. No. 1:22-cv-01844-AA, 2025 WL 2555337
(D. Or. Sept. 5, 2025)........................................................................................25

10109927\000047\132179330\V-4

*Goff v. PeaceHealth*,
No. 6:22-CV-01991-MTK, 2024 WL 4979432
(D. Or. Dec. 4, 2024) .................................................................................18

*Groff v. DeJoy*,
600 U.S. 447 (2023).................................................................................15

*Hassett v. United Airlines, Inc.*,
No. 23 C 14592, 2025 WL 3268667 (N.D. Ill. Nov. 24, 2025) .........................21

*Health Freedom Defense Fund, Inc. v. Carvalho*,
148 F.4th 1020 (9th Cir. 2025) ................................................................2, 17

*Moriarty v. Port of Seattle*,
No. 2:23-CV-01209-TL, 2025 WL 3295346
(W.D. Wash. Nov. 26, 2025) .....................................................................21

*Morris v. Asante Health Sys.*,
No. 1:22-CV-01707-CL, 2025 WL 1770806
(D. Or. June 25, 2025) ............................................................................17

*Nidds v. Schindler Elevator Corp.*,
113 F.3d 912 (9th Cir. 1997) ....................................................................14

*Parsons v. PeaceHealth*,
No. 6:22-CV-01246-MTK, 2024 WL 4979430
(D. Or. Dec. 4, 2024) .............................................................................18

*Petersen v. Snohomish Regional Fire and Rescue*,
150 F.4th 1211 (9th Cir. 2025) ...........................................................*passim*

*Richardson v. National Basketball Association*,
23cv6926, 2025 WL 2402614 (S.D.N.Y. Aug. 18. 2025)................................19

*Sch. Bd. of Nassau Cnty., Fla. v. Arline*,
480 U.S. 273 (1987)................................................................................27

*Snow v. Women's Healthcare Associates, LLC*,
No. 3:23-CV-01393-IM, 2024 WL 3640111 (D. Or. Aug. 2, 2024)..................17

*Sutton v. Providence St. Joseph Med. Ctr.*,
192 F.3d 826 (9th Cir. 1999) ...............................................................23, 24

iv

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
   809 F.2d 626 (9th Cir. 1987) .................................................................14

*Trusov v. Oregon Health & Science University*,
   3:23-cv-77-SI, 2025 WL 2462782 (D. Or. Aug. 26, 2025)................................20

**Federal Statutes**

42 U.S.C. § 12111 (10)(A)....................................................................25

Americans with Disabilities Act .......................................................*passim*

**Rules**

Fed. R. Civ. P. 56 ...............................................................................1

Fed. R. Civ. P. 56(a).............................................................................14

Fed. R. Civ. P. 56(e).............................................................................14

Local Rule 56.1 ..................................................................................1

10109927\000047\132179330\V-4

**DEFENDANTS HAWAIIAN AIRLINES, INC. AND
HAWAIIAN HOLDINGS, INC.'S MOTION FOR SUMMARY
JUDGMENT AS TO ERWIN YOUNG, PUANANI BADIANG,
SABRINA FRANKS, AND RONALD LUM**

Defendants HAWAIIAN AIRLINES, INC. and HAWAIIAN HOLDINGS, INC. (collectively "Hawaiian"), move for summary judgment under Fed. R. Civ. P. 56 and LR56.1, pursuant to the Court's Minute Order dated January 20, 2026 [Dkt. 404]. This motion applies to the remaining Plaintiffs in this action: Erwin Young, Puanani Badiang, Sabrina Franks, and Ronald Lum (collectively, "Plaintiffs"). Specifically, Hawaiian moves for summary judgment as to Count I (Title VII failure to accommodate as to Young, Badiang, Franks, and Lum) and Count IV (ADA failure to accommodate as to Lum).

## I.    INTRODUCTION

Plaintiffs were Hawaiian employees whose job duties required them to spend significant portions of their work hours: (1) indoors or in enclosed spaces such as an airline cockpit; and (2) in physical proximity to co-workers or passengers. They all requested exemptions from Hawaiian's COVID-19 vaccine policy ("Vaccine Policy")—*i.e.*, to be permitted to work while unvaccinated. Under recent caselaw in the Ninth Circuit, summary judgment should be granted as to the remaining claims in this action for several reasons.

First, under *Petersen v. Snohomish Regional Fire and Rescue*, 150 F.4th 1211 (9th Cir. 2025), Plaintiffs' requested accommodations would have constituted

10109927\000047\132179330\V-4

an undue hardship in light of (1) the health and safety risks, (2) operational burdens, and (3) financial burdens they would have caused Hawaiian.  Hawaiian was entitled to consider these three *Petersen* factors, as well as the potential impact of granting accommodations to the large numbers of employees who had requested them, in light of the information that was available at the time it considered Plaintiffs' requests.

Second, as the Ninth Circuit recognized in *Health Freedom Defense Fund, Inc. v. Carvalho*, 148 F.4th 1020, 1033 (9th Cir. 2025), employers had a valid reason to rely on published CDC guidance at the time and to conclude the COVID-19 vaccines would protect the health and safety of its employees.  Employers had no obligation to second-guess CDC guidance or to indulge anti-vaccine theories when deciding accommodation requests.

As explained below, the facts in the record demonstrate that permitting Plaintiffs to continue working while unvaccinated would have incurred significant operational, logistical, and financial burdens, while resulting in unacceptable risks to the health and safety of other employees and/or customers.  All of the accumulated "costs" constitute an undue hardship under both Title VII and the ADA, and the risk to health and safety constitutes a direct threat under the ADA.

## II.    RELEVANT FACTUAL BACKGROUND

2

10109927\000047\132179330\V-4

### A.  Hawaiian's vaccine policy arose during a time of upheaval in the airline industry.

From early 2020, COVID-19 brought Hawaii's travel industry to a standstill and forced Hawaiian to reduce its operations, reorganize, and allocate its limited resources to survive.  CSF 1 (Kobayashi Decl., ¶ 3).[1]  In late summer/early fall 2021, Hawai`i and the rest of the U.S. were experiencing the Delta Variant surge.  CSF 2, 4 (Kobayashi Decl., ¶ 7).  Between late 2021 and early 2022, Hawai`i was battling record high one-day COVID-19 case counts.  CSF 3 (Exs. JR-5, JR-6).

By this time, three of Hawaiian's employees had died of COVID-19.  CSF 3.  One of these employees, a flight attendant, tested positive along with 16 others after an in-person training event held at Hawaiian's corporate headquarters.  *Id.*  Hawaiian engaged Fredrick Ming Chen, MD, ("Dr. Chen")—who was a Professor at University of Washington Medical School and Chief of Family Medicine at Harborview Medical Center at the time and subsequently the Chief Health and Science Officer of the American Medical Association—to provide expert medical advice regarding Hawaiian's vaccine policy and employee disability accommodation requests.  CSF 18.

Vaccines emerged as the single best tool to stem the contraction and transmission of COVID-19 while also preventing severe illness and death.  CSF 5.

---

[1]  Between 2020 and 2022, Hawaiian lost approximately $896 million and took on over one billion dollars in debt.  CSF 17 (Snook Decl. ¶ 7; Exs. JS-1, JS-2).

3

Other measures such as testing, masking, and social distancing, were less effective in protecting employees.  CSF 6.  The effects of the Delta surge convinced Hawaiian's management that instituting the Vaccine Policy was necessary to maintaining the safety of Hawaiian's employees.  CSF 5.

On August 9, 2021, Hawaiian announced to its employees that as of November 1, 2021, Hawaiian would require all U.S.-based employees to be vaccinated against COVID-19.  CSF 7 (Kobayashi Decl., ¶ 4).  This meant that employees would need to have received by November 1, 2021, their second shot of either the Pfizer or Moderna vaccines, or the single shot of the Janssen vaccine unless they (1) received a medical accommodation, (2) received reasonable accommodation for a disability under the Americans with Disabilities Act ("ADA"), or (3) received a religious accommodation.  CSF 7.  The deadline for vaccination was subsequently extended to January 4, 2022.  *Id*.

**B.    Hawaiian received an unprecedented number of accommodation requests while the travel industry was attempting to recover from the pandemic.**

Whereas Hawaiian typically received five to ten religious accommodation requests in a given year, Hawaiian received 496 such requests for the Vaccine Policy, along with 72 medical accommodation requests, for a total of 568 accommodation requests.  CSF 20.  These requests came from all major operational groups at Hawaiian, including but not limited to 71 pilots, 268 flight attendants, 138 employees in Airport Operations (which includes customer service

4

agents and ramp agents), and 22 employees in Maintenance and Technical Operations. *Id*. (Jackson Decl. ¶ 4).

By the end of 2021, Hawaiian and the rest of the state's travel industry was taking steps to recover from the low-point of 2020 during the pandemic. CSF 19. Hawaiian was increasing staffing in line with the overall increased flights and revenue forecasts at the time. CSF 19 (Kobayashi Decl., ¶ 19). There was also a need to re-train employees returning from leaves/furloughs, and to train new employees in front-facing positions such as flight attendants and customer service agents. *Id*. Hawaiian had implemented a return to work policy, where full-time remote work was no longer an option. *Id*. (Kobayashi Decl., ¶ 20).

## C. Various factors limited the potential options for reasonable accommodations to the vaccine policy.

### 1. The Federal Contractor Mandate and related guidance required masking and social distancing for all unvaccinated employees.

On September 9, 2021, the Biden Administration issued Executive Order No. 14042 (the "Federal Contractor Mandate"), which required federal contractors (including Hawaiian) to ensure their workforces were fully vaccinated or entitled to a legal accommodation. CSF 8 (Ex. JR-24). The deadline for compliance with the Federal Contractor Mandate was extended several times to January 4, 2022. CSF 8 (Kobayashi Decl., ¶ 15; Jackson Decl. ¶ 5). The Safer Federal Workforce Task Force issued guidance to federal contractors regarding the mandate ("Federal

5

10109927\000047\132179330\V-4

Workforce Guidance").  CSF 8 (Ex. WJ-2).  Among other things, federal

contractors had to ensure that all employees "comply with published CDC

guidance for masking and physical distancing at a covered Contractor workplace."

CSF 8 (WJ-2 at 12059).  "Individuals who are not fully vaccinated must wear a

mask indoors and in certain outdoor settings . . . .  To the extent practicable,

individuals who are not fully vaccinated should maintain a distance of at least six

feet from others at all times. . . ."  *Id*.  Therefore, Hawaiian was required to ensure

that any employee receiving an accommodation to the Vaccine Policy would be

able to mask and socially distance where practicable at all times.  CSF 8.[2]

> **2.  State and local measures required distancing and other safety measures of Hawaiian's employees at airports.**

In 2021 and 2022, Governor Ige issued Executive Orders requiring

distancing and masking of employees of contractors on all State Facilities,

including airports.  CSF 12 (Exs. JR-11, JR-12, JR-13).

> **3.  Hawaiian faced unique operational challenges that required a focus on safety when considering potential accommodations.**

Operational considerations forced Hawaiian to be particularly cautious and

safety-sensitive in its response to COVID-19 and in considering potential

reasonable accommodations to the Vaccine Policy.  Hawaiian employs more

---

[2]  This is in line with published and well-established CDC guidance at the time.
CSF 8 (Ex. FC-3, FC-4).

10109927\000047\132179330\V-4

people in Hawaiʻi than any other carrier and is headquartered in a remote location in the middle of the Pacific with limited access to healthcare facilities and emergency room capacity and severe shortages of physicians and nurses.  CSF 13 (Snook Decl., ¶ 5).  For most unionized work groups, ranging from pilots to airport operations, staffing at Hawaiian was so lean that any cluster of COVID-19 cases would have had a significant operational impact on the Company.  *Id.*  Another consideration regarding contract employees (those who are union members and subject to collective bargaining agreements) is that if an exemption to the Vaccine Policy were granted for one employee but not for others in the same workgroup, then such disparate treatment would trigger issues of seniority and potential conflict with seniority rights. CSF 14 (Doane Decl., ¶ 3).

If Hawaiian suffered a shortage in flight crew as a result of sickness, it would have a difficult time diverting aircraft and personnel from other locations, because Hawaiian's routes are all to or from locations in Hawaiʻi.  CSF 14 (Snook Decl., ¶ 3.)  The concern over pilot sickness was particularly acute during the pandemic, given the fact that Hawaiian faced a pilot shortage at the time, which caused Hawaiian to cancel a number of flights.  CSF 15.  The Vaccine Policy ameliorated these risks by ensuring that Hawaiian could comply with international and domestic requirements, while minimizing downtime from possible infections in its workforce.  CSF 18 (Ex. FC-1 at 7; Chen Decl., ¶¶ 12, 13).

7

**D.    Hawaiian's Transitional Period Testing Program ("TPTP")
demonstrated the significant burdens and limitations of testing.**

The TPTP was a temporary testing program that gave several months to
employees who were unsure about vaccination to make a decision before the
January 4, 2022 deadline.  CSF 17 (Kobayashi Decl., ¶ 21).  For those employees
who chose to participate in TPTP testing, Hawaiian provided, at its expense,
COVID-19 rapid tests, and those employees were required to submit to proctored
testing from November 1, 2021 to January 4, 2022.  *Id.*, ¶ 22.

TPTP proved to be burdensome to administer and to ensure that employees
complied with testing.  CSF 21.  Testing was not a viable long-term alternative to
the Vaccine Policy given its significant limitations in reducing the spread of the
disease.  CSF 22.  The additional costs to Hawaiian included not just obtaining a
suitable vendor and a sufficient supply of tests during COVID-19 surges, but also
the expense of hiring additional personnel to ensure compliance.  CSF 22, 23.  In
order to maintain accurate test results, Hawaiian required proctored testing.  *Id.*
(Kobayashi Decl., ¶ 22).

During the Delta variant surge, Hawaiian struggled to obtain a vendor who
could supply a sufficient number of tests before the testing kits expired.  CSF 22.
The supply of test kits during the surge was unpredictable, and Hawaiian often had
to purchase thousands of extra kits to ensure it had a sufficient supply.  *Id.*  For the

8

2 months of the TPTP testing program alone, Hawaiian spent approximately $320,000.  CSF 23.

More importantly, maintaining compliance with the testing program created operational disruptions.  Each work group was responsible for holding employees accountable to the testing schedule.  Hawaiian issued over 150 noncompliance letters for failure to take a test.  CSF 25 (Kobayashi Decl., ¶ 25).  Hawaiian tracked compliance rates in the TPTP program.  In the first three weeks of the TPTP program, with over 1,300 proctored tests administered, approximately 15% of these scheduled tests resulted in a "no test"—*i.e.*, a failure to report a timely test result.  CSF 25 (Valerie Wong Decl. ¶ 8, Ex. VW-1).  Compliance was generally tracked within each work group.  CSF 24 (Wong Decl., ¶ 5).  This meant that managerial employees in each work group were diverted from their everyday duties and tasked with administering and overseeing TPTP compliance.  CSF 24.

Every time there was a failure to timely test, that employee on TPTP had to be held out of service, and Hawaiian had to scramble to replace that employee.  CSF 25 (Snook Decl., ¶ 15).  When Hawaiian found replacements to fill that shift, it had to pay that replacement overtime.  *Id.*  For each noncompliance letter sent to contract employees, managers were required to hold a disciplinary hearing.  *Id.* (Kobayashi Decl., ¶ 25).  These hearings required Hawaiian to hold the noncompliant contract employees out of service, which meant that employees were

9

placed on a leave of absence while management, the employee, and the union

found a date to schedule the disciplinary hearing. *Id.* Not only did Hawaiian

suffer unpredictable staffing shortages as a result of waiting for employees to have

their hearings, but Hawaiian was also contractually bound to pay noncompliant

contract employees for this lost time. *Id.*

> **E.    Hawaiian determined that providing accommodations to Plaintiffs Lum, Franks, Young, and Badiang would have constituted an undue hardship.**

Willard Jackson, Hawaiian's Director of Leave Management, discussed the

issue of potential accommodations with various operational leaders at Hawaiian.

CSF 26 (Jackson Decl., ¶¶ 10, 11). Hawaiian determined that permitting an

accommodation to the Vaccine Policy would require an unvaccinated employee to

socially distance and wear a mask while working in light of CDC guidelines and

the Federal Workforce Guidance. CSF 26.

**Ronald Lum**. Lum was a Hawaiian pilot who flew inter-island flights on

the Boeing 717 from 2004-2006 and 2014 to January 2022. CSF 27. On or about

November 20, 2021, Lum submitted a request for medical accommodation. CSF

28 (Exs. 2, 4). Lum's doctor requested that he not get the COVID-19 vaccine

because of his "medical condition." CSF 28 (Ex. JR-20 (at Ex. 7). Lum also

submitted a religious accommodation request form on October 25, 2021. CSF 28

(Ex. 2, 4). He requested these accommodations: "COVID screening per CDC" and

"COVID testing." CSF 28 (Lum Depo Ex. 2). Pilots, who must work in airports at

10

times in proximity to members of the public and to co-workers, and who must work in airplane cockpits, cannot socially distance while working. CSF 29. On December 7, 2021, Hawaiian sent Lum a letter denying his request for a medical accommodation. CSF 29 (Ex. JR-20 at Ex. 11). On December 17, 2021, Hawaiian sent to Lum a letter denying his request for a religious accommodation. CSF 29 (Ex. JR-20 at Ex.12). On December 4, 2021, Lum accepted the unpaid leave (up to one year) offered by Hawaiian. CSF 30.

**Sabrina Franks**. Franks was a customer service agent (CSA) at Hawaiian. CSF 31 (Ex. JR-21 25:2-13). Her duties as a customer service agent included checking in passengers, facilitating baggage drop off, helping with seating, ticketing, and boarding. CSF 31. On September 30, 2021, Franks submitted a religious accommodation request form. CSF 32 (Ex. JR-21 at 72:20-73:1) Frank's requested accommodations included mask wearing and testing. CSF 32 (JR-21 (Ex. 4)). Hawaiian determined that unvaccinated CSAs, who core duties are customer-facing at the airport, could not comply with the core safety requirements of masking and social distancing. CSF 34 (Jackson Decl. ¶ 19). On December 13, 2021, Hawaiian sent to Franks a letter denying her accommodation request on the ground of undue hardship. CSF 34 (Ex. JR-21 (at Ex. 5)).

**Erwin Young**. Young was a Lead Mechanic in the Maintenance (Sheetmetal/Composites) Department. CSF 35 (Ex. JR-22 at 26:3-4). As a Lead

11

10109927\000047\132179330\V-4

Mechanic, Young's primary work location was at the hangar, and approximately 25 to 35 people would work there.  CSF 35 (Ex. JR-22 at 31:17-25; 36:16-20).  In addition, Young would attend morning meetings in a Maintenance office room approximately 20 feet by 60 feet with 10 to 15 people.  CSF 35 (Ex. JR-22 at 30:3-31:16).  As a Lead Mechanic, Young also spent time in a "little office" with other leads checking inventory, researching manuals, and working with Engineering on cases.  *Id*. at 37:6-38:9.  Sheetmetal mechanics generally work in pairs for safety reasons, with one mechanic on each side of a work piece.  CSF 35 (W. Jackson Decl., ¶ 20).

Young submitted a religious accommodation request form on September 30, 2021.  CSF 36 (Ex. JR-22 (Ex. 2)).  He requested as accommodations "a wellness questionnaire, or a saliva testing."  *Id*.  Jackson discussed the issue of potential accommodations to Maintenance employees with Beau Tatsumura, VP of Maintenance.  CSF 37 (Jackson Decl., ¶ 20).  Hawaiian determined that Lead Mechanics in Sheetmetal/Composites could not safely socially distance while masked: sheet metal work is generally a two person job for safety and practical purposes.  CSF 37  (Jackson Decl.,¶ 20).  On December 16, 2021, Hawaiian sent a letter to Young denying his request for accommodation on the ground of undue hardship.  CSF 37 (Ex. JR-22 (Ex. 6)).

12

**Puanani Badiang**.  Badiang was a Corporate Trainer who trained new and current employees in various work groups.  CSF 38 (Ex. JR-23).  In-person training was conducted at corporate headquarters, in a group setting.  CSF 38 (Ex. JR-23. at 33:14-41:10).  Customer service agents had a part of their training in a "back office room" in the airport.  CSF 38 (Ex. JR-23 36:6-16).  Badiang also trained customer service agents by observing their "role playing" as if they were assisting customers at a check-in kiosk.  CSF 38 (Ex. JR-23 45:1-24).  Corporate training was a very small department, with five instructor slots.  *Id*. (Ex. JR-23 at 61:4-11.)  By the time Badiang left Hawaiian in January 2022, there were only *two* instructors (including herself).  CSF 41.

On September 28, 2021, Badiang submitted a religious accommodation request form.  CSF 39 (Ex. JR-23, Ex. 2).  Her request form was blank with respect to requested accommodations or alternate accommodations.  *Id*.  Instead, Badiang attached a letter from a pastor that she obtained online.  CSF 39.

Hawaiian determined that masking while socially distanced was not a feasible option for corporate trainers.  CSF 40 (Jackson Decl., ¶ 21).  There was significant demand for training—both recurrent training for returning employees from voluntary leave and training of new employees.  CSF 40.  This training occurred not just in the classroom at headquarters but also in the airport.  CSF 38.  In addition, Hawaiian expected to continue to ramp up flights in 2022, so there was

13

an expectation of increased on-the-job training for the majority of employees.  CSF 40.  On December 14, 2021, Hawaiian sent a letter to Badiang denying her accommodation request on the ground of undue hardship.  CSF 40 (Ex. JR-23 at Ex. 6).

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To defeat summary judgment "there must be sufficient 'evidence that a reasonable jury could return a verdict for the nonmoving party.'" *Nidds v. Schindler Elevator Corp*., 113 F.3d 912, 916 (9th Cir. 1997).

The moving party has the initial burden of "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The moving party, however, has no burden to negate or disprove matters on which the opponent will have the burden of proof at trial.  *Celotex*, 477 U.S. at 325.  If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of probative evidence tending to support its legal theory.  *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 282 (9th Cir. 1979). The opposing party must present admissible evidence showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

14

10109927\000047\132179330\V-4

## IV.   ARGUMENT

### A.   Summary Judgment should be granted as to the Plaintiffs' Title VII claims.

#### 1.   The Ninth Circuit's three-part analysis of undue hardship in *Petersen* applies here.

Without waiving its arguments against the Plaintiffs' prima facie case, Hawaiian asks the Court to grant summary judgment against their Title VII failure to accommodate claims on the basis of undue hardship.  The United States Supreme Court has explained that an undue hardship is more than a de minimis cost or burden.  *Groff v. DeJoy*, 600 U.S. 447, 468 (2023).  The undue hardship analysis must take into account all relevant factors, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer.  *Id*. at 470-71.  In affirming the grant of summary judgment against a failure to accommodate claim concerning a COVID-19 vaccine mandate, the Ninth Circuit explained that for an undue hardship analysis, it is appropriate to examine (1) health and safety costs, (2) operational burdens, and (3) financial burdens on the employer.  *See Petersen*, 150 F.4th at 1218.

#### 2.   The health and safety costs of accommodating Plaintiffs are undisputed.

##### a)   The Vaccine Policy and Hawaiian's accommodation decisions were driven by safety concerns based on the medical and scientific consensus at the time.

15

It is undisputed that Hawaiian's leadership implemented the Vaccine Policy to protect the health and safety of its employees after they learned of three employees who died of COVID and after consulting with their retained medical expert, Dr. Chen, who relied on the consensus of the scientific community and public health authorities during the pandemic.  CSF 3, 5, 18.  This consensus is uncontroversial: vaccination was necessary to protect the public, reduce the severity of the illness, and lower the risk and number of hospitalizations and deaths due to COVID-19.  CSF 5 (Chen Decl. ¶¶ 11-16, Ex. FC-1 through FC-4).

Hawaiian's concerns about employee health and public safety needs to be emphasized.  In August 2021, reported COVID-19 cases in Hawai`i rose significantly, and the Hawai`i Department of Health reported a "tidal wave" of over 10,800 infections between August 15 and August 29, 2021.  CSF 3 (Ex. JR-5).  This surge convinced Hawaiian's leadership that the Vaccine Policy was necessary to maintaining the safety of Hawaiian's employees.  CSF 5 (Kobayashi Decl. ¶ 12).

In *Bordeaux v. Lions Gate Entertainment, Inc*., 2025 WL 655065, at \*2 (9th Cir. Feb. 28, 2025), the Ninth Circuit held that evidence of a surge in COVID-19 cases demonstrated that the plaintiff's religious accommodations request placed an undue hardship on the employer where social distancing was not possible.  Furthermore, courts have found the risk of an unvaccinated individual getting

16

others sick to be non-speculative and supporting a finding of undue hardship on an

employer in the COVID-19 context.  *See Petersen*, 150 F.4th at 1220; *Bordeaux v.*

*Lions Gate Entertainment, Inc.*, 703 F.Supp.3d 1117, 1136 (C.D. Cal. Nov. 21,

2023) (collecting cases); *Eshom v. King Cnty.*, No. 2:23-CV-00028-JNW, 2025

WL 3187479, at *9 (W.D. Wash. Nov. 14, 2025); *Morris v. Asante Health Sys.*,

No. 1:22-CV-01707-CL, 2025 WL 1770806, at *8 (D. Or. June 25, 2025); *Snow v.*

*Women's Healthcare Associates*, *LLC*, No. 3:23-CV-01393-IM, 2024 WL

3640111, at *6-7 (D. Or. Aug. 2, 2024).

> **b)    Hawaiian was reasonable in relying on published
> CDC guidance and complying with the Federal
> Contractor Mandate.**

The Ninth Circuit recognized that the medical consensus from health experts

including the U.S. Centers for Disease Control and Prevention supported

vaccination mandates by employers during the height of the COVID-19 pandemic

in 2021.  *Carvalho*, 148 F.4th at 1030-31.  Indeed, *Carvalho* held that "it was more

than reasonable for the [employer school district] to conclude that COVID-19

vaccines would protect the health and safety of its employees and students," citing

published CDC guidance on the effectiveness and safety of the COVID-19

vaccines.  *Id*. at 1031.

The same holding applies here: Hawaiian was certainly reasonable in relying

on published CDC guidance, as well as the Federal Contractor Mandate and its

associated regulations.  Hawaiian had no obligation to question the CDC guidance

17

and the consensus of the medical community.  Nor did it have any duty to conduct its own research and entertain novel or fringe theories concerning vaccination.  *See Carlson v. City of Redmond*, No. 2:22-CV-01739, 2025 WL 3496535 at *11 (W.D. Wash. Dec. 5, 2025) (in granting summary judgment to employer based on undue hardship, court noted "The City was entitled to follow contemporaneous guidance from authoritative sources; it was not required to anticipate how scientific understanding might evolve."); *Cline v. PeaceHealth*, No. 6:23-CV-01985-MTK, 2025 WL 295113, *5 (D. Or. Jan. 24, 2025) (rejecting plaintiffs' expert "who casts doubt on COVID-19 vaccines as a tool to slow the spread of COVID-19," noting that "these unproven, fringe theories are inadmissible under Rule 702 and *Daubert*, as they directly contradict consistent public health recommendations from the state and federal government without scientific proof.")[3]; *Goff v. PeaceHealth*, No. 6:22-CV-01991-MTK, 2024 WL 4979432, at *9 (D. Or. Dec. 4, 2024) (granting summary judgment based on undue hardship, finding that employer's concern about health and safety risk was supported by the "consensus among the scientific medical community at the time, and reliance on guidance from authoritative sources such as the CDC and the [state health authority]"); *Parsons v.*

---

[3]  The exclusion of "fringe theories" conflicting with public health recommendations from the federal and state governments at the time is further warranted by the Ninth Circuit's decision in *Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025).

18

*PeaceHealth*, No. 6:22-CV-01246-MTK, 2024 WL 4979430, at *9 (D. Or. Dec. 4, 2024) (same); *Efimoff v. Port of Seattle*, No. 2:23-CV-01307-BAT, 2024 WL 4765161, at *13 (W.D. Wash. Nov. 13, 2024) (holding that based on public health data and guidance, the Port "reasonably concluded that allowing unvaccinated employees to have direct, in-person contact with [the public] and employees posed a substantial increased cost on its operations."); *see also Richardson v. National Basketball Association*, 23cv6926 (DLC), 2025 WL 2402614 at *11-13 (S.D.N.Y. Aug. 18. 2025).

> **c)   Testing, masking, and social distancing were not reasonable alternatives to vaccination.**

Testing is not a prophylactic measure; it is a diagnostic tool that simply determines whether an individual has COVID-19 at a particular moment in time. Chen Decl. at ¶ 12.  It is possible for an employee to test negative on a given day, contract COVID-19 after the test is administered, and be contagious before the next test.  In the meantime, that employee could have exposed their co-workers, customers, or other members of the community to COVID-19.  *Id*.  In addition, tests are not 100% accurate, further increasing the risk of an infected employee exposing others to COVID-19.  *Id*.  Masking and social distancing are similarly insufficient, because they require individual discretion and vigilance in wearing a well-fitting mask and maintaining appropriate distance from others at all relevant times.  Chen Decl. at ¶ 13.

10109927\000047\132179330\V-4

Furthermore, it is undisputed that the published governmental guidance (including CDC publications) in 2021 strongly urged vaccination because the scientific data showed that vaccination decreased the risk of transmission, severity of symptoms, and risk of hospitalization and/or death.  Exs. FC-3 and FC-4. Therefore, courts have held that permitting employees to remain unvaccinated at work would risk the health and safety of others in the workplace (even in spite of mitigation measures such as masking, testing, and social distancing), and that such health and safety concerns are legitimate bases for finding undue hardship.  *See Trusov v. Oregon Health & Science University*, 3:23-cv-77-SI, 2025 WL 2462782 at *5-6 (D. Or. Aug. 26, 2025); *Petersen*, 150 F.4th at 1219-20.

### d) **Plaintiffs could not mask and socially distance while performing their job duties.**

As demonstrated above in Section II(E), Plaintiffs' job duties required: (1) sitting in an enclosed cockpit seated next to a co-pilot (Lum); (2) interacting with customers (Franks); (3) working with other mechanics in enclosed indoor spaces (Young); or (4) leading training sessions of current and/or incoming employees in indoor group settings (Badiang).

Hawaiian relied on the Federal Workplace Guidance, which in turn cited to published CDC guidance when it determined that any approved accommodation to the Vaccine Policy would require masking and social distancing.  CSF 8.  In light of the unprecedented numbers of accommodation requests, Hawaiian could not

20

grant accommodations relying on individual discretion and "best efforts" in adhering to safety protocols such as masking and social distancing—especially where job duties called for indoor work in proximity to others. *See Petersen*, 140 F.4th at 1220 (considering aggregate impact of large numbers of accommodation requests on operations); *Efimoff v. Port of Seattle*, No. 2:23-CV-01307-BAT, 2024 WL 4765161 at *9 (W.D. Wash. Nov. 13, 2024). *See also Hassett v. United Airlines, Inc.*, No. 23 C 14592, 2025 WL 3268667 at *3-7 (N.D. Ill. Nov. 24, 2025) (granting summary judgment to United Airlines based on undue hardship, noting difficulty of enforcing masking for pilots and logistical challenges of testing); *Moriarty v. Port of Seattle*, No. 2:23-CV-01209-TL, 2025 WL 3295346 at **15, *18-19 (W.D. Wash. Nov. 26, 2025) (granting summary judgment on undue hardship where plaintiff's work was "administrative and computer based" but indoors where several members of her crew and organization were present, noting that 113 other employees requested vaccine exemptions).

> e) **EEOC guidelines support Hawaiian's determination of the health/safety costs.**

As noted in *Petersen*, *Groff v. Dejoy* references EEOC guidance as a helpful course in determining health and safety costs would have imposed an undue hardship. *Petersen*, 150 F.4th at 1220.

> The EEOC has said that when considering undue hardship in the context of COVID, employers should consider if the employee "works in a solitary or group work setting," "has close contact with other

21

10109927\000047\132179330\V-4

employees or members of the public," and "works outdoors or indoors."

*Id*. (citation omitted).  Here, just as in *Petersen*, consideration of these factors cited in the EEOC guidance support a finding of undue hardship.  *See supra* at Section II(E).

### 3. The operational burdens of accommodating Plaintiffs are undisputed.

#### a) Allowing Plaintiffs to work while unvaccinated created an unreasonable risk of operational disruption.

As explained above in Section II(C), Hawaiian faced operational challenges that forced it to be particularly cautious with respect to COVID-19 outbreaks.  It is headquartered in the middle of the Pacific with limited access to healthcare providers and facilities.  Staffing at Hawaiian for most unionized work groups was so lean that any cluster of COVID-19 of COVID-19 cases would have had a significant operational impact on the Company.  Indeed, Hawaiian had to cancel a number of flights due to a pilot shortage at the time and instances of sickness.

It is undisputed that outbreaks of COVID-19 cases continued in Hawai`i after the announcement of the Vaccine Policy.  (Exs. JR-5, JR-6).  Furthermore, Hawaiian received a total of 568 accommodation requests, with 496 religious accommodation requests.  *See supra* at Section II(B).  These requests came from all major operational groups at Hawaiian, and the Company was reasonable in considering the potential impact of permitting significant numbers of unvaccinated

employees to continue to work during the height of the COVID-19 pandemic.  *See Petersen*, 150 F.4th at 1220.  Hawaiian "could not afford to have substantial numbers of [its employees] on sick leave."  *Id.*; *see also Efimoff*, 2024 WL 4765161 at *12.

Lastly, Hawaiian had to comply with federal and state legal requirements concerning COVID-19 safety measures, including the Federal Contractor Mandate and the related Federal Workplace Guidance (requiring masking and social distancing where vaccination not possible) and Executive Orders from the Hawai`i Governor (requiring masking and social distancing of employees of contractors on all state facilities).  Permitting Plaintiffs to continue working unvaccinated when Hawaiian had determined that masking and social distancing were not feasible in light of Plaintiffs' job duties would have risked violating federal and state law.  *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830-31 (9th Cir. 1999).

### b)    The operational burdens of the TPTP were significant.

Even assuming *arguendo* that testing was a safe and adequate substitute for vaccination (it is not), Hawaiian's experience with the TPTP confirmed that administering a timely testing program for large numbers of employees exacted an undue operational burden.  *See supra* at Section II(D).  Hawaiian had to create and run a *de facto* managerial oversight program to ensure compliance with requirements to submit timely test results.  There were significant numbers of "no

23

test" results and Hawaiian ended up issuing over 150 non-compliance letters. *See id*. For every instance of non-compliance, an employee on TPTP had to be held out of service, and Hawaiian had to find a replacement (who would be paid overtime). *See id*. In addition, cases of non-compliance were subject to discipline, resulting in hearings. The net result was unpredictable staffing shortages. *See id*. On-time execution is a critical component of all of Hawaiian's operations. Having to incur the logistical and operational challenges of a large scale testing program indefinitely, or up to one year, was not tenable.

### 4. The financial burdens of accommodating Plaintiffs are undisputed.

Hawaiian suffered significant financial losses and faced continued risks of further financial hardship. *See supra* at Section II(A). Unvaccinated employees, absenteeism, and the risk of canceled flights or delayed operations imposed real and substantial costs to Hawaiian and also threatened real costs to the community. *Petersen*, 150 F.4th at 1221. In addition to the costs attendant to employee sick days, Hawaiian also faced the significant costs of maintaining a large-scale testimony program, which entailed ensuring adequate managerial staffing to ensure compliance and procuring an ample supply of test kits (when the supply of such kits was unsteady at the time), which cost over $320,000 for just two months.

In addition, Hawaiian faced potential loss of federal government contracts if it failed to comply with the Federal Contactor Mandate and its associated Federal

24

Workplace Guidance.  As explained above, permitting Plaintiffs to continue working unvaccinated when Hawaiian had determined that masking and social distancing were not feasible would have risked jeopardizing its federal contracts.

**B.     Summary Judgment should be granted as to the Plaintiff Ronald Lum's ADA claim.**

**1.     The same considerations of health/safety risk and operational/financial burdens demonstrate undue hardship under the ADA.**

Under the ADA, an employer may establish an undue hardship by showing that the requested accommodation would require "significant difficulty or expense."  *See* 42 U.S.C. § 12111 (10)(A).  EEOC guidance provides: "Undue hardship refers not only to financial difficulty, but to reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business.  An employer must assess on a case-by-case basis whether a particular reasonable accommodation would cause undue hardship."  *Gemmrig v. Asante Three Rivers Med. Ctr., LLC*, Civ. No. 1:22-cv-01844-AA, 2025 WL 2555337, at *8 (D. Or. Sept. 5, 2025) (quoting EEOC ADA Enforcement Guidance (citing 42 U.S.C. § 12111(10); 29 CFR § 1630.2(p); 29 CFR pt. 1630 app. § 1630.2(p))).

Here, the same considerations of health/safety risk, operational burden, and financial burden, as discussed above in the context of Title VII, demonstrate undue hardship under the ADA.  Allowing Plaintiff Lum to continue to work as a pilot for

25

Hawaiian (even with preventative measures such as masking and testing) would have substantially disrupted the workplace because it would have increased the risk of COVID-19 transmission and illness among co-workers and passengers.  *See id*. (granting summary judgment as to ADA claim based on undue hardship).  With Hawaiian already facing a pilot shortage that resulted in canceled flights, granting an accommodation to Lum would have resulted in unacceptable risk to Hawaiian's employees, passengers, and operations—especially given that *seventy* other Hawaiian pilots had requested the same accommodation.

> **2.    Allowing Plaintiffs to work while unvaccinated would have created a direct threat.**

A direct threat under the ADA is "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Echazabal v. Chevron USA, Inc*., 336 F.3d 1023, 1027 (9th Cir. 2003) (citing 42 U.S.C. 12111(3)). A direct threat determination "shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id*.  In weighing the risks and their magnitude, "the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority." *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998).  In reviewing those authorities, courts consider: "(1) the "duration of the risk;" (2) the "nature and severity of the potential harm;" (3) the "likelihood that the potential harm will occur;" and (4) the

26

"imminence of the potential harm." *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 288 (1987).

As explained above, the published guidance from the CDC as to COVID-19 was clear: the CDC urged the public to get vaccinated, and other preventative measures such as masking and testing were not as effective.  Given the information in Q4 2021, the duration of the risk was unknown.  No one could have predicted at the time when the pandemic would end.  The severity of the potential harm was COVID-19 illness, hospitalization, and/or death.  The likelihood of the potential harm was significant: three Hawaiian employees had died of COVID-19.  Evidence of imminence of the potential harm can be found in the Hawai`i State Department of Health published data showing that the Delta surge had resulted in record numbers of COVID-19 infections at the time the Vaccine Policy was announced.  As a result, any accommodation other than unpaid leave would have constituted an undue hardship or a direct threat under the ADA.  Indeed, Mr. Lum accepted Hawaiian's offer of unpaid leave.

27

10109927\000047\132179330\V-4

## V.    CONCLUSION

In accordance with the foregoing, the Court should grant this Motion.

DATED:  Honolulu, Hawai`i, February 10, 2026.

/s/ JOHN RHEE
PAUL ALSTON
WILLIAM S. HUNT
NICKOLAS A. KACPROWSKI
JOHN RHEE
CHRISTINE BELCAID

Attorneys for Defendants
HAWAIIAN AIRLINES, INC. and
HAWAIIAN HOLDINGS, INC.

28

10109927\000047\132179330\V-4