William Harrison, HBN 2948
**HARRISON LAW CENTER**
1001 Bishop Street, Ste. 2828
Honolulu, HI 96813
(808) 809-7065
william@harrisonlawcenter.com

John C. Sullivan*
Austin R. Nimocks*
Jace Yarbrough*
**S|L LAW PLLC**
610 Uptown Blvd., Ste. 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com
austin.nimocks@the-sl-lawfirm.com
jace.yarbrough@the-sl-lawfirm.com

Walker Moller*
**SIRI | GLIMSTAD LLP**
700 S. Flower St., Ste. 1000
Los Angeles, CA 90017
Telephone: (213) 376-3739
wmoller@sirillp.com

Christopher Wiest*
**CHRIS WIEST, ATTY AT LAW, PLLC**
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
Telephone: (513) 257-1895
chris@cwiestlaw.com

*Counsel for Plaintiffs*

*Admitted *pro hac vice*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| RIKI O'HAILPIN, NINA ARIZUMI, ROBERT ESPINOSA, ERWIN YOUNG, PUANANI BADIANG, SABRINA FRANKS, RONALD LUM, DAN SAIKI, and BRANDEE AUKAI, <br><br> *Plaintiffs*, <br><br> v. <br><br> HAWAIIAN AIRLINES, INC. and HAWAIIAN HOLDINGS, INC., <br><br> *Defendants*. | Civil No. 1:22-cv-00532-HG-WRP <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO ERWIN YOUNG, PUANANI BADIANG, SABRINA FRANKS, AND RONALD LUM** <br><br> Trial Date:   TBD <br> Trial Judge:   Honorable Helen Gillmor |

## TABLE OF CONTENTS

Table of Authorities ......................................................................................... iii

Introduction ....................................................................................................... 1

Background and Factual Corrections to  Hawaiian's Misstatements of Fact ........... 7

Standard of Review .......................................................................................... 18

Summary Of Argument ..................................................................................... 18

Argument .......................................................................................................... 19

**I.    The *Petersen* Factors Do Not Show That Hawaiian Is Entitled To Judgment As A Matter Of Law. ........................................................... 19**

    A.   There were no health or safety costs in accommodating Plaintiffs. .......... 19

    B.   The operational burdens Hawaiian offers are hypothetical and not undue under *Groff*. ....................................................................... 22

    C.   There would have been no financial burden in accommodating Plaintiffs. ........................................................................................ 23

**II.   Hawaiian Cannot Overcome The ADA's Standard For Plaintiff Lum. 23**

Conclusion ....................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Bates v. United Parcel Serv., Inc.*,
511 F.3d 974 (9th Cir. 2007) ...............................................................................16

*Bragdon v. Abbott*,
524 U.S. 624 (1998) .............................................................................................23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .............................................................................................18

*Cripe v. City of San Jose*,
261 F.3d 877 (9th Cir. 2001) ...............................................................................25

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ............................................................................18

*Georgia v. Biden*,
574 F. Supp.3d 1337 (S.D. Ga. 2021), overruled in part *Georgia v. President of the U.S.*, 46 F.4th 1283, 1308 (11th Cir. 2022) ....................................................13

*Groff v. DeJoy*,
600 U.S. 447 (2023) ....................................................................... *passim*

*Health Freedom Defense Fund, Inc. v. Carvalho*,
148 F.4th 1020 (9th Cir. 2025) ...................................................................... 5, 19

*Humphrey v. Memorial Hospitals Ass'n*,
239 F.3d 1128 (9th Cir. 2001) .............................................................................24

*Petersen v. Snohomish Regional Fire & Rescue*,
150 F.4th 1211 (9th Cir. 2025) ................................................................ 4, 18, 19

*Sevcik v. Unlimited Const. Servs., Inc.*,
462 F. Supp. 2d 1140 (D. Haw. 2006) .................................................................24

*Snapp v. United Transportation Union*,
889 F.3d 1088 (9th Cir. 2018) .............................................................................24

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021) ...........................................................................................1

**Statutes**

42 U.S.C. § 12111 ....................................................................................... 23, 25

42 U.S.C. § 2000e(b) ...............................................................................................4

**Other Authorities**

*Interim Clinical Considerations for Use of COVID-19 Vaccines Currently
Approved or Authorized in the United States: Contraindications and
precautions*, https://www.cdc.gov/vaccines/covid-19/clinical-
considerations/covid-19-vaccines-us.html#Contraindications...........................25

**Rules**

Fed. R. Civ. P. 56 ...............................................................................................18

**Regulations**

29 C.F.R. § 1630.2 ............................................................................................23

29 C.F.R. § 1630.2(j)(1)(i)..................................................................................16

45 C.F.R. § 84.3(j)(2)(i) (1997) .........................................................................23

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO ERWIN
YOUNG, PUANANI BADIANG, SABRINA FRANKS, AND RONALD LUM**

### INTRODUCTION

Defendants Hawaiian Airlines and Hawaiian Holdings, Inc. ("Hawaiian") seek to dodge liability under Ninth Circuit law addressing instances where unrebutted evidence concerning COVID-19 vaccine mandates and safety led to judgment as a matter of law. That is not this case. The evidence Hawaiian offers concerning its supposed motives for the mandate is both suspect and rebutted by the record. And in all events, Hawaiian's claim that safety was only achievable through vaccination is refuted by both the science—including the CDC's own statements and actions—and Hawaiian's willingness to put employees at risk by allowing thousands of *unvaccinated and untested* individuals on its planes each day, along with untested but vaccinated workers who were vaccinated a year or more earlier. Hawaiian's actions were not about the science.

The evidence in this case shows:

(1) Hawaiian was never going to provide a reasonable accommodation— "unpaid leave" for up to 12 months was decided in *October* of 2021, long before even the Transition Period Testing Program ("TPTP"), and it is disingenuous for Hawaiian to now act as if it were ever going to be

1

otherwise.    Plaintiffs' Response to Defendants' Statement of Facts ("PRS") Nos. 5, 26, 34; Concise Statement of Facts ("PCS") No. 1;[1]

(2) Hawaiian's COVID vaccine mandate was done for business reasons over safety (indeed, Hawaiian did no research on the risks of vaccinated versus unvaccinated employees—which is unsurprising since it allowed unvaccinated passengers on its planes daily), PRS5, PCS12;

(3) Hawaiian's parent company—Alaska Airlines—"liberally grant[ed] requests for reasonable accommodations," showing that vaccines were not required to be "safe" (confirmed by Hawaiian), PCS2;

(4) Johnson & Johnson, makers of the Janssen COVID-19 vaccine, showed vaccines were not being required for safety by not requiring vaccination for exempt employees who were visiting doctors offices daily and in proximity to doctors, nurses, and patients, PCS3;

(5) The CDC showed vaccines were not necessary for safety by not terminating any unvaccinated employees and by ceasing to even inquire as

---

[1] Indeed, Hawaiian admitted: "Rather, our intent is that a*ny accommodation that meets our standards of safety poses an undue hardship. . . .* Therefore, to be true to our intent, I recommend that we acknowledge the employee's religious belief is bona fide but provide that we cannot accommodate their request due to undue hardship." PRS34 (Exh. 21).

to vaccination status as of January 24, 2022—before the employees in this case were put out of work, PCS4;

(6) In 2021, COVID vaccines were ineffective at preventing infection and transmission beyond three to five months—and this was known at the time—yet Hawaiian did not mandate booster shots (thus undercutting its own late-raised pleas it now offers the Court about how essential the vaccines were), PRS6, PCS14;

(7) Hawaiian's own internal data showed that its vaccinated employees were being infected with COVID-19 at increasing rates after unvaccinated employees were put out of work, PCS5;

(8) Accommodations were denied to Plaintiffs based on the "strong opinions" of Hawaiian's HR Director about how employment law works and an "aggressive" approach to denials showing a deliberate indifference to religious rights, PRS34, PRS37, PRS40, PCS12;

(9) Hawaiian's internal communications show that accommodation was possible, though unpreferred, PCS10;

(10) Hawaiian claims accommodations would have been expensive, but knew accommodations would have cost the company nothing, PRS21;

(11) Hawaiian's anti-religious bias ensured accommodations would not be provided, PCS7;

3

(12) Federal law requires exemptions for at least 7% of an employer's workforce, 42 U.S.C. § 2000e(b) (explaining that Title VII applies to employers with at least 15 employees)—here, the percentage would have been lower even if all employees were accommodated.

Given these facts (and others), this Court held the case was "inappropriate for summary judgment." ECF No. 178 (citing *Groff v. DeJoy*, 600 U.S. 447, 468–69 (2023)). The Court recognized "the parties present conflicting stories on how the religious and medical accommodation requests were handled." ECF No. 101, Order at 3. And the Plaintiffs' specific roles and duties "would necessarily require a fact-intensive inquiry not suitable for summary judgment." ECF No. 178.

Recent cases from the Ninth Circuit do not change that truth. The correctness of the Circuit Court's opinions in cases such as *Petersen v. Snohomish Regional Fire & Rescue*, 150 F.4th 1211, 122–23 (9th Cir. 2025), necessarily relies on the defendants' summary judgment evidence being "unrebutted." *Id.* at 1218, 1220, and 1222. There were no disputed material facts in *Petersen*. For example, had the plaintiff produced evidence showing that the COVID vaccines were known, at the time, to wane after three months (as Plaintiffs have done here), the Court of Appeals would not have been able to declare the defendant's scientific evidence unassailable. And while judges around the country may believe that vaccines were the best (or only) way to stop the spread of COVID-19, that does not make it true nor can it be

unquestioningly accepted when a plaintiff provides counter evidence. Here, Plaintiffs have provided ample evidence to the contrary—including direct evidence from the CDC: evidence that Hawaiian knew at the time it put people out of work.

Even worse is Hawaiian's appeal to *Health Freedom Defense Fund, Inc. v. Carvalho*, 148 F.4th 1020, 1033 (9th Cir. 2025). Not only does the case *not say what Hawaiian claims about CDC guidance* (at 2), *Carvalho* does not apply here at all since it was an equal protection challenge to *government* action rather than a private employer. Under Title VII, an employer must look into the facts of supposed "undue hardship" rather than offer a rational basis fig leaf about the CDC. *See Groff*, 600 U.S. at 470–71 (requiring substantial costs that do not include temporary or administrative costs).

Never mind that, as Plaintiffs have showed, the CDC itself fired zero individuals over the COVID-19 vaccine and, in fact, stopped asking for vaccination status altogether *before* Hawaiian had put the Plaintiffs here out of work (except for Pua Badiang who was fired two weeks before the CDC stopped asking employees for vaccination status). PCS5. According to Hawaiian's own epithets (at 2), the CDC must have been "anti-vaccine" as well since it did not drive out its unvaccinated workers (all Plaintiffs asked was to not be forced out of work—they are hardly "anti-vaccine").

But even if vaccination was the "best" way to prevent transmission—a disputed fact that the evidence in this case shows is untrue—that still does not answer the question here of whether Hawaiian could have operated safely without denying every exemption. The company knew that it could do so, and Hawaiian allowed unvaccinated employees to work "safely" for several months under a testing regime (just like other airlines operating in the exact same manner). The only reason the testing regime was ended was that Hawaiian wanted all along to be a "pro-vax" airline, not because it was unsafe to not be (just ask Alaska Airlines). The company cannot come back years after the fact and offer the Court declarations about what is now a "fact" when Hawaiian's words and actions at the time show the Title VII and ADA violations that took place. The real facts show that there would have been no operational, logistical, or financial burdens to Hawaiian to provide accommodations in this case (let alone undue burdens) and no cognizable safety risk to anyone from doing so (as the CDC, J&J, Honolulu, and Alaska Airlines examples all show). PCS2, PCS3, PCS4. PCS16. This is not Monday-morning quarterbacking after the fact; this is holding Hawaiian accountable for the actions it took for the reasons it took them at the time it took them. Hawaiian knew before it ever considered accommodations that unpaid leave would be the answer. See PCS1. At a minimum, there are fact questions concerning Hawaiian's true motives and actions.

The motion should be denied.

6

**BACKGROUND AND FACTUAL CORRECTIONS TO
HAWAIIAN'S MISSTATEMENTS OF FACT**

**I.     Background of Hawaiian's Reasonable Accommodation Process.**

**A.     Hawaiian denied all exemption requests based on the Human
Resources Director's "strong opinions" about federal employment
law.**

Rather than follow EEOC Guidance for its vaccine mandate, Hawaiian took an "aggressive" approach to denying accommodation requests and prepared to preemptively challenge religious requests. *See* PRS34 (Exhs. 8, 9, 10). Hawaiian sent "canned" denial letters to employees that were inapplicable to their claims. *See* PCS8. Hawaiian also did not consider disabilities when making medical accommodation determinations. *See* PCS9. And it was celebrated with the company's medical director that Hawaiian denied every medical request barring a contraindication under the CDC's list of *allergic* reactions. *See* Exh. 15. And HR set aside advice from the legal department on processing accommodation requests for the "strong opinions" of HR Director Robin Kobayashi. PRS34 (Exh. 8). Kobayshi even boasted the 99% denial rate, claiming "the number speaks for itself." Exh. 16 at 93:5-8; 94:3-5.

The company forced vaccinations so that it would not be known, in the CEO's words, as the "anti-vax airline." Exh. 28 (HA(O'HAILPIN)0025030). But Hawaiian confirmed it could have accommodated employees, at least through testing. *See* PCS6, PCS10 (*e.g.*, Exh. 11 (HA(O'HAILPIN)0015103). And while

7

Hawaiian argues there were financial and administrative costs involved with testing, those costs could be eliminated by employees either paying for their own testing or using the free testing offered through the State. *See* PRS22, PCS10. Or Hawaiian could have allowed unvaccinated employees to take other precautions like other large national employers—*see* PCS2, PCS3—and like Hawaiian did with the seven employees it did accommodate, Exh. 12 at 215:2–5.

This is why Kobayashi also admitted Hawaiian could have been lenient with accommodations. PCS10 (Exh. 16 at 102:8–14). Indeed, "anything [wa]s possible" regarding accommodations. *Id.* This was true in January 2022 when Hawaiian knew that: (1) it is impossible to catch COVID on an airplane, PCS11; (2) vaccination against COVID did not prevent transmission of new variants, PRS6; and (3) vaccine efficacy waned after three months, falling behind protection by natural immunity, PRS6. Hawaiian leadership admitted these facts. *See* PCS20 (Exh. 24 at 53:15–22, 24:12–15); PRS6 (Exh. 17 at 76:18–25, 77:1–2).

Ultimately, Hawaiian denied all but seven religious accommodation requests—a denial rate approaching 99%. Exh. 12 at 215:2–5. And though Hawaiian's vaccination rate approached 100%, its former CEO confirmed the airline never studied the marginal benefit of forcing vaccination on the final few. PCS12. Hawaiian has no evidence of any marginal "safety" value of forcing Plaintiffs to become vaccinated. *Id.* Having far surpassed herd immunity standards as a

8

company—both through boosted employees and those with natural immunity—the accommodation for any employee entitled to one could have been following the safety requirements in place for other accommodated employees. *See* PRS34, PCS3. Hawaiian acknowledged vaccine efficacy waned over time and that new COVID-19 variants outpaced the original vaccines. PRS6. Yet booster shots were never required by Hawaiian. PCS14. Plaintiffs—who were willing to test negative (at their own expense) prior to reporting for work, PRS22—were at greater risk from their vaccinated-but-untested colleagues than the vaccinated employees were from the Plaintiffs.

**B.    Hawaiian conducted periodic testing to allow employees to work safely for two months.**

Hawaiian has long maintained that testing was a safe, but less preferred, alternative to vaccination. *See* PCS6. And for good reason. While Hawaiian was implementing its mandate, Delta was the prevalent variant and the vaccines—based on prior iterations of the virus—did not stop Delta transmission and were inferior to natural immunity three months post-vaccination. PRS6. Aligning with that was the Chief Pilot's recognition—in late November of 2021—that the mandate and accommodations were "not really playing out like we think off island and Hawaii is probably one of the more conservative communities with respect to the virus." PCS13.

When Hawaiian began removing unvaccinated employees in January 2022,

9

Omicron was the dominant variant and the CDC warned vaccines would not prevent breakthrough infections. PRS6. By the end of 2021/beginning of 2022, Hawaiian's infection rates skyrocketed amongst its vaccinated employees. PCS5. The vaccines couldn't stop the Omicron variant. Thus, an employee that tested negative was far safer than an employee vaccinated months prior for variants no longer being transmitted. PRS6.

To avoid accommodations, Hawaiian announced that unvaccinated workers may not work past January 4, 2022, in part because of the "administrative burden of managing the testing program," PCS27, even though the company decided in October 2021 that unpaid leave would be the only accommodation offered, PCS1. Hawaiian also blamed "the degree of non-compliance by a number of participants in the testing program" as interfering with staffing. PRS34 (Exh. 18).

Willard Jackson confirmed two reasons stated in a November 5, 2021 email (before the testing program commenced) that he did not "think testing is sustainable long term" because of "the cost and administrative burden." *See* PRS21, PCS10; *see also* Exh. 12 at 28:2–19; 35:12–17; 186:3–13; 187:5–11. The cost burden—assuming it even counts given *Groff*'s direction—was eliminated by allowing employees to pay for testing or test at *free* sites—as did exempt government employees. PRS22. After conceding there was no cost if employees paid for testing, Jackson argued "the administrative burden piece would still remain, though,"

10

including a "high degree of noncompliance" and "manual tracking for testing," PCS10 (Exh. 12 at 35:12–17; 56:6–7). This does not constitute an undue burden. *Groff*, 600 U.S. at 471 ("no undue hardship is imposed by . . . administrative costs").

## II.    Factual Corrections

Throughout its "Factual Background" section, Hawaiian makes claims unsupported or contradicted by the evidence.

### A.    Hawaiian's vaccine policy arose *after* the time of upheaval and arose as a direct result of actions taken by another airline.

While Plaintiffs show strong scientific evidence to the contrary—PRS6, including from the CDC—Hawaiian claims (at 3) that vaccines are the "best tool" for combating COVID-19. Yet vaccine-induced immunity waned at three months after the vaccine was taken, PRS6 (*see, e.g.*, Exh. 19 at 131:8–15, 23–25 and 132:1–4 (Dr. Chen agreeing that vaccine-induced immunity waned after three months following introduction of the Delta variant)), and Hawaiian never mandated booster shots, PCS14. But Hawaiian allowed employees vaccinated early in 2021 to continue working in 2022—well beyond three months post-vaccination—even though those individuals had worse immunity than unvaccinated employees with natural immunity. PCS34.

Hawaiian also fails to mention its vaccinated employees contracting COVID-19 at an increased rate after unvaccinated employees were placed out of work. PCS5. That is because the Omicron variant was the predominate variant by that

11

point and the vaccines (developed for variants prior even to the Delta variant) were ineffective regarding contraction and transmission. PRS6. By the time Hawaiian enforced its mandate, the vaccines mandated were outdated. *See* PRS6, PCS5.

Hawaiian's actions do not align with science because its mandate was enacted primarily so that the company would not be known as the "anti-vax airline." Exh. 28 (HA(O'HAILPIN)0025030). Hawaiian was afraid that United Airlines' mandate would trigger other airlines to follow suit and that it needed its own mandate to keep up on the business side. *See id.* Ironically, Hawaiian notes (at 4) that a "single shot of the Janssen vaccine" is sufficient while J&J—the makers of the Janssen COVID-19 vaccine—allowed the accommodation of not taking the vaccine for its sales persons who entered doctors' offices and were around patients all the time. PCS3.

**B. Hawaiian's unique employment requirement triggered a significant number of exemption requests, but it was still consistent with what Title VII expects of employers.**

The larger the employer, the more employees that may be expected to apply for an accommodation. *See Groff*, 600 U.S. at 471. Larger employers deal with larger amounts of requests, especially if they enact a mandate so sweeping and invasive of individual's ADA and Title VII rights. That Hawaiian received 568 accommodation requests from its ~7,000 employees (~8%) should be no surprise. 42 U.S.C. § 2000e(b).

12

But as of November 5, 2021, there were only 409 religious and 50 medical requests remaining.  PCS15.  So in reality, the number of accommodations sought was even less than what Title VII expects (and likely much lower by the beginning of January).  Hawaiian wants the Court to focus on the volume without paying attention to the relevant denominator.[2]

**C.      Hawaiian had no unique burdens that prohibited accommodation.**

Hawaiian asks the Court to take judicial notice of factors that are either wrong, overstated, or irrelevant.  First, Hawaiian mentions (at 5–6) the federal contractor mandate.  This is a red herring for at least three reasons:

(1)      EO 14042 was not in effect when Hawaiian placed Plaintiffs out of work, *Georgia v. Biden*, 574 F. Supp.3d 1337, 1357 (S.D. Ga. 2021), overruled in part *Georgia v. President of the U.S.*, 46 F.4th 1283, 1308 (11th Cir. 2022);

(2)      EO 14042 authorized reasonable accommodations, PRS9; and

(3)      J&J and Alaska Airlines serve as a damning examples of EO 14042 not forcing companies to coerce employees because of religious beliefs or ADA rights, PCS2, PCS3.

---

[2] Hawaiian also makes a claim (at 5) that it "implemented a return to work policy, where full-time remote work was no longer an option."  Such pronouncements hold no sway, however, in the face of federal employment law that requires accommodations where feasible—Hawaiian can enact policies so long as reasonable accommodations (such as remote work) are provided.  *See Groff*, 600 U.S. at 471.

Second, Hawaiian notes (at 6) the "State and local measures" requiring safety measures. While the Governor enacted Executive Orders regarding COVID-19 safety measures, they do not further Hawaiian's claims. The City and County of Honolulu—subject to the Governor's orders—provided reasonable accommodations for its employees (such as testing). PCS16. State and local measures did not prevent accommodation.

Hawaiian's third claim (at 6–7) involves "unique operational challenges" in granting accommodations. These hypothetical claims are untrue, as the record shows. Claiming Hawaiian had unique COVID-19 challenges because it is headquartered in Hawaii is absurd. Other airlines flew into Honolulu daily during the same timeframes without terminating or forcing leave on exempt employees. *See* PCS17. Those airlines faced the exact same difficulties as Hawaiian. After all, Hawaii is just as far from California for Alaska Airlines as it is for Hawaiian Airlines if a flight needed to be diverted. And Hawaiian's complaints (at 7) about pilot shortages were of its own making, suffering shortages from *vaccinated* pilots suffering from the Omicron variant while unvaccinated pilots were not allowed to fly. PCS5.

The fourth claim (at 8–10) is the original specious reason Hawaiian provided for denying all exemption requests it did not pretextually deny: that the "Transitional Period Testing Program" (TPTP) demonstrated significant burdens. But Hawaiian

14

never intended to reasonably accommodate employees.  PCS1, PRS Nos. 5, 26, 34.

While Hawaiian now claims testing was not viable long-term due to safety concerns,

that claim is unsubstantiated.   Testing was superior—as compared with old

vaccination—in protecting employees and Plaintiffs attempted to engage in a good

faith interactive process, indicating they would have accepted any reasonable

accommodation option Defendant had offered (*e.g.*, covering their own testing costs

if necessary).  *See* PRS Nos. 5, 6, 32, 34, 36, 37, 38, 39, 40.  The State of Hawaii

was conducting free testing (sponsored by Hawaiian, no less, so the company knew

it existed and helped pay for it).  *See* PRS22.  Hawaiians' arguments (at 8) about

testing during the Delta surge are another *ex post* liability avoidance scam.

Hawaiian next complains (at 9) about "operational disruptions" from

employees failing to comply with testing protocols.  But Plaintiffs followed the

testing regime.   PCS19.   To now argue, after telling this Court that the

accommodations must all be individualized, that Plaintiffs' accommodation claims

fail because *other* employees cannot comply is more than bold—it is disingenuous.

Yet even this is overstated since employees not complying with testing were not

entitled to an accommodation.  The TPTP excuse is just that: an excuse.  Hawaiian

said it couldn't use the TPTP program to accommodate because of what it "learned"

during the TPTP; the is that Hawaiian never meant to use the TPTP as an

accommodation.

15

Finally, Hawaiian offers (at 10–14) "facts" about Plaintiffs that were considered in denying their requests. These are fabricated and overstated.

**Ron Lum**—Captain Lum has a disability—coronary artery disease affecting his circulatory system—that prevented him from taking the COVID-19 vaccine. PCS18. But before his termination, Captain Lum tested positive for COVID-19 and recovered. *See* PCS18. Captain Lum also worked successfully during the pandemic while observing Hawaiian's testing protocols and relayed that he continue to do so as an accommodation option. PCS19. While Hawaiian complains (at 11) that Captain Lum could not socially distance while working, it ignores the evidence indicating testing was at least as safe as vaccination. *See* PRS Nos. 5, 6, 34, 37, 40.

Hawaiian does not dispute the facts of Captain Lum's disability or his ability to perform the essential functions of his job. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (en banc); 29 C.F.R. § 1630.2(j)(1)(i). The company did, however, reject his accommodation request because Dr. Chen told Hawaiian it could limit medical accommodations to "contraindications" to the vaccine listed by CDC. PCS9 (Exh. 14). No ADA analysis was undertaken.

**Sabrina Franks**—Ms. Franks was a Customer Service Agent and denied accommodation though she worked behind plexiglass with a mask, face shield, and gloves. See PRS31 (Exh. 34, ¶ 15). Her interactions with others consisted of checking credentials and swiping cards for lounge entry using a small opening in the

16

plexiglass. *See id.* Hawaiian seeks (at 11) to expand her duties to include customer-facing roles where she "could not comply with the core safety requirements." This is not Ms. Franks' experience or that testing was at least as safe as vaccination. *See* PRS Nos. 5, 6, 34, 37, 40.

**Erwin Young**—Mr. Young, a Lead Mechanic, worked successfully throughout the pandemic while observing Hawaiian's testing protocols. *See* PRS35. Mr. Young attempted to engage in the interactive process to identify potential accommodation options, which would include masking, continued testing, recognition of natural immunity, etc., but Hawaiian refused to engage. *Id.* (Exh. 35, ¶¶ 10–14). Had the company engaged, they would have identified a variety of viable accommodation options. *See* PRS Nos. 5, 6, 34, 37, 40.

**Puanani Badiang**— Ms. Badiang was a Corporate Trainer who had very limited in-person contact in her job role. In fact, Hawaiian ordered that she work remotely for periods during the pandemic (and so she could have done that as an accommodation). *See* PCS38. Additionally, before her termination, Ms. Badiang contracted and recovered from COVID-19. Exh. 36, ¶ 17. Ms. Badiang worked successfully during the pandemic while observing Hawaiian's testing protocols. PRS38. When Ms. Badiang attempted to engage in an interactive process so Hawaiian could evaluate her unique situation and accommodation options, but the

17

company did not engage, which would have revealed viable low cost and no-cost accommodation possibilities.  PRS39; *see also* PRS Nos. 5, 6, 34, 37, 40.

## STANDARD OF REVIEW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The initial burden is on the moving party to show that there is an absence of genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## SUMMARY OF ARGUMENT

Hawaiian is lying.  See PCS1, PRS Nos. 5, 26, 34.  Accommodations from the mandate were feasible and safe—otherwise, CDC, Alaska Airlines, and J&J operated unsafely (when these employers voluntarily canceled mandates because the Omicron variant was not stopping transmission).  Hawaiian just didn't want to do it.

Plaintiffs collected a mountain of evidence—including scientific evidence, from both experts and the CDC—bringing  Hawaiian's claims into dispute.  This removes the case from the realm of *Petersen* or *Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025).  Because there are materially disputed facts, the motion should be denied.

18

**ARGUMENT**

I.     **The *Petersen* Factors Do Not Show That Hawaiian Is Entitled To Judgment As A Matter Of Law.**

In justifying closing the TPTP, Hawaiian offered two reasons: "the cost and administrative burden." *See* PRS21, PCS10; *see also* Exh. 12 at 28:2–19; 35:12–17; 186:3–13; 187:5–11.  Hawaiian now looks to expand its excuses to include health and safety concerns.  Not only are these new excuses false, the evidence shows all of Hawaiian's "undue burdens" were *ex post* justifications for the marketing decision the head of HR thought the company could get away with.  *See* PRS5, PRS34.  This creates material disputed facts and forecloses summary judgment.  Even so, this case is hardly like *Petersen* (given the disputed facts) and not like *Carvalho* at all (given the difference in claims and defendant).

A.     **There were no health or safety costs in accommodating Plaintiffs.**

To support Hawaiian's new claim there was no accommodation available, Hawaiian asks the Court to blink reality and accept its skewed version of the "facts" based on the opinion of its medical expert whose specious opinions are the subject of a *Daubert* motion.  Hawaiian is counting on the Court accepting a strawman argument: that Plaintiffs are anti-vaxxers.  That is unsupported by the record.  There is a difference between arguing that the vaccines waned in effectiveness or were not (statistically) as reliable as testing at preventing the spread of COVID-19 versus arguing that the vaccines did nothing to slow the spread of the disease.  And all this

19

assumes, of course, that Hawaiian did not have its own ideological and discriminatory motives.

First, though Hawaiian claims its vaccine policies were driven by safety concerns, the record shows otherwise.  Plaintiffs do not contend steps should not have been taken regarding health and safety.  But Hawaiian's decisions were driven by marketing and "strong opinions" about employment law.  And the specifics of each case must be considered to know whether any burden on a company was undue.  That other airlines, vaccine manufacturers, the City and County of Honolulu, and CDC all found ways *not* to put unvaccinated employees out of work, it cannot be that Hawaiian had no choice.  PCS2, PCS3, PCS4, PCS16.

Hawaiian next claims reliance on CDC Guidance and the federal contractor mandate, but these do not address reasonable accommodations.  Even if EO 14042 was in effect when Hawaiian purged the unvaccinated, accommodations were available.  PRS9.  But Hawaiian was selective regarding what CDC guidance it followed, ignoring those indicating vaccines were not permanent solutions.  PRS6 (Exh. 17 at 76:18–25, 77:1–2).  And while Hawaiian complains (at 18) it had no "duty to conduct its own research," it had a duty to follow federal law, including consideration of all CDC Guidance and its own motives, before putting exempt employees out of work.

Finally, Hawaiian raises (at 19) a new argument that testing was not a reasonable alternative. The record evidence from depositions is contrary to this position, and the declaration on which it relies is suspect since Dr. Chen is unqualified to offer an opinion on this matter and offered conclusions conflicting with his own literature. ECF No. 203.[3]

A review of Hawaiian's new argument reveals its flaws. Plaintiffs' expert acknowledged that an individual who tested negative could contract COVID-19 after the test and be contagious before the next test. But what Hawaiian tries to hide is that someone vaccinated more than 3-5 months prior could contract COVID-19 after the vaccination and be contagious moving forward. PRS6. Even worse, the individual would not be testing after the vaccine waned. PCS6. This explains why Hawaiian's *vaccinated* employees were driving increasing case counts. PCS5.

The solution to this problem is booster shots if absolute immunity is the goal. But Hawaiian never implemented a booster requirement, PCS14, allowing thousands to continue working whose immunity had waned and were a greater threat to safety than unvaccinated employees who tested daily.

---

[3] Hawaiian acknowledged testing could be an accommodation for employees exempt under Title VII or the ADA. *See* PCS10. Hawaiian knew testing was a safe alternative to vaccination, which is why the company never questioned whether it could be used for that reason. *See* PRS34, PRS37, PRS40.

Moreover, Dr. Chen never analyzed "risks of transmission from accommodating" Hawaiian employees whose accommodation requests were denied, much less Plaintiffs' accommodation requests.  Exhibit 19, 133:14-25; 142:1-24.

**B.     The operational burdens Hawaiian offers are hypothetical and not undue under *Groff*.**

After conceding there was no cost if employees paid for testing, Willard Jackson argued the administrative burden still remained.  PRS20, PCS10.  The "administrative burden" included the "high degree of noncompliance" and "manual tracking for testing."  PCS10 (Exh. 12 at 35:12–17; 56:6–7).  This does not constitute an undue burden.

"[A]dministrative burdens" do not constitute undue hardship.  *Groff*, 600 U.S. at 471.  This is doubly true when the company chooses the job requirement for which accommodation is needed and the company chooses the accommodation system.  Allowing employees to test at free sites—as did exempt government employees— was far simpler.

Moreover, Hawaiian failed to produce any competent evidence there was any undue burden outside the say-so of its management team.  Hawaiian complains about non-compliance with the TPTP, but that argument fails for several reasons: (1)  Plaintiff did comply; (2) the noncompliance  focused at the beginning of the TPTP (when innocent mistakes are prevalent); (3) the noncompliance is an unwarranted blanket indictment against everyone in the program; and (4) Hawaiian

22

never meant the TPTP to be a permanent solution.  Additionally, Hawaiian had the authority to terminate employees for noncompliance and cannot claim any burden for "hold[ing] out of service" employees prior to termination since that is what Hawaiian did to those who refused the vaccine.

### C. There would have been no financial burden in accommodating Plaintiffs.

As noted above, any cost burden—assuming qualified as substantial under *Groff*—was eliminated by allowing employees to pay for their tests *or* allowing employees to test at *free* sites around the State—as did exempt government employees.  PRS22.  Hawaiian conceded this point.  Exh. 12 at 28:2–19; 35:12–17; 186:3–13.

### II. Hawaiian Cannot Overcome The ADA's Standard For Plaintiff Lum.

Hawaiian cannot dispute Ronald Lum's entitlement to relief under the ADA. Circulation falls within the "major life activities" limited by his medical condition. *See Bragdon v. Abbott*, 524 U.S. 624, 638 (1998).  The Rehabilitation Act covers the circulatory systems—45 C.F.R. § 84.3(j)(2)(i)—and the ADA provides at least as much protection as the Rehabilitation Act.  *Bragdon*, 524 U.S. at 632.

Lum's ADA claim requires he be able to perform the essential functions of his job "with or without reasonable accommodation."  42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m).  If he cannot do the job with an accommodation, he has no claim for failure to accommodate.  *See Sevcik v. Unlimited Const. Servs., Inc.*, 462

F. Supp. 2d 1140, 1147 (D. Haw. 2006).  Lum could perform his job and only required an accommodation because the vaccine was not recommended by his doctor as it may exacerbate his disability.  Because he could perform his job, only an accommodation from the vaccination was needed.[4]

Hawaiian is liable for a breakdown in the interactive process.  *See Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).  As part of an interactive process, Hawaiian must "explore [multiple] methods of accommodation."  *Id.* at 1138.  Hawaiian engaged in *no* interactive process or explored *multiple methods* of accommodation.  *See* Exh. 14.  Any number of accommodations were reasonable: periodic testing is one example, even if paid by Lum or conducted at sites approved for government employees.  PRS5, PRS6, PRS22.  Hawaiian's interactive failure triggers liability.  *See Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018); *Humphrey*, 239 F.3d at 1137.

Hawaiian also failed to accommodate Lum's disability.  Reasonable accommodation means employers make special adjustments.  *McAlindin*, 192 F.3d at 1237.  The failure to provide a reasonable accommodation is an act of discrimination if the employee is a "qualified individual," the employer receives

---

[4] Since reasonable accommodations are available here, Hawaiian is liable for failing to engage in the interactive process.  *Humphry v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).

24

notice, and reasonable accommodation is available. *Snapp*, 889 F.3d at 1095. Those elements are met with Lum and "undue hardship" does not even arise since he could perform the essential functions of his job without an accommodation. *Cripe v. City of San Jose*, 261 F.3d 877, 885 (9th Cir. 2001).

Not wanting to change its policy for employees needing ADA accommodations, Hawaiian played doctor itself and informed Plaintiffs their doctors were wrong because of CDC recommendations. PCS9. Setting aside Hawaiian's interjection into its employees' doctor/patient relationships, Hawaiian misread the CDC's Guidance, which merely provided examples of known contraindications of allergic reactions to vaccines. *See Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States: Contraindications and precautions*, https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html#Contraindications. It was not intended to override physician recommendations—nor could it. *See id. Appendix B*.

The "direct threat" defense is also unavailable to Hawaiian. A "direct threat" is "a *significant* risk to the health or safety of others that *cannot be eliminated by reasonable accommodation*." 42 U.S.C. § 12111(3) (emphases added). Allowing Lum to work under the TPTP added no additional risk (as Hawaiian conceded)—let

25

alone a *significant* risk.  And unvaccinated-but-tested individuals add no risk amidst thousands of unvaccinated/untested passengers daily flying on Hawaiian's planes.[5]

## CONCLUSION

Defendants' motion should be denied.

---

[5] Hawaiian never attempted to establish such a defense by doing any sort of analysis. *See* PCS12.

March 3, 2026                                  Respectfully submitted.

                                              William Harrison
                                              Hawaii Bar No. 2948
                                              **HARRISON LAW CENTER**
                                              1001 Bishop Street, Suite 2828
                                              Honolulu, HI  96813
                                              Telephone: (808) 809-7065
                                              william@harrisonlawcenter.com

                                              */s/ John C. Sullivan*
                                              John C. Sullivan*
                                              Austin Nimocks*
                                              Jace Yarbrough*
                                              **S|L LAW PLLC**
                                              610 Uptown Boulevard, Suite 2000
                                              Cedar Hill, TX  75104
                                              Telephone: (469) 523-1351
                                              Facsimile: (469) 613-0891
                                              john.sullivan@the-sl-lawfirm.com
                                              austin.nimocks@the-sl-lawfirm.com
                                              jace.yarbrough@the-sl-lawfirm.com

                                              Walker Moller*
                                              **SIRI | GLIMSTAD LLP**
                                              700 S. Flower St., Ste. 1000
                                              Los Angeles, CA 90017
                                              Telephone: (213) 376-3739
                                              wmoller@sirillp.com

                                              Christopher Wiest*
                                              **CHRIS WIEST, ATTY AT LAW, PLLC**
                                              50 E. Rivercenter Blvd., Ste. 1280
                                              Covington, KY 41011
                                              Telephone: (513) 257-1895
                                              chris@cwiestlaw.com

                                              *Counsel for Plaintiffs*
                                                * Admitted *pro hac vice*

27

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon Counsel of record

by filing same via CM/ECF, this 3rd day of March, 2026.

/s/ John C. Sullivan
John C. Sullivan

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the Local Rules of the District of

Hawaii as it was written in Times New Roman, 14-point font and contains 5608

words.

/s/ John C. Sullivan
John C. Sullivan